**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:26-cv-27409**

**NIKHIL PATEL, NIPUNA PATEL, NIMISH PATEL, JYOTI PATEL, HARSHAD S. PATEL, KHUSBU HARSHAD PATEL, MANDAKINI SUBHASH PATEL, JIT PATEL, KARISHMA GUPTA, KINJALKUMAR PATEL, BHUMIKA PATEL, DINESH THAKKER, SHASHIKALA THAKKER, SANJAY GUPTA, ANITA GUPTA, JAMES ANDREW HO, STEVEN SCHULMAN, ANKUR ANAND, GREGORY LOVALLO, ROBERT HARPER, HOWIE MANN, WILLIAM JOSEPH MORONEY, THEODORE CHESNER, STEVEN STILES, YATIN KHANNA, ALYA CAPITAL, LLC, AAYU HEALTH, LLC, ALFRED LEHOUILLIER individually and on behalf of his IRA and as trustee of THE ALFRED JOSEPH LEHOUILLIER LIVING TRUST, AYAN BHATTACHARYA, PAULA LYNN DARBY, STEPHEN MATTHEW DARBY, individually and on behalf of his IRA, ALEXANDER JOSEPH, HALEY JOSEPH, DEREK A KAHN, MANISH M PATEL, individually and on behalf of his IRA, HITESH R. DALAL, RAVI H. DALAL, EDLENE ZIMILES, ANDREI ZIMILES, individually and as trustee of the Andrei Zimiles Revocable Living Trust, BRIAN LEE, MICHAEL S. PATEL, HOWARD JEFFREY SIEGEL, KAREN SIEGEL, BLUE VOLLEY LLC, NARESH PARBHOO, individually and on behalf of his IRA and Roth IRA, DHARMISTA PARBHOO, on behalf of her IRA and Roth IRA, JITEN NARESH PARBHOO, KENTAN KUMAR PATEL, ROBERTO SADA, SHREYAS PATEL, LAKSHMANAN MADDY individually and as trustee for the MADDY FAMILY**

Consolidated Case Nos.:

1:26-cv-23998-DPG[1]
1:26-cv-25543-DPG
1:26-cv-25755-DPG
1:26-cv-26109-DPG
1:26-cv-26135-DPG
1:26-cv-26580-DPG
1:26-cv-26627-DPG
1:26-cv-26693-DPG
1:26-cv-26917-KMW
1:26-cv-26957-DPG
1:26-cv-26980-DPG
1:26-cv-27007-RKA
1:26-cv-27064-DPG
1:26-cv-27137-DPG
1:26-cv-27140-DPG
1:26-cv-27155-DPG
1:26-cv-27156-DPG

---

[1] The *Schulman* case is the only consolidated cases where Defendant Broad Street Global Management LLC ("BSG Management") is the Plaintiff. In *Schulman*, BSG Management asserts a single count for declaratory judgment against five of the Plaintiffs in this case. To address this issue, Plaintiffs assert a claim for declaratory judgment (Count I) in this Master Complaint to cover the same issue raised in *Schulman*.

**LIVING TRUST, BALMUKUND R PATEL, JAY K. PATEL, DHARITRI PATEL, JITEN PATEL individually and on behalf of his IRA and as trustee for the PATEL FAMILY TRUST, LAURA ANN GOFFREDO, TONI DARU, JERRY MARION, VINCENT LANTERI individually and on behalf of his IRA and as trustee for the ALTOIRA EMPIRE TRUST, LISA JOY SHAPIRO, individually and on behalf of her IRA, ASILS HOLDING LLC, J FIVE LLC, LAGOON INVESTMENT LLC, DAT ANESTHESIA LLC, RG PARTNERS, LLC, PRS PARTNERS, LLC, JOHN P. ARVIG, ALOK VARDYA individually and as trustee for the ALOK VARDYA LIVING TRUST, SAVITHRI DUDKIKAR, AJAY B. AJMERA and AARTHI K. AJMERA as trustees for the AJMERA TRUST,**

Plaintiffs,

v.

**BROAD STREET GLOBAL MANAGEMENT LLC, BROADSTREET, INC., DAVID FEINGOLD, STEVEN BALDASSARRA, JOSEPH BALDASSARRA and AKHIL MORADA,**

Defendants.

_____________________________________________/

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS....i

MASTER COMPLAINT....1

INTRODUCTION....1

PARTIES....7

PLAINTIFF....7

DEFENDANTS....23

JURISDICTION AND VENUE....25

FACTUAL BACKGROUND....26

I. BSG Fund's Formation, Operation, and Relation to the Broadstreet Enterprise....26

II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities....27

III. The Offering Documents....29

IV. The BSG Fund Series....31

a. Merchant Cash Advance ("MCA")....32

b. Real Estate Infrastructure Development ("Infrastructure")....33

c. Pre-IPO securities ("Pre-IPO")....33

d. Fixed income securities: ("Fixed Income")....34

e. Hotel Projects ("Hotel")....34

f. Custom Home Building ("Home Building")....35

g. Crystal Lagoons ("Crystal Lagoons") ....................................................35

h. Bitcoin Mining ("Bitcoin Mining") ........................................................35

i. Altcoin Mining ("Altcoin Mining")……………………………………..36

j. Self-Storage Facilities ("Self-Storage")…………………………………36

V. Broadstreet Knowingly Raised Money from Non-Accredited Investors ......37

VI. Feingold and the Baldassarras Have Taken More than $170 Million From the BSG Fund. ..............................................................................................38

VII. BSG Management and the Baldassarras Are Investment Advisers .............41

VIII. Feingold and the Baldassarras Control BSI and BSG Management .............42

IX. The July 2023 Compliance Acknowledgement Update ................................45

a. Broadstreet Collected 30% in Upfront Fees It Was Not Entitled To .......46

b. Broadstreet Acted as Plaintiff's Investment Advisor ...............................48

X. In 2025 Broadstreet Ran Out of Money to Continue Paying the Guaranteed Distributions. ..................................................................................................49

XI. Feingold's Role in the Scheme. .....................................................................50

XII. The Baldassarras' Role in the Scheme .........................................................52

XIII. Beginning in March 2025 Broadstreet Initiated Its Scheme to Get Rid of the Investors in the Altcoin Series. .....................................................................54

XIV. Beginning in May 2025 Investors Start Receiving Reports from the Court Appointed Monitor in the SEC Enforcement Action. ...................................60

XV. Monitor's First Status Report ......................................................................61

XVI. Monitor's Third Status Report.......................................................................62

XVII. Monitor's Fourth Status Report .....65

XVIII. Broadstreet Initiated Its Scheme to Get Rid of its Remaining Investors in November 2025 by Issuing a Redemption Notice .....68

a. Cover letter to Redemption Notice .....70

b. The Redemption Notice .....71

c. Item 1 the Additional Q&A Information Schedule .....74

d. Item 2 the Operating Agreement .....76

e. Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo .....77

XIX. Issues with Soulpower Acquisition Corp. and SPAC's in General .....81

XX. The December 3, 2025 Hearing in the SEC Enforcement Action .....83

XXI. Broadstreet Misrepresents the Amount of Investors that Chose Stock verses Cash .....83

XXII. Broadstreet's February 2, 2026 Investor Update .....84

XXIII. Broadstreet's February 25, 2026 Investor Update .....86

XXIV. Broadstreet's March 23, 2026 Investor Update .....87

XXV. Broadstreet's April 28, 2026 Investor Update .....87

XXVI. Monitor's Sixth Status Report .....88

XXVII. Broadstreet's May 14, 2026 Investor Update .....89

XXVIII. Broadstreet's May 22, 2026 Investor Update .....90

XXIX. Broadstreet's May 28, 2026 Investor Update .....92

XXX. Monitor's Seventh Status Report .....92

XXXI. Monitor's Eight Status Report ....................................................93

XXXII. Broadstreet's July 27, 2026 Investor Update ....................................94

PLAINTIFF SPECIFIC FACTS ....................................................95

Nikhil Patel and Nipuna Patel ....................................................95

Nimish Patel ....................................................96

Jyoti Patel, Harshad S. Patel and Khushbu Patel ....................................................98

Mandakini Patel ....................................................98

Jit Patel and Karishma Gupta ....................................................99

Kinjalkumar Patel and Bhumika Patel ....................................................99

Dinesh Thakker and Shashikala Thakker ....................................................100

Sanjay Gupta and Anita Gupta ....................................................101

James Andrew Ho ....................................................101

Steven Schulman ....................................................102

Ankur Anand ....................................................102

Gregory Lovallo ....................................................103

Robert T. Harper ....................................................104

Howie Mann ....................................................105

William Joseph Moroney ....................................................105

Theodore "Ted" Chesner ....................................................106

Steven Stiles ....................................................106

Yatkin Khanna and Alya Capital LLC ....................107
AAYU Health, LLC ....................108
Alfred Lehouillier ....................111
Ayan Bhattacharya ....................115
Paula Darby and Stephen Darby ....................117
Alexander Joseph and Haley Joseph ....................119
Derek A Kahn ....................121
Manish M. Patel ....................126
Hitesh R. Dalal and Ravi H. Dalal ....................127
Edlene Zimiles and Andrei Zimiles ....................128
Brian Lee ....................134
Michael Patel ....................136
Howard Jeffrey Siegel and Karen Siegel ....................138
Blue Volley LLC ....................139
Naresh Parbhoo, Dharmista Parbhoo and Jiten Parbhoo ....................151
Kentan Kumar Patel ....................152
Roberto Sada ....................153
Shreyas Patel ....................156
Lakshmanan Maddy ....................158
Balmukund R. Patel ....................159

Jay Patel and Dharitri Patel....159

Jiten. Patel....160

Laura Ann Goffredo....162

Toni Daru....165

Jerry Marion....167

Lisa Shapiro and Asils Holdings LLC....168

J Five LLC....171

Lagoon Investment LLC....175

DAT Anesthesia LLC....175

RG Partners, LLC and PRS Partners, LLC....181

John P. Arvig....181

Alok Vardya....182

Ajay Ajmera, Aarthi Ajmera and Savithri Dudkikar....184

CLAIMS FOR RELIEF....186

COUNT I – DECLARATORY JUDGMENT....186

COUNT II – BREACH OF CONTRACT (The Redemption Notice)....187

COUNT III – BREACH OF CONTRACT (The Operating Agreement)....191

COUNT IV – CONVERSION....193

COUNT V – CIVIL THEFT....196

COUNT VI – BREACH OF CONTRACT (Altcoin Participation Vote)....198

COUNT VII – FRAUD IN THE INDUCEMENT (Altcoin Participation Vote)..201

COUNT VIII – FRAUD ....................................................................................207

COUNT IX – BREACH OF FIDUCIARY DUTY ...............................................210

COUNT X – DISGORGEMENT .........................................................................213

COUNT XI – ACCOUNTING ............................................................................214

COUNT XII – CONTROL PERSON LIABILITY ...............................................215

COUNT XIII – CONSTRUCTIVE TRUST, EQUITABLE LIEN, AND/OR SEGREGATION OF SALE PROCEEDS ........................................................216

COUNT XIV – SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78J AND RULE 10B-5, 17 C.F.R. § 240.10B-5 ...................................................................217

COUNT XV – BREACH OF CONTRACT (Zimiles Side Letter Agreements)...221

PRAYER FOR RELIEF ......................................................................................222

JURY TRIAL DEMAND ....................................................................................224

CERTIFICATE OF SERVICE ............................................................................225

**MASTER COMPLAINT**

Pursuant to the Order issued at the Status Conference held on October 13, 2026 for several of the consolidated actions listed above (*see, e.g. Patel v. Broad Street Global Management LLC et al.*, No. 1:26-cv-26693-DPG (S.D. Fla) [DE 12]), Plaintiffs hereby respectfully file this consolidated Master Complaint seeking judgement against Broad Street Global Management LLC, Broadstreet, Inc., David Feingold, Steven Baldassarra, Joseph Baldassarra[2] and Akhil Morada (collectively "Defendants" or "Broadstreet"). Plaintiffs intend for this Master Complaint to achieve efficiency and economy by presenting certain common factual and legal allegations that generally pertain to Plaintiffs who filed individual actions. This Master Complaint consolidates the actions listed in the caption above. Plaintiffs plead all Counts in this Master Complaint in the broadest sense and pursuant to all applicable laws and choice of law principles, and is support thereof state:

**INTRODUCTION**

1) The Plaintiffs brings this lawsuit because Defendants, as agents of the Broad Street Global Fund, LLC ("BSG Fund"), are trying to steal **over half a billion dollars** from their own investors, including over **$42 million** Plaintiffs invested in the BSG Fund. They are attempting to do this while there is a pending SEC Enforcement Action against these same individuals and entities related to their involvement with the BSG Fund, *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-DPG (S.D. Fla.), and while there is a pending class action and derivative lawsuit against the Defendants and others for stealing over $150 million in funds and assets from three private

[2] The "**Baldassarras**" or the "**Baldassarras Brothers**" refer collectively to Steven Baldassarra and Joseph Baldassarra.

equity funds[3] and their investors, *Siriani et al. v. Feingold et al.*, Case No. 9:26-cv-80119-DPG (S.D. Fla.).

2) Broadstreet is trying to pull off this heist of investor assets by fraudulently misrepresenting the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors to accept as an "in-kind' redemption, while Broadstreet keeps the remaining assets (not involved in the "in-kind" transactions for ZSQR and SOUL) that were acquired with over $500 million of investor assets for itself. Broadstreet is keeping for itself, among other things: hotels, auto dealerships, self-storage facilities, 70% of the infrastructure projects, pre-IPOs, a custom home building company and a man-made beach/water park called Crystal Lagoons. Meanwhile its investors get stock that may be restricted for the next 3 ½ years in companies that have no track record that Broadstreet claims are worth $3.6 billion with absolutely nothing that supports that valuation. Broadstreet is doing all this after it has already paid itself over $300 million (or 30%) of the over $1 billion it raised from its investors in upfront fees for 5 years of services that it never provided. This is theft in broad daylight.

3) Broadstreet ran the BSG Fund in Ponzi-like fashion. Broadstreet raised money for the BSG Fund by guaranteeing investors interest payments, sometimes as high as 28% annually, that far exceed income being generated from any of the BSG Fund's investments. Broadstreet was able to maintain the distribution payments to its investors with a combination of paying old investors with new investor money and using money from the Merchant Cash Advance (MCA)

---

[3] The three private equity funds are the L3 Capital Income Fund, LLC, the L3 Capital Hotel Fund, LLC and the L3 Capital Special Opportunity Fund, LLC (collectively the "**L3 Funds**").

Series investment to pay distributions to all BSG Fund's investors regardless of the investment Series that the investor chose.

4) Broadstreet provided its investors with monthly investor reports that made it appear that the distributions they received came from the investment that the investor selected when that was not the case. These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money the investor allocated to a particular investment Series made it to that investment, when in fact 30% of the funds the investor provided for their selected investment was immediately stripped out as fees.

5) Broadstreet's house of cards came crashing down in 2025 when the Court in the SEC Enforcement Action issued its January 31, 2025 Order (and later Orders) preventing Broadstreet from raising new investor funds (DE 18 at 2, DE 88 at 1-2, DE 95 at 9 in *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-DPG (S.D. Fla.)) and the MCA Series was forced into a liquidation due to a money-in versus money-out loss of over $40 million from the excess withdrawals from that investment.

6) Realizing that it could no longer keep up the pretense that its investments were generating money, Broadstreet came up with a two-step plan to get rid of all the BSG Fund investors. First, Broadstreet convinced all its investors in its Altcoin Series to allow Broadstreet to transfer their interest in the Altcoin Series to a publicly traded company called Z Squared Inc. (ZSQR). Broadstreet did this in March 2025 by fraudulently representing to the Altcoin investors that if they agreed to move their investments to a publicly traded company, they would receive their investment back plus 100% or 50% of their investment (depending on when they invested) and by fraudulently representing to the Altcoin investors that Broadstreet and/or its affiliates would only be paid after the investors received their entire remuneration. Broadstreet had already paid

itself and its affiliates 30% of the money raised for the Altcoin Series and the Z Squared stock that Broadstreet provided to the Altcoin investors was not worth anything close to what Broadstreet represented, and thus Broadstreet fraudulently induced its Altcoin investors to agree to transfer their ownership interest in the Altcoin Series.

7) Next, to get rid of its remaining investors, in November 2025 Broadstreet notified its investors that the BSG Fund is going private and will no longer have any investors. On November 14, 2025, Broadstreet sent each of its investors a **binding** Redemption Notice giving each investor the right to choose how they wanted to exit the BSG Fund. Redemption Choice – A promised to pay investors the cash value of their capital account within 180 days. Redemption Choice – B promised to pay investors three times the amount of their capital account in the form of common stock in a Cayman Island special purpose acquisition company ("SPAC") called Soulpower Acquisition Corp. (SOUL) that may be restricted for the next 3 ½ years. In exchange for taking the BSG Fund investors SOUL would receive approximately 30% of the BSG Fund's infrastructure projects, and Broadstreet would keep all the remaining assets of the BSG Fund. The November 14, 2025 BSG Fund Redemption Notice ("Redemption Notice") is attached hereto as **Exhibit A**.

8) Most of the Plaintiffs selected Redemption Choice – A for cash in the Redemption Notice. However, on May 22, 2026, five days before the cash payment was due, Broadstreet informed its investors that it was no longer going to honor the cash redemption selection and instead it is going to redeem those investors with shares of SOUL as an "in-kind" redemption. Effectively taking away the right to control their own investment decisions that Broadstreet claims each investor has pursuant to the Compliance Acknowledgement Update each investor signed. A

compilation of Compliance Acknowledgement Updates that Broadstreet provided its investors is attached hereto as **Composite Exhibit B**.

9) The majority of the Plaintiffs invested in the BSG Fund with the goal of receiving a steady income stream. Having their funds locked up for 3 ½ years is not what they signed up for, nor is it what they were told they were investing in. Broadstreet is forcing the Plaintiffs, and presumably other BSG Fund investors, into unsuitable investments that are expressly contrary to the Plaintiffs' investment objectives and risk tolerance.

10) In an effort to stop Broadstreet from taking away their rights, the Plaintiffs retained the undersigned counsel to send BSG Fund a civil theft demand letter objecting to the alleged "in-kind" redemptions of their interests in the BSG Fund though the distribution of shares of ZSQR and SOUL. Plaintiffs' Civil Theft Demand Letters are attached hereto as **Composition Exhibit C**.

11) On June 8, 2026, Defendants filed a Complaint in *Broad Street Global Management v. Schulman et al.*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) to obtain a declaratory judgment that would force the Plaintiffs and presumably all BSG Fund investors to accept as an "in-kind' redemption restricted shares in Soulpower Acquisition Corp. If granted, it would not only prevent approximately **<u>$148 million</u>** in cash redemptions from flowing back to BSG Fund investors, but it would allow Broadstreet to steal over **<u>$500 million</u>** in assets acquired with its investors' funds while its investors get a potentially worthless piece of paper. Broadstreet must be stopped.

12) For these reasons and others, the Plaintiffs hereby file this lawsuit seeking, *inter alia*: (i) the return of misappropriated funds and assets; (ii) the return of unpaid distributions that the Plaintiffs are entitled to; (iii) rescission of the Plaintiffs' investment in the BSG Fund including the conversion of their ownership interest in the Altcoin Series into shares of Z Squared, Inc.; (iv)

injunctive relief preventing Defendants from selling or transferring away assets of any investment Series that the Plaintiffs have an ownership interest in; (v) dissolution of the BSG Fund; (vi) removal of the manager of the BSG Fund and appointment of a Receiver to oversee the liquidation of the BSG Fund; (vii) attorneys' fees where provided for by contract and statute; and (viii) when they are granted leave to do so, punitive damages against Defendants based on their outrageous conduct arising from their theft and diversion of hundreds of millions of dollars from innocent investors.

## PARTIES

### PLAINTIFFS

13) Nikhil Patel is a resident and citizen of the State of Tennessee.

14) Nipuna Patel is a resident and citizen of the State of Tennessee.

15) Nimish Patel is a resident and citizen of the State of North Carolina.

16) Jyoti Patel is a resident and citizen of the State of Alabama.

17) Harshad S. Patel is a resident and citizen of the State of Alabama.

18) Khusbu Harshad Patel is a resident and citizen of the State of Alabama.

19) Mandakini Subhash Patel is a resident and citizen of the State of Georgia.

20) Jit Patel is a resident and citizen of the State of Alabama.

21) Karishma Gupta is a resident and citizen of the State of Alabama.

22) Kinjalkumar Patel is a resident and citizen of the State of Texas.

23) Bhumika Patel is a resident and citizen of the State of Texas.

24) Dinesh Thakker is a resident and citizen of the State of Ohio.

25) Shashikala Thakker is a resident and citizen of the State of Ohio.

26) Sanjay Gupta is a resident and citizen of the State of Ohio.

27) Anita Gupta is a resident and citizen of the State of Ohio.

28) James Andrew Ho is a resident and citizen of the State of Nevada.

29) Steven Schulman is a resident and citizen of the State of New York.

30) Ankur Anand is a resident and citizen of the State of New York. Ankur Anand invested money in BSG Fund through his companies Beach Hotel Fund LLC and Broad Street SC Homes LLC. Beach Hotel Fund LLC is a New York limited liability company and Ankur Anand is its sole member. Broad Street SC Homes LLC is also a New York limited liability company, and all its members reside in and are citizens of the State of New York.

31) Gregory Lovallo is a resident and citizen of the State of New Jersey.

32) Robert Harper is a resident and citizen of the State of Texas.

33) Howie Mann is a resident and citizen of the State of New York.

34) William Joseph Moroney is a resident and citizen of the State of Arizona.

35) Theodore Chesner is a resident and citizen of the State of New Jersey.

36) Steven Stiles is a resident and citizen of the State of California.

37) Yatin Khanna is a resident and citizen of the State of New York.

38) Alya Capital LLC is a LLC incorporated in the State of New Jersey. Alya Capital LLC sole member is Yatin Khanna who is a resident and citizen of the State of New York. Alya Capital LLC invested money in the BSG Fund.

39) AAYU Health is a limited liability company incorporated in the State of Florida. AAYU Health's sole member is Abhishek Lunagariya who is a resident and citizen of the State of Florida.

40) Alfred Lehouillier is a resident and citizen of the State of North Carolina.

41) Ayan Bhattacharya is a resident and citizen of the State of New Jersey.

42) Paula Lynn Darby is a resident and citizen of the State of Florida.

43) Stephen Matthew Darby is a resident and citizen of the State of Florida.

44) Alexander Joseph is a resident and citizen of the State of Florida.

45) Haley Joseph is a resident and citizen of the State of Florida.

46) Derek A Kahn is a resident and citizen of the State of Tennessee.

47) Manish M Patel is a resident and citizen of the State of Florida.

48) Hitesh R. Dalal is a resident and citizen of the State of Texas.

49) Ravi H. Dalal is a resident and citizen of the State of Texas.

50) Edlene Zimiles a citizen and resident of the State of New York.

51) Andrei Zimiles a citizen and resident of the State of New York.

52) Brian Lee is a resident and citizen of the State of California.

53) Michael S. Patel is a resident and citizen of the State of Florida.

54) Howard Jeffrey Siegel is a resident and citizen of the State of New York.

55) Karen Siegel is a resident and citizen of the State of York.

56) Blue Volley LLC is a limited liability company incorporated in the State of Wyoming. Blue Volley LLC's sole member is Aaron Jonas who is a resident and citizen of the State of New York.

57) Naresh Parbhoo is a resident and citizen of the State of South Carolina.

58) Dharmista Parbhoo is a resident and citizen of the State of South Carolina.

59) Jiten Naresh Parbhoo is a resident and citizen of the State of North Carolina.

60) Kentan Kumar Patel is a resident and citizen of the State of South Carolina.

61) Roberto Sada is a resident and citizen of the State of Texas.

62) Shreyas Patel is a resident and citizen of the State of Arizona.

63) Lakshmanan Maddy, the trustee for the Maddy Family Living Trust, is a resident and citizen of the State of Arizona.

64) Balmukund R. Patel is a resident and citizen of the State of Arizona.

65) Jay K. Patel is a resident and citizen of the State of Arizona.

66) Dharitri Patel is a resident and citizen of the State of Arizona.

67) Jiten Patel, the trustee for the Patel Family Trust, is a resident and citizen of the State of Texas.

68) Laura Ann Goffredo is a resident and citizen of the State of New Jersey.

69) Toni Daru is a resident and citizen of the State of Florida.

70) Jerry Marion is a resident and citizen of the State of California.

71) Vincent Lanteri, the trustee for the Altoira Empire Trust, is a resident and citizen of the State of New Jersey.

72) Lisa Joy Shapiro is a resident and citizen of the State of Florida.

73) Asils Holdings LLC is a limited liability company incorporated in the State of Florida. Asils Holdings LLC's sole member is Lisa Joy Shapiro who is a resident and citizen of the State of Florida.

74) J Five LLC is a Pennsylvania limited liability company, and all its members are residents and citizens of the State of Pennsylvania.

75) Lagoon Investment LLC is a Wyoming limited liability company, and all its members are residents and citizens of the States of South Carolina, North Carolina and Florida.

76) DAT Anesthesia LLC is a Georgia limited liability company, and all its members are residents and citizens of the State of Florida.

77) RG Partners LLC is a Texas limited liability company, and all its members are residents and citizens of the State of Texas.

78) PRS Partners LLC is a Texas limited liability company, and all its members are residents and citizens of the State of Texas.

79) John P. Arvig is a resident and citizen of the State of Minnesota.

80) Alok Vardya is a resident and citizen of the State of Minnesota.

81) Savithri Dudkikar is a resident and citizen of the State of Minnesota.

82) Ajay B. Ajmera is a resident and citizen of the State of Minnesota.

83) Aarthi K. Ajmera is a resident and citizen of the State of Minnesota.

84) The Plaintiffs' investments in the BSG Fund are as follows:

| Investor Name | Investment | Equity Balance | Initial Contribution |
|---|---|---|---|
| **Nikhil R. & Nipuna Patel** | BSG15 | [redacted] | 6/1/2023 |
| | Broadstreet Tennessee | [redacted] | 6/21/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 5/31/2023 |
| | Land Banking | [redacted] | 3/30/2023 |
| | Self-Storage - 10% Annual Return/ Profit | [redacted] | 2/27/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/14/2023 |
| | DR Horton/Infrastructure #5 | [redacted] | 4/14/2022 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 2/24/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Nimish R Patel (IRA)** | BSG15 | [redacted] | 2/15/2023 |
| | Broadstreet Tennessee | [redacted] | 8/1/2024 |
| | DR Horton/Infrastructure #5 | [redacted] | 1/23/2023 |
| | **Investor Total:** | [redacted] | |

| | | | |
|---|---|---|---|
| **Jyoti H. Patel (Roth IRA)** | BSG15 | [redacted] | 3/15/2024 |
| | IF9 Infrastructure - 16% Annual Return | | 1/2/2024 |
| | **Investor Total:** | | |
| | | | |
| **Jyoti H. Patel** | BSG15 | | 10/15/2023 |
| | Broadstreet Tennessee | | 6/21/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 5/12/2023 |
| | Crystal Lagoons - 10% Annual Return/ Profit | | 10/7/2022 |
| | Data#2 - 19% Annual Return | | 11/15/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | | 11/15/2024 |
| | IF9 Infrastructure - 16% Annual Return | | 5/31/2023 |
| | Self-Storage - 10% Annual Return/ Profit | | 7/17/2023 |
| | **Investor Total:** | | |
| | | | |
| **Harshad S Patel** | BSGF-2 (from QSBS) | | 4/4/2025 |
| | Broadstreet Tennessee (from QSBS) | | 4/4/2025 |
| | **Investor Total:** | | |
| | | | |
| **Khusbu Harshad Patel** | Crypto/Altcoin Mining - 28% Annual Return | | 10/18/2023 |
| | Data#2 - 19% Annual Return | | 11/13/2024 |
| | IF9 Infrastructure - 16% Annual Return | | 7/19/2023 |
| | **Investor Total:** | | |
| | | | |
| **Mandakini Subhash Patel** | IF9 Infrastructure - 16% Annual Return | | 5/31/2023 |
| | **Investor Total:** | | |
| | | | |
| **Jit H. Patel** | BSG PTT | | 7/1/2025 |
| | BSG15 | | 3/15/2024 |
| | Broadstreet Tennessee | | 6/21/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 10/19/2023 |

| | | | |
|---|---|---|---|
| | Data#2 - 19% Annual Return | [redacted] | 11/14/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 12/14/2023 |
| | Self-Storage - Soft Costs 50% Deduction | [redacted] | 12/27/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Karishma Gupta (Roth IRA)** | BSG15 | [redacted] | 6/1/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 3/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Kinjalkumar Patel and Bhumika Patel** | BSG PTT | [redacted] | 7/14/2025 |
| | BSG15 | [redacted] | 11/15/2023 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 11/15/2024 |
| | Broadstreet Tennessee | [redacted] | 7/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/15/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Dinesh & Shashikala Thakker** | DR Horton/Infrastructure #5 | [redacted] | 4/14/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Sanjay & Anita Gupta** | IF9 Infrastructure - 16% Annual Return | [redacted] | 12/12/2023 |
| | BSG PTT | [redacted] | 6/30/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 4/5/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **James Andrew Ho** | BSG15 | [redacted] | 5/15/2024 |
| | Broadstreet Tennessee | [redacted] | 6/11/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 11/15/2023 |

| | | | |
|---|---|---|---|
| | Data#1 - 19% Annual Return | [redacted] | 10/22/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | | 2/20/2024 |
| | **Investor Total:** | | |
| | | | |
| **Steven Schulman** | BSG15 | | 4/15/2023 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 3/7/2024 |
| | DR Horton/Infrastructure #5 | | 9/29/2022 |
| | **Investor Total:** | | |
| | | | |
| **Beach Hotel Fund, LLC (Ankur Anand)** | Daytona Beach AC Retreats | | 5/14/2022 |
| | **Investor Total:** | | |
| | | | |
| **Broad Street SC Homes LLC (Ankur Anand)** | IF8 Infrastructure - 14.63% Annual Return | | 11/14/2024 |
| | **Investor Total:** | | |
| | | | |
| **Gregory Lovallo** | North Charleston Element | | 2/2/2022 |
| | Triller | | 2/26/2021 |
| | **Investor Total:** | | |
| | | | |
| **Robert T. Harper** | IF8 Infrastructure - 14.63% Annual Return | | 3/21/2024 |
| | **Investor Total:** | | |
| | | | |
| **Howie Mann** | DR Horton/Infrastructure #5 | | 12/21/2022 |
| | **Investor Total:** | | |
| | | | |
| **WJM Trust (Willima J Moroney)** | Weatherstone | | 5/24/2022 |
| | **Investor Total:** | | |
| | | | |
| **Theodore Chesner** | Daytona Beach AC Retreats | | 4/29/2022 |

| | | | |
|---|---|---|---|
| | **Investor Total:** | [redacted] | |
| | | | |
| **Steven Harry Stiles** | BSG PTT | | 7/2/2025 |
| | BSG15 | | 10/15/2024 |
| | Broadstreet Tennessee | | 6/14/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 5/1/2024 |
| | **Investor Total:** | | |
| | | | |
| **Steven & Estelle Stiles** | BSG15 | | 5/14/2024 |
| | **Investor Total:** | | |
| | | | |
| **Yatin Khanna** | BSG15 | | 8/13/2019 |
| | Ripple | | 10/19/2018 |
| | Virgin Hyperloop | | 8/15/2019 |
| | **Investor Total:** | | |
| | | | |
| **Alya Capital LLC** | Broadstreet Tennessee | | 1/14/2025 |
| | Crystal Lagoons - 10% Annual Return/ Profit | | 8/30/2022 |
| | Data#1 - 19% Annual Return | | 1/31/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 3/31/2022 |
| | **Investor Total:** | | |
| | | | |
| **AAYU Health, LLC** | Crypto/Altcoin Mining - 28% Annual Return | | 5/15/2023 |
| | IF9 Infrastructure - 16% Annual Return | | 11/29/2023 |
| | Broadstreet Tennessee | | 6/26/2024 |
| | **Investor Total:** | | |
| | | | |
| **Alfred Lehouillier** | Crypto/Altcoin Mining - 28% Annual Return | | 12/14/2023 |
| | BSG15 | | 3/6/2024 |
| | Self-Storage - 10% Annual Return/ Profit | | 3/12/2024 |
| | Broadstreet Tennessee | | 6/13/2024 |
| | Data#1 - 19% Annual Return | | 11/12/2024 |
| | **Investor Total:** | | |

| | | | |
|---|---|---|---|
| | | | |
| **Ayan Bhattacharya** | BSG 15 | [redacted] | 1/15/2025 |
| | Broadstreet Tennessee | | 1/13/2025 |
| | Data#1 - 19% Annual Return | | 3/12/2024 |
| | IF8 Infrastructure – 14.63% Annual Return | | 10/8/2024 |
| | Self-Storage – Soft Costs 50% Deduction | | 12/30/2024 |
| | **Investor Total:** | | |
| | | | |
| **Stephen Matthew Darby & Paula Lynn Darby** | BSG15 | | 12/11/2024 |
| | **Investor Total:** | | |
| | | | |
| **Directed Trust Company FBO Stephen M. Darby (IRA)** | BSG15 | | 5/15/2024 |
| | Broadstreet Tennessee | | 7/1/2024 |
| | Data#1 – 19% Annual Return | | 1/31/2025 |
| | IF8 Infrastructure – 14.63% Annual Return | | 2/1/2024 |
| | Self-Storage – 10% Annual Return/Profit | | 7/1/2024 |
| | **Investor Total:** | | |
| | | | |
| **Alexander & Haley Joseph** | Crypto/Altcoin Mining - 28% Annual Return | | 6/3/2024 |
| | Broadstreet Tennessee | | 7/31/2024 |
| | **Investor Total:** | | |
| | | | |
| **Derek A Kahn** | Crypto/Altcoin Mining - 28% Annual Return | | 12/2/2024 |
| | **Investor Total:** | | |
| | | | |
| **Manish M Patel** | Data#1 - 19% Annual Return | | 10/22/2024 |
| | Fixed Income Fund - 7% Annual Return | | 3/13/2018 |
| | **Investor Total:** | | |

| | | | |
|---|---|---|---|
| | | [redacted] | |
| **Feingold Morgan Sanchez Trust Cust for Manish M. Patel (IRA)** | BSG15 | [redacted] | 11/15/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 8/2/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 8/2/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Hitesh R. & Ravi H. Dalal** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 10/10/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Edlene Zimiles** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 4/15/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Andrei Zimiles Revocable Living Trust** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 4/15/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Brian Lee** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 8/21/2024 |
| | Infrastructure Reinvest - 14.63% Annual Return | [redacted] | 12/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Michael S. Patel** | BSG15 | [redacted] | 9/11/2023 |
| | Data#1 - 19% Annual Return | [redacted] | 11/13/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 3/6/2023 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 11/13/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Howard Jeffrey Siegel** | BSG PTT | [redacted] | |

| | | | |
|---|---|---|---|
| **& Karen Siegel** | | [redacted] | |
| | Broadstreet Tennessee | [redacted] | |
| | IF8 Infrastructure – 14.63% Annual Return | [redacted] | |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Blue Volley LLC** | BSG15 | [redacted] | 1/8/2025 |
| | Broadstreet Tennessee | [redacted] | 6/21/2024 |
| | Crystal Lagoons - 10% Annual Return/ Profit | [redacted] | 2/24/2023 |
| | Data#1 - 19% Annual Return | [redacted] | 11/13/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/29/2024 |
| | Alt Solutions/BSG ALTS structure | [redacted] | 8/2025 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Naresh B. Parbhoo** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 9/1/2023 |
| | Land Banking | [redacted] | 4/9/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 8/28/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Naresh Parbhoo (IRA)** | BSG15 | [redacted] | 6/15/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 4/17/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Naresh Parbhoo (Roth IRA)** | BSG15 | [redacted] | 6/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 3/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Dharmista Parbhoo (IRA)** | BSG15 | [redacted] | 7/1/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 4/1/2024 |
| | **Investor Total:** | [redacted] | |

| | | | |
|---|---|---|---|
| | | [redacted] | |
| **Dharmista Parbhoo (Roth IRA)** | BSG15 | | 6/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 3/1/2024 |
| | **Investor Total:** | | |
| | | | |
| **Jiten Naresh Parbhoo** | BSG15 | | 8/15/2023 |
| | Broadstreet Tennessee | | 6/14/2024 |
| | Crystal Lagoons - 10% Annual Return/ Profit | | 6/26/2023 |
| | IF8 Infrastructure - 14.63% Annual Return | | 5/12/2023 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 5/12/2023 |
| | **Investor Total:** | | |
| | | | |
| **Kentan Kumar Patel** | Broadstreet Tennessee | | 12/20/2024 |
| | **Investor Total:** | | |
| | | | |
| **Roberto Sada** | BSG PTT | | 1/2/2025 |
| | Land Banking | | 8/16/2024 |
| | **Investor Total:** | | |
| | | | |
| **Shreyas & Pinalven Patel** | BSG15 | | 2/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 10/30/2023 |
| | **Investor Total:** | | |
| | | | |
| **Maddy Family Living Trust** | BSG15 | | 6/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 2/28/2024 |
| | **Investor Total:** | | |
| | | | |
| **Balmukund R Patel** | Broadstreet Tennessee | | 7/29/2024 |

| | | | |
|---|---|---|---|
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/31/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Jay K. and Dharitri Patel** | BSG15 | [redacted] | 5/15/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 1/29/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 3/25/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Directed Trust Company FBO Jiten Patel (IRA)** | BSG15 | [redacted] | 3/1/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 11/22/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Patel Family Trust** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 10/31/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Laura Ann Goffredo** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 7/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Toni Daru** | DR Horton/Infrastructure #5 | [redacted] | 11/18/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Jerry Marion** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 8/14/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 11/26/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Vincent Lanteri** | Triller | [redacted] | 4/1/2021 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Directed Trust Company FBO** | BSG15 | [redacted] | 5/15/2024 |

| | | | |
|---|---|---|---|
| **Vincent Lanteri (IRA)** | | [redacted] | |
| | Crypto/Altcoin Mining - 28% Annual Return | | 6/1/2023 |
| | **Investor Total:** | | |
| | | | |
| **Altoira Empire Trust** | North Charleston Element | | 12/20/2021 |
| | **Investor Total:** | | |
| | | | |
| **Lisa Joy Shapiro** | Crypto/Altcoin Mining - 28% Annual Return | | 6/7/2024 |
| | **Investor Total:** | | |
| | | | |
| **Directed Trust Company FBO Lisa Shapiro IRA** | BSG15 | | 2/15/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 11/12/2024 |
| | **Investor Total:** | | |
| | | | |
| **Asils Holdings LLC** | Crypto/Altcoin Mining - 28% Annual Return | | 11/13/2024 |
| | **Investor Total:** | | |
| | | | |
| **J Five LLC** | Broadstreet Tennessee | | 1/13/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 11/29/2024 |
| | **Investor Total:** | | |
| | | | |
| **Lagoon Investment LLC** | Crystal Lagoons - 10% Annual Return/ Profit | | 11/1/2022 |
| | **Investor Total:** | | |
| | | | |
| **DAT Anesthesia LLC** | Data#1 - 19% Annual Return | | 1/31/2025 |
| | IF8 Infrastructure - 14.63% Annual Return | | 1/15/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 11/26/2024 |
| | **Investor Total:** | | |

| | | | |
|---|---|---|---|
| | | [redacted] | |
| **RG Partners LLC** | IF8 Infrastructure - 14.63% Annual Return | | 12/29/2023 |
| | Land Banking | | 4/12/2024 |
| | Self-Storage - 10% Annual Return/ Profit | | 7/14/2023 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 2/15/2024 |
| | **Investor Total:** | | |
| | | | |
| **PRS Partners LLC** | IF8 Infrastructure - 14.63% Annual Return | | 6/14/2024 |
| | **Investor Total:** | | |
| | | | |
| **John P Arvig** | IF8 Infrastructure - 14.63% Annual Return | | 11/15/2024 |
| | **Investor Total:** | | |
| | | | |
| **Alok Vardya Living Trust dated May 19th, 2005** | DR Horton/Infrastructure #5 | | 11/25/2024 |
| | Data#1 - 19% Annual Return | | 11/14/2022 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 5/30/2023 |
| | **Investor Total:** | | |
| | | | |
| **Alok Vardya 401(K) Plan** | Broadstreet Tennessee | | 6/26/2024 |
| | **Investor Total:** | | |
| | | | |
| **Savithri Dudkikar** | IF8 Infrastructure - 14.63% Annual Return | | 1/10/2025 |
| | **Investor Total:** | | |
| | | | |
| **Ajay B. and Aarthi K. Ajmera Trust** | BSG15 | | 2/14/2024 |
| | Broadstreet Tennessee | | 6/26/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | | 2/14/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | | 2/14/2024 |

| | | | |
|---|---|---|---|
| | Self-Storage - 10% Annual Return/ Profit | [redacted] | 8/14/2023 |
| | **Investor Total:** | | |
| | | | |
| **COMBINED TOTAL** | | **$42,202,726.64** | |

**DEFENDANTS**

85) David J. Feingold, Esq. ("Feingold") is a citizen of the State of Florida who resides in the Southern District of Florida. Feingold is also the Chief Executive Officer ("CEO") of BSI and a control person over BSI and BSG Management. The Baldassarras have delegated the management of many, including the largest, business lines funded by BSG Fund, including real estate infrastructure projects and merchant cash advance ("MCA portfolios"), to Feingold. Feingold is an attorney licensed in the state of Florida. In 1999, the Commission entered an order against Feingold to cease and desist from committing or causing any violations of Section 5 of the Securities Act and Rule 10b-13 of the Exchange Act. In 2011, Feingold and two co-defendants paid $18.8 million to settle—without admitting—charges by the Federal Trade Commission that the First Universal mortgage modification business deceived indebted homeowners by charging thousands of dollars in upfront fees while doing little to relieve the customers' debts. The Internal Revenue Service has also assessed fraud penalties against Feingold alleging that he dodged taxes on millions he got from Broadstreet and other private equity funds.

86) Joseph Baldassarra ("J.Baldassarra") is a citizen and resident of the State of South Carolina. He is also a managing member of BSG Management, the President of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Defendants BSG Management and Steven Baldassarra; soliciting investors for BSG Fund; and supervising BSI's internal sales staff who, among other things, solicit

investors for BSG Fund. Joseph Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

87) Steven Baldassarra ("S.Baldassarra") is a citizen of the State of South Carolina. He is also a managing member of BSG Management, the chief operating officer ("COO") of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Defendants BSG Management and Joseph Baldassarra; and performing back-office functions for BSG Fund, including overseeing BSG Fund's and BSG Management's bank accounts and its accounting staff. Steven Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

88) Akhil Morada ("Morada") resides in Puerto Rico. For purposes of this lawsuit based on diversity of citizenship, Morada is a citizen and resident of Puerto Rico. Morada is also a Senior Managing Director of Broadstreet, Inc. He was involved in the solicitation and sale of investments in the BSG Fund to several of the Plaintiff and has been their main point of contact regarding their investments in the BSG Fund. Morada was associated with several registered broker-dealers between 2004 and 2016 and has eight customer disputes and one regulatory event listed on his FINRA BrokerCheck report attached hereto as **Exhibit D**. On August 21, 2018, Mr. Morada was suspended from being a FINRA registered broker for 12 months for allegedly engaging in quantitively unsuitable trading in the accounts of customers, and at times exercising discretion without prior written authorization in those customers' accounts

89) Broad Street Global Management LLC ("BSG Management") is a South Carolina LLC that was formed on or about October 2018. BSG Management is the designated manager of BSG Fund. BSG Management is owned and managed by Steven Baldassarras and Joseph Baldassarras. Steven Baldassarras and Joseph Baldassarras are the only members of BSG

Management and both of them are citizens and residents of the State of South Carolina. BSG Management (through the Baldassarras) acts as an investment adviser with respect to BSG Fund. BSG Management has received approximately $9 million directly from investors and more than $871 million from the bank accounts of BSG Fund and BSG Series CM, LLC's ("BSG CM Series").

90) Broad Street Inc. ("BSI") is a Delaware corporation with its principal place of business in Greenville, South Carolina. It was formed on or about June 2022. BSI's voting shares are owned in equal parts by the Baldassarras and David J. Feingold ("Feingold") and unanimity by all three is required for shareholder decisions. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI. Feingold and the Baldassarras control BSI. BSI has received more than $200,000, an interest in a registered broker-dealer, and ownership over certain real estate assets.

## JURISDICTION AND VENUE

91) This Court has jurisdiction over the subject matter of this action pursuant to Section 10(b) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78j and Rule 10b-5, codified at 17 C.F.R. section 240.10b-5. Thus, this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and the principles of ancillary or supplemental jurisdiction under Title 28, United States Code, Section 1367. 20).

92) This Court has personal jurisdiction over Defendants through Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District.

93) Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### I. BSG Fund's Formation, Operation, and Relation to the Broadstreet Enterprise.

94) BSG Fund was formed in September 2020 to operate as a private equity fund. In the fourth quarter of 2020, BSG Fund purchased substantially all the investment assets of Broad Street Global Fund SCSp, a Luxembourg entity, which was a predecessor fund to the BSG Fund.

95) BSG Fund's offering materials claim that it is divided into a number of Series, each of which focuses on a separate and distinct investment opportunity.

96) BSG Fund is managed by BSG Management, which has authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra (collectively the "Baldassarras") are the managing members of BSG Management, and BSG Management acts through the Baldassarras. Since September 2020, BSG Management has been controlled by the Baldassarras and since June 2022, as alleged further below, Feingold has also controlled BSG Management.

97) BSG Management is not registered as an investment adviser with the SEC, although as alleged below it acts as an investment adviser with respect to BSG Fund.

98) In or around June 2022, Feingold formed and became the CEO of BSI. Joseph Baldassarra is the President of BSI and Steven Baldassarra is the Chief Operating Officer of BSI. The sales staff that solicits investors for BSG Fund are BSI personnel. BSI is listed as the owner on some of the real estate assets acquired with BSG Fund's funds. BSI oversees assets in which BSG Fund has invested.

99) From at least July 2022 until the present, BSI's publicly-available website contains information about certain of the Broad Street Entities, and illustrates the related nature of the Broad

Street Entities and the BSG Fund Series. For example, from approximately July 2022 through approximately March 2024, the following diagram was included on BSI's website:




## II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities.

100) From October 1, 2020 through the present (the "Relevant Period"), investors have deposited more than $1 billion in the bank accounts of BSG Fund, BSG Series CM, and BSG Management. Of this amount, investors deposited approximately $868 million in the BSG Fund's bank accounts, approximately $199 million in BSG CM Series' bank accounts, and approximately $9 million in BSG Management's bank accounts.

101) From the more than $1 billion that investors deposited in the above-mentioned bank accounts, approximately $880 million has been transferred to (or directly deposited) in BSG Management's bank accounts and extensively commingled. The chart below demonstrates the flow of investor funds to BSG Management:




102) During the Relevant Period, BSG Management has continuously solicited money from, and offered and sold BSG Fund LLC units in a variety of Series to investors.

103) From approximately October 1, 2020 until approximately May 2022, BSG Management used an internal sales staff to offer and sell BSG Fund LLC units. The internal sales staff was used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

104) From approximately June 2022, until at least October 31, 2024, BSG Management and BSI have used an internal sales staff comprised of BSI personnel to offer and sell BSG Fund LLC units. BSI's staff is used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

105) In addition, since at least August 2022, BSG Management has utilized registered broker-dealers to sell the offering pursuant to placement agreements.

106) As a result of the solicitation efforts undertaken by BSG Management, BSI, and associated broker-dealers, BSG Management has raised more than $1 billion on behalf of the BSG Fund from over a thousand passive investors. These investors are located across the United States, including in this district, and abroad.

107) Investors in BSG Fund committed funds in cash or via wire transfer to participate in an investment opportunity. They were promised significant returns, which were to be generated from passive business opportunities described in each of the Series' pitch decks.

108) BSG Fund's numerous investors have no ability to influence the management of BSG Fund under its operating agreement and are wholly dependent on the efforts of the Baldassarras and Feingold to select and oversee investments to generate their expected returns.

109) BSG Fund has no way to act independently from BSG Management.

**III. The Offering Documents.**

110) BSG Management typically provides prospective investors with materials that detail the terms of the potential investment, including a subscription agreement, operating agreement, private placement memorandum, and supplemental materials pertaining to specific BSG Fund Series, including Supplemental Series Schedules and pitch decks (the "Offering Documents").

111) BSG Fund's Subscription Agreement reflects that each investor received BSG Fund's operating agreement and private placement memorandum prior to investing.

112) BSG Fund has had at least three operating agreements: a Limited Liability Company Agreement dated as of September 14, 2020 ("Original Operating Agreement"); an Amended and Restated Limited Liability Company Agreement dated as of May 26, 2022 ("First Amended Operating Agreement"); and an Amended and Restated Limited Liability Company

Agreement dated as of September 2023 ("Second Amended Operating Agreement") (collectively the "Operating Agreement").

113) These operating agreements set forth certain terms concerning the operation of the BSG Fund.

114) One version of the BSG Fund Confidential Private Placement Memorandum that has been provided to investors is dated October 2020 ("October 2020 PPM").

115) The private placement memoranda set forth the "terms and conditions of the private offering by [BSG Management] of the membership interests" to investors in the BSG Fund.

116) Both the operating agreements and the private placement memoranda state that supplemental materials about each Series will be made available to investors and to the BSG Fund. For example, the First Amended Operating Agreement states that there are "Series Schedule[s]" that "cover terms specific to a particular Series." Similarly, the October 2020 PPM states that "[a] supplement to the [private placement memorandum] … in respect of each Series will be created and distributed to prospective investors in such Series."

117) BSG Management also gave prospective investors access to materials in its internet data room, which, among other things, and at different times, has contained Supplemental Series Schedules with additional terms and conditions of the offering and pitch decks explaining the various investment opportunities.

118) Specifically, pitch decks exist for numerous of BSG Fund's Series described below. Certain Series have multiple pitch decks or pitch decks that were updated over time.

119) Feingold reviewed the Offering Documents, including the PPM and the Operating Agreements, before they were made available to potential and actual investors.

120) The BSG Fund Offering Documents were reviewed and approved by the Baldassarras before they were made available to potential and actual investors.

121) Further, BSG Fund, as a legal entity, acts through its designated manager, BSG Management, and BSG Management, as a legal entity, acts through its co-managers, Joseph Baldassarra and Steven Baldassarra. As such, BSG Management and the Baldassarras each have the ultimate authority with respect to the content of any written statements in the BSG Fund Offering Documents that were provided to investors.

122) In addition to the Offering Documents, BSG Management communicates with investors in other ways, including through BSI's website and periodic investor updates, which were issued monthly or quarterly.

123) Periodic investor updates and BSI's website were reviewed and approved by the Baldassarras before they were made available to investors.

**IV. The BSG Fund Series.**

124) As alleged above, BSG Fund's Offering Documents claim that it is divided into separate Series, each of which focuses on a different investment opportunity and has different risks. For example, the October 2020 PPM states that BSG Fund "has been established to pursue multiple investment objectives and investment strategies in different Series so investors can select the investment objectives and investment strategies to which the investor wishes to have exposure." It further states that "[a] Series may vary from other Series due to, among other things, investment strategy and objectives, risk and return profile, use of leverage, exposure to particular strategies and other factors."

125) BSG Fund investors must, at the time of purchase, select their LLC units within a particular Series.

126) During the Relevant Period, BSG Fund investors have been offered the opportunity to invest in numerous Series, including the ones listed below. BSG Fund has sometimes used the term Series and sub-Series interchangeably, with sub-Series generally being a further differentiation of a particular Series (for example, as discussed below, where there are different returns offered in MCA investments or there are investments in different pre-IPO companies, those are referred to as sub-Series).

**a. Merchant Cash Advance ("MCA"):**

127) The MCA Series contains at least three sub-Series that claim to use investor funds to invest in portfolios of MCAs, which are transactions in which a small business can receive quick funding by selling its future receivables at a steep discount. The advance is repaid by debiting a percentage of the business's daily sales.

128) The Offering Materials describe risks related to MCA investments. For example, an August 2022 MCA pitch deck explains that there is "industry risk, such as defaults and potential future regulation," and that "merchants are considered higher risk." The pitch deck claims that the high rates charged to the merchants offset these risks.

129) BSG Fund has promised to pay investors in the MCA Series a fixed annual return of 14%, 15%, or 18%, depending on the sub-Series, and a 17% return for at least one investor via a side-letter. BSG Management sent funds for these sub-Series to, among other places, Samson Horus, which has offices in New York, New York, and Boca Raton, Florida.

130) As of November 2023, BSG Management had raised approximately $87 million for BSG Fund's MCA Series.

**b. Real Estate Infrastructure Development ("Infrastructure"):**

131) The Infrastructure Series, BSG Fund's largest, contains at least nine sub-Series that claim to invest investor funds, as a pool, in the development of raw land into build-ready lots that can be sold to residential home builders.

132) The Offering Materials tout the relative safety of Infrastructure investments. For example, an undated Real Estate Infrastructure Development pitch deck notes existing contracts with numerous national homebuilders, which are "backed by the full faith and credit of the Fortune 500 top publicly traded homebuilders," and further notes that lots are presold to national homebuilders before "Broad Street and its affiliates" close on the land in order to "minimize risk."

133) BSG Fund has promised to pay investors in these sub-Series a preferred annual return of 14.6% or, for one investor, a 16% annual return pursuant to a side letter. BSG Management has sent funds for these sub-Series to, among other places, two real estate development companies, Blackstream Development, LLC and Contender Development, Inc.

134) As of November 2023, BSG Management had raised more than $168 million for BSG Fund's Infrastructure Series.

**c. Pre-IPO securities ("Pre-IPO"):**

135) The Pre-IPO Series contains a number of sub-Series, each of which is focused on acquiring stock of a specific company via forward purchase contracts before that company's stock can be publicly traded on a securities exchange.

136) BSG Management has promised to either deliver the specific shares acquired with the investor's funds or the proceeds from the sale of those shares after the company goes public or another liquidity event occurs.

137) As of November 2023, BSG Management had raised approximately $53.5 million for BSG Fund's Pre-IPO Series.

**d. Fixed income securities: ("Fixed Income"):**

138) The Fixed Income Series seeks to provide positive returns by investing in a wide variety of income generating investments in publicly-traded securities that primarily reflect debt, equity, or closed-end funds that have exposure to government agency and/or similar income generating investments.

139) BSG Fund has promised to pay investors in this Series a fixed annual return of 7%.

140) As of November 2023, BSG Management had raised approximately $2 million for BSG Fund's Fixed Income Series.

**e. Hotel Projects ("Hotel"):**

141) The Hotel Series contains at least three sub-Series that claim to invest in the purchase or construction and operation of specific hotel properties, including one Hotel project located in Daytona Beach, Florida.

142) BSG Fund has promised to pay investors in these sub-Series a return based on an ownership share of the hotel's operating income or proceeds from the sale of the property.

143) As of November 2023, BSG Management had raised approximately $19.4 million for the BSG Fund Hotel Series.

144) The BSG Fund's Quarterly Report for Q1 - 2024 lists a Raleigh, NC-TownePlace Suites as one of its hotel projects. However, the BSG Fund never acquired this hotel, and thus to the extent that Broadstreet raised any money for this hotel it did so as part of a true Ponzi scheme. See Page 17 of the BSG Fund's Q1 2024 Quarterly Report attached hereto as **Exhibit E**.

**f. Custom Home Building ("Home Building"):**

145) The Home Building Series contains at least four sub-Series that claim to invest in the construction of residential housing communities. BSG Fund has promised to pay investors in these sub-Series a return based on a profit split with the home builder.

146) On June 20, 2024, BSG Fund's partner in the Home Building Series filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, where the partner's "nerve center" is located.

147) As of November 2023, BSG Management had raised approximately $31.2 million for BSG Fund's Home Building Series.

**g. Crystal Lagoons ("Crystal Lagoons"):**

148) The Crystal Lagoons Series claims to invest in the construction and operation of a resort project in Columbia, South Carolina, featuring a clearwater recreational lagoon with beach-like areas.

149) BSG Fund has promised investors in this Series "Perpetual Income at Rates of Return Never Seen Before" in the form of a fixed annual return of 10% during the first two years of the project, and a fixed annual return of 20% thereafter with additional payments based on a 25% share of the resort's operating profits or 50% of the proceeds from the sale of the property.

150) As of September 2023, BSG Management had raised approximately $24.2 million for BSG Fund's Crystal Lagoons Series.

**h. Bitcoin Mining ("Bitcoin Mining"):**

151) The Bitcoin Mining Series claims to invest in a "wholly owned [sic] bitcoin mining facility."

152) BSG Fund has promised to pay investors in this Series a targeted annual return of 25%.

153) As of November 2023, BSG Management had raised approximately $1.9 million for BSG Fund's Bitcoin Mining Series.

**i. Altcoin Mining ("Altcoin Mining"):**

154) The Altcoin Mining Series claims to "make investments into crypto coin mining machines" that will be used to generate alternative forms of crypto assets other than Bitcoins.

155) BSG Fund has promised to pay investors in this Series a targeted annual return of 28%.

156) As of November 2023, BSG Management had raised approximately $41.8 million for BSG Fund's Altcoin Mining Series.

**j. Self-Storage Facilities ("Self-Storage"):**

157) The Self-Storage Series claims to invest in a collection of self-storage facilities.

158) BSG Fund has promised to pay investors in this Series a fixed annual return of 10% paid quarterly until projects are profitable and can sustain the 10% return based on positive cash flows generated from the self-storage facilities. Thereafter, profit distributions will be based on investor percentage ownership in the sub-Series. BSG Management has told investors that it estimates it will pay 27% annualized returns for this BSG Fund Series.

159) As of November 2023, BSG Management had raised approximately $16.6 million for BSG Fund's Self-Storage Series.

## V. Broadstreet Knowingly Raised Money from Non-Accredited Investors.

160) Broadstreet aggressively raised money for the BSG Fund in 2024. As a result, from the beginning of 2024 through October 31, 2024, approximately an additional $500 million was raised from investors.

161) In total Broadstreet raised somewhere between $1 billion and $1.2 billion from investors for the BSG Fund.

162) But not all the investors were accredited investors, and Broadstreet knew it.

163) Akhil Morada, a senior managing director at Broadstreet, Inc., often told potential investors that they did not have to worry about being an accredited investor and he would get them into the BSG Fund even though he knew they did not meet the financial requirements to be an accredited investor.

164) Mr. Morada had a practice of soliciting investors for the BSG Fund, having them wire their money to the BSG Fund, and only after he took their money did, he present them with forms to sign for their investment.

165) These forms often had investors' financial information prepopulated to reflect that they were accredited investors. However, when some of the investors informed Mr. Morada that the information about their finances was incorrect, he would tell them to ignore that part, just fill out the rest of your personal information and sign the document.

166) But Mr. Morada was not the only one at Broadstreet bringing non-accredited investors into the BSG Fund.

167) Upon information and belief, Joseph Baldassarra also told potential investors that he would get them into the BSG Fund even though they did not meet the definition of an accredited investor.

168) Thus, the practice of accepting investors into the BSG Fund who were not accredited came from the top, and presumably employees of Broadstreet were instructed by upper management on how to bring investors into the BSG Fund who were not accredited.

169) As a result, many investors who could not afford to lose their life savings or were dependent on the income generated from it now have no access to their money.

## VI. Feingold and the Baldassarras Have Taken More than $170 Million From the BSG Fund.

170) From the investor monies that have become assets of the BSG Fund, Feingold and the Baldassarras have, directly or indirectly, received more than $170 million from BSG Fund.

171) Feingold and the Baldassarras have used the money they siphoned away from the BSG Fund to live a lavish lifestyle including purchasing multiple homes, yachts, an aviation company and maintaining a private jet.

### Steven Baldassarra

172) Just a Nice Day, Inc. ("Just A Nice Day") is a South Carolina corporation owned and controlled by Steven Baldassarra.

173) Through Just a Nice Day, Steven Baldassarra received more than $50 million of illicit proceeds.

174) In addition, more than $1.9 million of BSG Fund's assets have been transferred to Steven Baldassarra directly.

175) Collectively, from these payments and his proportionate interest in related entities and payments of personal expenses, Steven Baldassarra has received more than **$56.7 million** of BSG Fund's assets.

<u>Joseph Baldassarra</u>

176) Josephbenjamin, Inc. ("Joseph Benjamin") is a South Carolina corporation owned and controlled by Joseph Baldassarra.

177) Through Joseph Benjamin, Joseph Baldassarra received more than $65 million of illicit proceeds.

178) In addition, more than $300,000 of BSG Fund's assets have been transferred to Joseph Baldassarra directly.

179) Collectively, from these payments and his proportionate interest other related entities and personal expenses, Joseph Baldassarra has received more than **<u>$68.2 million</u>** of BSG Fund's assets.

<u>David Feingold</u>

180) More than $36 million of BSG Fund's assets have been transferred to Feingold through related entities controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

181) More than $7 million of BSG Fund's assets have been transferred to Feingold through another related entity owned by him and one of his sons and controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

182) Collectively, from these payments and his proportionate interest in Feingold's related entities and personal expenses, Feingold has received more than **<u>$46 million</u>** of BSG Fund's assets.

<u>Other Ways Feingold and the Baldassarras Receive BSG Fund's Assets</u>

183) Feingold and the Baldassarras also have arrangements to obtain money from BSG Fund's assets.

184) For example, in September 2023, BSI acquired a 24.9% ownership stake in one of the broker-dealers that sells BSG Fund LLC units through private placements (the "Broker Dealer"). The Baldassarras and Feingold, through their ownership in BSI, share in the placement fees that the Broker Dealer earns for selling BSG Fund LLC units to investors. In total, approximately $12.3 million of BSG Fund's assets have been paid to the Broker Dealer.

185) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus a MCA Company. Samson Horus charged the Broad Street Entities substantial management fees (typically, between 3% to 5% of the amount advanced to the merchant) and commissions (typically, between 10% to 15% of the amount advanced) to participate in the MCA transaction. These management fees and commissions significantly reduced the returns that the Broad Street Entities received from Samson Horus. Feingold receives half of all the management fees and 20% of the commission Samson Horus charged the Broad Street Entities.

186) As alleged above, BSG Management sends funds for the Infrastructure Series to, among others, Contender Development, Inc., of which Feingold or his family members own 35% and he is co-chairman of its board of directors. Contender Development, Inc. has paid, among other things, land acquisition fees and a share of development fees to Feingold or entities under his control.

187) As alleged above, BSG Management sends funds for the Home Building Series to, among others, Durham Homes, of which Feingold or his family members own 33%. Durham Homes pays substantial commissions and management fees from Broad Street Entities' Home Building investments to Feingold or entities under his control.

Broadstreet Global Holdings, LLC

188) Broadstreet Global Holdings, LLC ("BSG Holdings") is a South Carolina LLC. BSG Holdings is owned and managed by the Baldassarras. BSG Holdings receives funds to pay the expenses for BSG Fund, BSG Management, and BSI. BSG Holdings has received more than $134.5 million from BSG Management.

189) Collectively, the money Feingold, the Baldassarras Brothers and BSG Holdings received from the BSG Fund, add up to at least **$305.4 million** or approximately 30% of the over $1 billion raised by the BSG Fund.

## VII. BSG Management and the Baldassarras Are Investment Advisers.

190) BSG Management, Joseph Baldassarra, and Steven Baldassarra are each investment advisers within the meaning of Section 202(a)(11) of the Advisers Act. 15 U.S.C. § 80b-2(a)(11).

191) Section 202(a)(11) of the Advisers Act defines an "investment adviser" as a "person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."

192) BSG Management advises BSG Fund with respect to investments in securities. According to the October 2020 PPM, BSG Management may be paid a management fee by the BSG Fund's Series "for managing the investment and reinvestment of such Series' assets," which include investments that are securities as defined by the federal securities laws. Specifically, at least some of the investments in the Pre-IPO securities Series and Fixed Income Series are investments in securities as defined by the federal securities laws.

193) Most recently, the BSG Fund's two exit transactions involve securities traded on the NASDAQ and NYSE.

194) BSG Fund's October 2020 PPM also holds BSG Management out as an investment adviser, stating that "[f]ees charged by [BSG Management] may be greater or lower than fees charged by other investment advisers for similar services."

195) As the sole managers and owners of BSG Management, the Baldassarras are also investment advisers to BSG Fund. In their roles at BSG Management, the Baldassarras provide advice about securities for compensation to the BSG Fund and, accordingly, also meet the definition of "investment adviser."

196) As investment advisers to BSG Fund, Defendants BSG Management, Joseph Baldassarra, and Steven Baldassarra owe a fiduciary duty to BSG Fund. An investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty. The duty of care requires an investment adviser to provide investment advice in the best interest of its client. The duty of care also requires BSG Management to operate the BSG Fund in accordance with its Operating Agreements. Under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.

## VIII. Feingold and the Baldassarras Control BSI and BSG Management.

197) Feingold and the Baldassarras Brothers control BSI.

198) Feingold and the Baldassarras are senior executives at BSI. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI.

199) In addition, BSI's voting shares are owned in equal parts by the Baldassarras and Feingold and unanimity by all three is required for shareholder decisions.

200) Feingold and the Baldassarras also control BSG Management.

201) As alleged above, BSG Fund is managed by BSG Management, which has sole authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra are the managing members of BSG Management, and BSG Management acts through the unanimous agreement of the Baldassarras.

202) In or around June 2022, when he formed and became the CEO of BSI, Feingold began to control BSG Management and its management of BSG Fund, along with the Baldassarras. Although Feingold is not formally listed as a manager of BSG Management in BSG Fund's PPM or Operating Agreements, he is involved with the management of BSG Management and uses his control over BSI to direct the management of BSG Fund's operations by BSG Management. As CEO of BSI, Feingold is the most senior executive officer of BSI.

203) As alleged above, BSI's website shows the interrelated connected relationships between the Broad Street Entities. In addition, BSG Management, the BSG Fund, BSG Holdings, BSG Series CM and BSI, operate as a single organization.

204) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, and CJS Technology Select Management, LLC ("CJS") prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2022.

205) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, CJS, and BSG CM Series prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2023.

206) For almost two years, from in or around August 2022 to in or around April 2024, BSI did not have its own bank account, but instead paid its operating expenses (including its staff's

compensation) through BSG Holdings' bank account, which was funded by a share of the money taken from BSG Fund by BSG Management.

207) As alleged further below, BSG Fund's Offering Documents generically use the terms "Broadstreet," "Broadstreet Global," or "affiliates" without clearly identifying to which entity the materials refer.

208) All of the staff performing back-office roles for BSG Management (on behalf of BSG Fund) are personnel of BSI, some of whom are also shareholders of BSI, including the staff performing the compliance, operations management, and accounting functions. Likewise, the internal sales staff soliciting potential investors for BSG Fund are personnel of BSI. There is no formal separation of duties established between BSI and BSG Management.

209) Certain of BSI and BSG Management staff share the same office space.

210) Feingold is the individual with the most knowledge of and has primary oversight over the most substantial investments managed by BSG Management, including the MCA portfolios held at Samson Horus and the Infrastructure projects being developed by Blackstream Development, LLC and Contender Development, Inc.

211) Feingold receives weekly, monthly, and quarterly financial reports regarding BSG Fund from BSI staff performing BSG Management's back-office functions (on behalf of BSG Fund). These reports are typically shared with Feingold by Steven Baldassarra.

212) Feingold participates in weekly meetings with BSG Management and BSI staff, in which all matters pertaining to BSG Fund and its business lines are discussed.

213) Feingold and the Baldassarras Brothers have daily meetings via phone or video conference. No other persons typically attend these meetings, and all aspects of the Broad Street Entities are discussed.

214) Feingold and the Baldassarras Brothers jointly make decisions regarding the investment of certain of BSG Fund's assets, which occurs through BSG Management.

215) Feingold shared in the money taken from the BSG Fund by BSG Management.

216) Feingold has also involved himself in BSG Management's capital-raising activities for BSG Fund by making regular presentations to BSG Fund's potential investors concerning BSG Fund's investments via dinner meetings and on video conference calls, directly answering questions from potential investors, and preparing side letters with BSG Fund investors documenting special investment terms.

**IX. The July 2023 Compliance Acknowledgement Update.**

217) In July 2023, while the SEC was investigating Broadstreet for fraud and misrepresentations to investors, Broadstreet decided to issue a Compliance Acknowledgement Update to its investors to get its investors to ratify what it had already been doing but never disclosed to the investors.

218) Broadstreet acknowledged that prior to initiating the enforcement action on January 29, 2025, the SEC investigated Broadstreet for more than two years, during which it issued more than ninety document subpoenas to third parties and Broadstreet-related entities and individuals, including Broadstreet's bank and financial institutions. DE 301 page 1 in Case 1:25-cv-20436-DPG (SD Fla.). Thus, the SEC investigation had already begun by the time Broadstreet first sent out the Compliance Acknowledgement Update.

219) On July 15, 2023, Broadstreet sent an email to its investors with the subject "URGENT BROADSTREET ACCOUNT UPDATE" that contained the following message:

> Dear Broadstreet Investor, In the next few days you will receive a very important email from "signNow" regarding updating your Broadstreet account. The email will be a simple one page document to e-sign. **The acknowledgement contains certain information which you have already seen or certified to in documents such as**

> **our ppm, data room and subscription documents. Therefore, your review and signature should be very quick. This is a very short process** but important for our regular compliance updates **and necessary to keep your account active.** Thank you in advance for your prompt attention when you receive the email from "signNow" regarding Broadstreet and your account update. As always, we are happy to have you as part of the Broadstreet family.

(Emphasis added). A copy of the July 15, 2023 Email is attached hereto as **Exhibit F**.

220) This email attempts to downplay the significance of what the investors would be agreeing to in this Compliance Acknowledgement Update. It encourages its investors to sign it without reading it by claiming they have already seen or certified the information that they would be acknowledging, which was not true. And it contains a threat that distributions will be withheld and the investor will be kicked out the fund if they do not sign. Thus, arguably, Broadstreet coerced, or at the very least misled, its investors into signing the Compliance Acknowledgment Update. A compilation of Compliance Acknowledgement Updates that Broadstreet provided its investors is attached hereto as **Composite Exhibit B**.

221) After July 2023, Broadstreet attached the Compliance Acknowledgement towards the end of the subscription agreement packet sent to investors anytime they made a new investment in the BSG Fund.

**a. Broadstreet Collected 30% in Upfront Fees It Was Not Entitled To.**

222) One of the things Broadstreet asked its investors to acknowledge in the Compliance Acknowledgement Updates was that Broadstreet could immediately keep 30% of the funds each investor provided as fees.

223) However, Broadstreet didn’t simply ask its investors to agree to allow it to keep 30% of their money, presumably because most investors, including Plaintiffs, would not have agreed to that.

224) Instead, Broadstreet buried this request among 15 different items and asked its investors to agree to a 30% fee in an indirect way so that it wouldn't appear that they are asking the investors to keep 30% of their money.

225) Specifically, Broadstreet framed the acknowledgement in Paragraph 6 as follows:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

226) This acknowledgement lists several ways Broadstreet could collect fees, including paying itself 30% of the money raised as an immediate upfront fee for the promise of services that will be rendered over the next five years.

227) Even though this disclosure states that Broadstreet can take 30% as upfront fee, Broadstreet never disclosed to Plaintiffs that it did in fact take 30% of their money as a fees.

228) The monthly investor reports sent to Plaintiffs never reflected any fees being deducted from their accounts, and Broadstreet never provided Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

229) Instead, every month Broadstreet provided Plaintiffs with misleading investor reports that made it appear that Plaintiffs' entire capital was invested in the investment that Plaintiffs selected, meanwhile 30%, at a minimum, of Plaintiffs' capital never made it to Plaintiffs' selected investment.

230) Through the SEC enforcement action Plaintiffs learned that Broadstreet collected approximately 30% or at least $305.4 million in fees upfront and funneled that money to Feingold, the Baldassarras Brothers and BSG Holdings to support their lavish lifestyles.

231) In addition, less than three years after Broadstreet started having Plaintiffs and its other investors sign the Compliance Acknowledgement Update, Broadstreet is now attempting to get rid of all its investors.

232) Thus, despite collecting five years of fees upfront, Broadstreet is refusing to provide five years of service to many of its investors, including the Plaintiffs.

233) Accordingly, to the extent that Broadstreet collected fees from Plaintiffs for services it did not provide, those fees need to be returned.

**b. Broadstreet Acted as Plaintiffs' Investment Advisor.**

234) Broadstreet also had Plaintiffs acknowledge Paragraph 12, which states: "*I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.*" Yet, at the same time it had Plaintiffs acknowledge Paragraph 7 and 8, which states:

> "7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects."
>
> "8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves."

235) The acknowledgment in Paragraph 12 conflicts with the acknowledgements in Paragraphs 7 and 8. Plaintiffs cannot both make their own investment decisions and give Broadstreet the right to invest Plaintiffs' money however it sees fit.

236) Although Plaintiffs were under the impression that they were making their own investment decision by selecting which of the Broadstreet Series they wanted to invest in, in actuality, Broadstreet decided in its sole discretion how Plaintiffs' funds were used.

237) In fact, in Broadstreet's motion to dismiss the SEC complaint, it points to numerous provisions in the Compliance Update and Amendments to the PPM and Operating Agreement which it claims gives it broad powers and discretion to manage, own, and control fund assets. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 301 at ¶¶ 35-38, 48-51.

238) Thus, taking the investment decisions away from Plaintiffs and allowing Broadstreet to have discretionary control over their investments, which also means that Broadstreet was acting as Plaintiffs' investment advisor and thus owed Plaintiffs the highest fiduciary duty to act in Plaintiffs' best interest.

239) Moreover, Paragraph 8 is even more problematic because it requires Plaintiffs to agree to a Ponzi scheme. Specifically, it requires Plaintiffs to agree that instead of investing their money Broadstreet could give Plaintiffs back their own money as distributions or interest payments or use Plaintiffs' money to pay distributions to other investors.

240) Since a Ponzi scheme is illegal under both federal and state laws, no investor, including Plaintiffs, could legally agree to participate in one.

## X. In 2025 Broadstreet Ran Out of Money to Continue Paying the Guaranteed Distributions.

241) In 2025 the scheme that Broadstreet had devised to falsely present distributions as profits began to fall apart.

242) Broadstreet and its sales team promised investors guaranteed returns in amounts that varied by investment that were typically around 14% but ranged from 7% to 28% annual returns.

243) However, most of the distributions paid to the Broadstreet investors was money pulled out of the Samson Horus/MCA Series investment.

244) Broadstreet withdrew money from the Samson Horus/MCA Series to pay its investors these guaranteed returns regardless of whether the investors selected the Samson Horus/MCA Series as one of their investments.

245) Broadstreet provided its investors with monthly investor reports representing distributions coming from their particular investment, when in fact as much as 80% of those distributions were being funded by the Broadstreet investors who invested in Samson Horus/MCA Series.

246) The constant depletion of the funds from the Samson Horus/MCA Series forced Broadstreet to liquidate the MCA portfolios in 2025. Broadstreet's mismanagement of the MCA portfolios resulted in a money-in versus money-out loss of approximately $40 million.

247) Indeed, the court appointed Monitor overseeing Broadstreet in the SEC's enforcement action wrote in his Third Status Report issued on July 30, 2025 that unless Broadstreet sold some of its assets, it would not be able to continue making distributions to its investors.

248) Ultimately, with the Samson Horus/MCA Series depleted and 30% of the money raised already siphoned out of the fund, Broadstreet could no longer continue its ruse that its investments were generating money.

249) Thus, Broadstreet devised a new scheme to get rid of all its investors in 2025.

## XI. Feingold's Role in the Scheme.

250) Feingold knew that BSG Fund investors were being paid inflated returns that did not actually represent profits.

251) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus. Feingold had primary responsibility for the management of the MCA portfolios funded by BSG Fund at Samson Horus. Feingold, through BSI, also oversaw the BSG Fund's Infrastructure

projects under development by Blackstream Development, LLC and Contender Development, Inc. Feingold knew that the shortfall needed to pay the promised returns to Infrastructure Series investors was to be paid from purported profits on MCA investments.

252) Despite the fact that the MCA portfolio generated little to no profits, Feingold frequently requested cash withdrawals from Samson Horus, which were paid to the Broad Street Entities' bank accounts.

253) Feingold received periodic reports showing the profitability (or lack thereof) of the MCA portfolios that he requested from Samson Horus. Samson Horus prepared a weekly performance report titled "Dave's ROI," meaning David Feingold's return on investment. These weekly reports accumulated factor rates – the percentage return a merchant would have to repay (i.e., a 1.36 factor rate meant that a merchant would have to repay 136% of the amount advanced) – as well as costs, such as origination and management fees, which reduce the amount that the BSG Fund could receive from its MCA investments. Samson Horus used this transaction data to calculate a profit percentage for each MCA portfolio. While certain of the "Dave's ROI" reports state, on their face, a "Year to Date" return on investment, the listed returns are cumulative, which is readily apparent from the reports.

254) Feingold requested, obtained, and reviewed these weekly reports, and extracted information from them to make his own calculation of the average annual return of the MCA portfolios.

255) The data in the "Dave's ROI" reports shows the profitability of the MCA portfolios. Projected profits on open MCA deals were less than 14% annually, and the open MCA deals included accounts in collections and default.

256) Further, the deterioration in the collectability of the MCA portfolios alleged above would have been apparent to Feingold by dividing the cumulative returns shown on the Dave's ROI reports by the age of the portfolios.

257) In addition, Feingold reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

258) Despite knowing the actual performance of the MCA investments, Feingold provided materially overstated MCA performance information to BSG Management and to BSI. This information was incorporated into MCA Series pitch decks and BSG Fund periodic investor updates. These materials were distributed by BSI's staff to certain of BSG Fund's actual and prospective investors.

259) In addition, Feingold was the source of materially overstated MCA performance information that was incorporated into BSG Fund's unaudited consolidated financial statements for fiscal year 2023 and made available to investors upon request.

260) After its formation in June 2022, Feingold acted in his role as chief executive officer of BSI. After that time, the conduct of Feingold is imputed to BSI.

## XII. The Baldassarras' Role in the Scheme.

261) The Baldassarras should have known that BSG Fund investors were being paid inflated returns that did not actually represent profits.

262) BSG Fund's draft unaudited financial statement and income tax returns in 2020 and 2021, all of which were available to Joseph Baldassarra and Steven Baldassarra (which were signed by Steven Baldassarra), reported multi-million-dollar losses to BSG Fund and identified no income attributed to MCA investments. Despite these documents showing losses, substantial sums

were paid from the Broad Street Entities' bank accounts (or were rolled over) to BSG Fund investors during at least 2021.

263) In addition, Steven Baldassarra reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

264) Further, the Baldassarras should have known that BSG Management did not create and maintain Series-level financial statements for BSG Fund reflecting the actual profits of each Series, as required by BSG Fund's Offering Materials. The Baldassarras made no effort to determine how the purported profits from MCA investments had been apportioned to the various BSG Fund Series. The Baldassarras authorized, and BSG Management and BSI provided, periodic account statements to investors, including MCA and Infrastructure Series investors, that reported consistent, fixed returns. Specifically, the account statements reflected the principal amount invested less any withdrawals, and earnings based on the investor's promised return (e.g., 14%) multiplied by the account balance. These account statements were not based on actual profits.

265) Despite the above allegations, the Baldassarras authorized, or had the power to authorize, payments to BSG Fund investors. The Baldassarras also authorized, or had the power to authorize, investors rolling over monies that were represented as profits (that the BSG Fund would have otherwise had to pay in cash) into new BSG Fund investments.

266) Further, as managers of the BSG Fund and by reviewing information that went to investors before it was sent out, the Baldassarras should have known that the information being provided by Feingold into the pitch decks, periodic updates, and unaudited financial statements regarding MCA performance, as well as the performance of the BSG Fund overall, was false and misleading.

267) The Baldassarras acted in their role as managers of BSG Management. The conduct of the Baldassarras is imputed to BSG Management.

## XIII. Beginning in March 2025 Broadstreet Initiated Its Scheme to Get Rid of the Investors in the Altcoin Series.

268) Broadstreet raised approximately $416,000,000 from its investors for the Altcoin Series. See Page 16 of the Monitor's Third Status Report in Case 1:25-cv-20436-DPG (S.D. Fla.) at DE 135.

269) Broadstreet investors, including many of the Plaintiffs, executed an Altcoin subscription agreement that promised a 28% annual return through quarterly distributions.

270) However, many of the Plaintiffs received distributions for less than one year before the distributions stopped. And none of the Plaintiffs have received any distributions from their Altcoin investment since March 2025.

271) Upon information and belief, Broadstreet stopped paying distributions to the Plaintiffs and all the other Altcoin investors because the Altcoin Series was not generating enough income to support the 28% returns that were promised.

272) Indeed, this is not surprising since Broadstreet immediately pocketed 30% of the money raised as fees and paid 28% of the money raised back to the Altcoin investors in Ponzi like fashion. Thus, only about 40% of the money raised ever made it to the Altcoin investment.

273) The assets purchased for the Altcoin Series would have had to generate annual profits of at least 70% just to continue paying the Altcoin investors the 28% annual interest that was promised – and it did not do that.

274) To pay the Altcoin investors 28% annual dividends, the Altcoin Series would have had to generate **$116,480,000** of income annually. However, from January 1, 2025 through May 31, 2025, the BSG Fund had only received a total of **$8,714,034** from crypto mining activity, thus

the Altcoin Series could not possibly generate the income needed to pay the Altcoin investors 28% (or $116,480,000) annual dividends.

275) Aware of this problem Feingold and the Baldassarras Brothers concocted a plan to hide the losses from the Altcoin Series (BSG Series CM) by converting it into restricted stock of Z Squared, Inc. through a merger with Coeptis Therapeutics Holdings.

276) Coeptis Therapeutics Holdings was a money-losing biotech company that had nothing to do with crypto asset mining, but it was already a publicly traded company. Thus, by merging with Coeptis Therapeutics Holdings, Z Squared, Inc. could bypass the requirements for becoming a publicly traded company.

277) In addition, Broadstreet convinced one of its employees, David Halabu, to become the CEO of Z Squared, Inc.[4] Thus, Z Squared is controlled by a former employee of Broadstreet. Accordingly, Broadstreet basically created a new company for the sole purpose of transferring away its Altcoin Series investors.

278) Sometime around March 22, 2025, Broadstreet presented the Altcoin investors with a document entitled Altcoin Mining Participant Vote. A copy of the March 22, 2025 Altcoin Mining Participant Vote is attached hereto as **Exhibit G**. This document didn't give the investors an option to vote yes or no. It only had a place for the investors to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

279) Regarding the Z Squared stock conversion, items four through eight in this document states:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.

---

[4] David Halabu who was formally a Managing Director at Broadstreet, Inc.

> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.

(Emphasis added).

280) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

281) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including the Plaintiffs, to agree to the sale to the public company.

282) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

283) In addition, the Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that Plaintiffs did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series.

284) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of the original investment decision and were not fully disclosed before Plaintiffs' consent was solicited in the Altcoin Mining Participant Vote.

285) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including many of the Plaintiffs, into Z Squared restricted stock. Indeed, as of June 1, 2026, the Investor Reports reflect that any investor in the Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

286) Of the Altcoin investors, Akhil Morada, a senior managing director at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding

shares the Altcoin investors received in the transaction.[5] Similarly, Michael Dazzo, another senior managing director at Broadstreet holds 1,207,311 shares of Z Squared stock through Strategic Business Advisory LLC and Ameritech Global Ventures LLC. Glenn Hechler holds 88,033 shares of Z Squared stock, comprising 47,664 held directly and 40,369 through BSGGH LLC.

287) Upon information and belief, Mr. Morada and the others received these shares as part of their compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

288) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

289) However, this was a false statement because on July 27, 2026, Z Squared Inc. (ZSQR) closed at $4.81 per share, which means the 41,521,276 shares that Broadstreet received as part of the Altcoin conversion would only be worth around $200 million, if they could be traded.

290) But the Z Squared shares aren't even worth that much. As a result of the restrictions on the stock the Altcoin investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027. These restrictions materially impair liquidity and affect the value of the shares received.

291) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors to get them to agree to receiving the stock and to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

---

[5] The Form S-1 Registration Statement for Z Squared Inc. dated June 9, 2026 lists the total outstanding shares as 51,431,493.

292) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

293) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. **Exhibit G**. However, only 9,800 of the 16,000 altcoin machines were transferred from Broadstreet to Z Squared, Inc., and these machines are depreciating assets that become obsolete as new technology emerges.

294) SEC filings by Coeptis in June 2025 said that accounting firm CohnReznick's partners Anthony Doughty and Jake Wright appraised the mining systems in March 2025 at a value of $660 million, or $67,378 per unit. The filings said the valuation had assumed the machines were all Antminer L9 systems when, in fact, 84% of the fleet were L7s—an older, less-powerful system that isn't suited for AI modeling.

295) The $660 million CohnReznick valuation led to Broadstreet investors getting 85% of the merged company's shares when the deal went effective in April2026. A pro forma balance sheet in the merger proxy filing showed that the Broadstreet business had carried the mining systems at only $35.3 million.

296) Z Squared's June-quarter financial statements, filed on August 13, 2026, recorded the mining fleet at a transferred historical carrying amount of approximately $12.4 million, or $1,269 per unit, and a June 30, 2026 net book value of approximately $11.3 million after depreciation.

297) This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation. Broadstreet materially overstated the $600 million value of the Altcoin Series/Z Squared shares, including by relying on valuation assumptions inconsistent with the actual mining fleet.

298) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the investors receive their entire remuneration and, in that document, and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce the Altcoin investors to agree to accepting the Z Squared shares.

299) The Plaintiffs in the Altcoin Series relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

300) These misrepresentations warrant rescission of this transaction and the Plaintiffs in the Altcoin Series should be put back in the same position that they were in before these misrepresentations were made.

301) Accordingly, the Plaintiffs in the Altcoin Series should have their capital accounts restored, or receive the monetary value thereof as damages including all distributions payments they were entitled to receive since March 2025.

## XIV. Beginning in May 2025 Investors Start Receiving Reports from the Court Appointed Monitor in the SEC Enforcement Action.

302) On January 29, 2025, the Securities and Exchange Commission ("SEC") commenced an action against David J. Feingold, Joseph B. Baldassarra, Steven S. Baldassarra, Broad Street Global Management, LLC, Broad Street, Inc. and others (the "SEC Enforcement Action") Case 1:25-cv-20436-DPG (S.D. Fla.).

303) On April 21, 2025, the court in the SEC Enforcement Action granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Broad Street Global Management, LLC, Broad Street, Inc.,

Broadstreet Global Fund, LLC, Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Just A Nice Day, Inc., and Josephbenjamin, Inc. (collectively, the "Monitorship Entities").

304) The Monitorship Order, *inter alia*, obligates the Monitor to make recommendations and issue reports regarding the Monitor's assessment of the ongoing operations of the Monitorship Entities.

305) These reports contained valuable information that Broadstreet was hiding from its investors.

## XV. Monitor's First Status Report.

306) The Monitor issued his First Status Report on May 5, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 99. In it the Monitor reported, *inter alia*, that:

> In response to a specific request by the Monitor, the Monitorship Entities also produced 22 spreadsheets of "investor ledgers." Id. at ¶ 17. These ledgers memorialized "dividends" and "return on capital contributions" accrued for the benefit of investors, and whether those "dividends" and "return on capital contributions" were distributed or re-invested at the direction of the investor. Id. The "investor ledgers" did not memorialize management fees deducted from the investors' "equity balances." Id.
>
> As stated above, the Monitor has learned that there are two Internet-based, password protected "data rooms"—one for institutional investors and one for non-institutional investors—through which the Monitorship Entities primarily communicate with their investors. Id. at ¶ 48. The data room for institutional investors includes access to the data room for non-institutional investors.
>
> The Monitorship Entities post informational updates about their projects, including, but not limited to, pitch decks and quarterly updates, to the data rooms. Id. at ¶ 49. The data room for institutional investors includes detailed financial information. Id.
>
> In addition to informational updates, financial information, and quarterly and other reports, the Monitorship Entities post legal documents—including supplements to the private placement memoranda—in the data rooms. Id. at ¶ 50. According to the Monitorship Entities and the private placement memoranda, the posting to the data rooms of these legal documents (including supplements to the private placement memoranda) is sufficient to alter the legal obligations of the parties; unilaterally impose legally binding obligations on the parties; and/or create new

> benefits for the parties, including as it relates to the amount of fees the Monitorship Entities can collect and when those fees may be collected. Id.
>
> While the investors are able to read and review the documents and materials posted in the data rooms, a representative for Monitorship Entities confirmed that the default setting is that the investors are *not* able to download or save a copy of the documents and materials posted in the data room. Id. at ¶ 51.
>
> The Monitorship Entities have access to and have produced audit trails for the data rooms. Id. at ¶ 52. Those audit trails show the date and time a document is uploaded into the data room, as well as the dates and times that users accessed documents in the data rooms. Id.
>
> Importantly, the Monitorship Entities also produced approximately 4,035 Compliance Acknowledgment forms, executed by investors across various Series on dates varying throughout 2023, 2024, and 2025. Id. at ¶ 55.
>
> The Monitor has reviewed the "investor ledgers" provided by the Monitorship Entities. Id. at ¶ 56. The "investor ledgers" do not contain a record or accounting of any management fees being deducted from the investors' "equity balances." Id. Further, a Monitorship Entities' representative confirmed that the individual investor ledgers do not reflect "a management fee removal." Id.

## XVI. Monitor's Third Status Report.[6]

307) The Monitor issued his Third Status Report on July 30, 2025. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 135. In it the Monitor reported, *inter alia*, that:

> As of the end of the second quarter of 2025, according to the Monitorship Entities' records, **the balance of the investors' capital accounts across all Series is approximately $633,000,000**. Id. at ¶ 31. **The infrastructure-based Series** comprise more than half of investor funds, **with approximately $239,000,000** invested in the Infrastructure Series **and another $144,000,000** invested into an infrastructure series called BSG15. Id. This balance **does not include** investors in the former MCA, QSBS, **Altcoin** (BSG CM), or TCVI Series. Id. (Emphasis added).
>
> Contender Development, Inc. advised that, through December 31, 2024, only approximately $300,000 in *profits* ever had been realized on any of the

---

[6] The Monitor issued his Second Status Report on May 30, 2025, however the only unredacted portions of that report relate to a dispute over the ownership of assets with another private equity fund, and since those assets are not at issue in this lawsuit the Second Status Report does not need to be addressed here.

infrastructure development projects and that only one project was realizing profits as of June 4, 2025. Id. at ¶ 39.

Feingold is a partner and owner of Contender Development. Id. at footnote 1.

In late 2024, BSG Fund wound down/rolled over and discontinued the MCA Series. Id. at ¶ 44. The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15. Id. at ¶ 45. To effectuate the roll over from the MCA Series into BSF15, BSG Fund "credited over" the MCA Series investors' capital accounts to the BSG15 Series. Id. In other words, no actual funds changed hands (or Series) when the discontinuation occurred. Id.

The incoming funds from the historic MCA portfolios to BSG Fund are being used to pay investor dividends across all Series. Id. at ¶ 46.

BSG Fund does not reduce a fund investor's principal balance when management fees are received by BSG Management. Investors are able to redeem the entire amount of their original investment if and when they redeem their investments. *See* S. Baldassarra Feb. 14, 2025 Decl. ¶ 16, ECF No. 54-2. Id. at ¶ 52.

Juniper does not track or report to BSG Fund or the investors the amount of management fees deducted from their investment. Id. at ¶ 53. As a result, both BSG Fund's internal records and the investor-facing records all reflect that all investors' capital accounts contain the amount invested without any reduction for the up to 30% in up front management fees. Id. Moreover, the investors' dividends, which typically are a set percentage of the capital account, are not reduced proportionately to the management fees collected. Id.

BSG Fund does, however, collect--and distribute to its manager/partners--management fees, despite such fees not being reflected on the investor ledgers. Id. at ¶ 54.

When BSG Fund solicited and received investor funds, BSG Fund held "closings" twice a month, on the 1st and 15th, when it would receive and then deploy investor funds. Id. at ¶ 55

From the interview with Steven Baldassarra, the Monitor learned that BSG Fund maintains what it refers to as a "management fee worksheet." Id. at ¶ 56. In essence, with each "closing" (*i.e.*, when investor funds were received historically on the 1st and 15th of each month), Steven Baldassarra calculated how much BSG Fund *could* collect in management fees on a Series-by-Series basis. Id.

At present, according to records provided by the Monitorship Entities, **the investor capital account balances across all Series is approximately $633,000,000**. Id. at ¶ 60. From January 1, 2025 through May 31, 2025, according to Juniper records, BSG Fund paid approximately $75,073,250 in investor dividends. Id.

> Based on internal accounting records and bank statements provided by the Monitorship Entitites and reviewed by the Monitor's forensic accountant team, from January 1, 2025, through May 31, 2025, BSG Management, as manager of BSG Fund, received a total of approximately $73,955,551 in incoming transfers. Id. at ¶ 61. Of that, approximately $5,012,503, or 6.8% was from Contender Development. Id. Another $8,714,034, or 11.78%, was from crypto mining activity. Id. **The remaining approximately $58,958,667, or 79.7% was from Samson, representing liquidated profits the historic MCA portfolios**. Id.
>
> ***Ultimately, for BSG Fund to be able to meet its dividend obligations going forward, and particularly into 2026, it appears that BSG Fund must begin to receive significantly more revenue from non-MCA sources (such as infrastructure), liquidate certain assets, or sell all or part of its equity in the infrastructure portfolio.***" Id. at ¶ 71

(Emphasis added).

308) Notably, on February 24, 2026, in another legal proceeding the President of Contender Development, Inc. acknowledged that the Highland Colony Estates infrastructure project (which is listed as a Broadstreet asset in Broadstreet's quarterly reports) has been completed. See Case 9:26-cv-80119-RKA (S.D. Fla.) DE 35-2 at page 2. The Highland Colony Estates infrastructure project was held in the Anderson Ridge Development LLC special purpose vehicle ("SPV"). The land for this project was purchased with $2,616,600.00. The Greenville, South Carolina county records show that a $740,880.00 mortgage was taken out on this land and all the lots associated with this infrastructure project were sold by June 10, 2024 for $6,615,000. Thus, the gross revenue for this project is approximately 2.5 times the initial investment, and that is before expenses are paid. After the mortgage was repaid and this project was closed there was presumably $5,874,120.00 remaining.

309) Also, on October 7, 2025, the Monitor issued a supplement to the Third Status Report to clarify that on a money in and money out basis the Samson/MCA portfolios were not profitable and in fact "from 2019 through mid-2025, [Broadstreet] sent at least $40 million more

to Samson than [Broadstreet] have received from Samson." See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 140. Thus, the Samson/MCA Series resulted in a $40 million loss.

**XVII. Monitor's Fourth Status Report.**

310) The Monitor issued his Fourth Status Report on October 30, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 165. In it the Monitor reported, *inter alia*, that:

> The Monitorship Entities owns a number of assets including 20,000 acres of infrastructure developments, hotels, car dealerships, and vacant land, among other assets. Id. at ¶ 7. The infrastructure assets are the most valuable, and comprise over 50 communities, over 120 projects, and over 40,000 eventual homesites. Id.
>
> As previously reported, the infrastructure assets are currently held through special purpose vehicles ("SPVs"), typically with 30% of the SPV being held by a "developer partner" (such as Contender Development, Inc.) and 70% of the SPV being held by the "equity partner." Id. at ¶ 8. For many of the infrastructure assets represented to be in the Broadstreet portfolio, the SPV's operating agreement identifies BSI (Broad Street, Inc.) as the 70% "equity partner." Id.
>
> [P]ursuant to the Tri-Pary Agreement … any proceeds from the sale of the lots owned by an SPV with BSI as the "equity partner" will flow to BSGM and then to the BSG Fund. Id. at ¶ 9.
>
> As of the filing of the Third Status Report, the Monitor was operating under incorrect impression that the incoming funds from Samson represented "profits" on a money in/money out basis. Id. at ¶ 27. In other words, the Monitor was led to believe that, from the beginning of time, the Monitorship Entities had sent more money to Samson to be invested in the MCA portfolio than it had received from Samson, and thus the current funds being received from Samson represented "profits." Id.
>
> The Monitor later learned that the Monitorship Entities did not provide the Monitor with the actual funds "received" from Samson, as the Monitor had requested. Id. at ¶ 28. Rather, the Monitorship Entities provided the Monitor with "right to receive" or "RTR" figures – which are projected, best-case scenario figures that assume all accounts receivable are collected. Id. The Monitor thus filed a Supplement to the Third Status Report retracting his statement about the profitability of the MCA portfolio. Id.
>
> Therein, the Monitor reported that, as of October 3, 2025, when the Monitor finally received a draft accounting from the Monitorship Entities of the money in and money out for the years 2019 through 2022, the updated accounting reveals that, from 2019 through mid-2025, the Monitorship Entities sent at least $40 million

*more* to Samson than the Monitorship Entities have received from Samson. Id. at ¶ 29.

In the time leading up to and following the publishing of the Supplement, the Monitor has continued his efforts to evaluate what exactly the incoming funds from Samson represent – both from an accounting standpoint and from a factual standpoint. The issue remains highly significant to the Monitor given (i) the amount of funds BSG Fund has received (and continues to receive) from Samson relative to the total amount of other funds BSG Fund receives; and (ii) BSG Fund's current monthly dividend obligations to investors. Id. at ¶ 30.

As such, the Monitor stands by his position, as reported in the Supplement to the Third Status Report. … The Monitor is merely saying that, on a macro-level, money in/money out basis, there remains a $40 million deficiency over the life of the MCA portfolio. Id. at ¶ 34.

Based on internal accounting records and bank statements provided by the Monitorship Entities and reviewed by the Monitor's forensic accountant team, from June 1, 2025 through September 30, 2025, BSGM, as manager of BSG Fund, received a total of approximately $93,419,429 in incoming transfers. Id. at ¶ 38. Of that, approximately $38,690,884 or 41.4%, was received from Samson (on account of the current liquidation of the MCA portfolio). Id. Another $13,053,650, or 14%, was received on account of infrastructure income. Id. $2,784770, or 3.0% was received on account of mining equipment rental income. Id. Approximately $509,180, or .5% represented interest. And $37,515,520.36, or 38.1%, represented deposits that have not been identifies. Id.

From January 1 to May 31, 2025, the vast majority of funds being used to pay investor dividends came from the BSG Fund's liquidation of the MCA portfolio, and the Monitor was aware that the stream of funds would taper off in the first quarter of 2026 … (reporting that the MCA portfolios "will be fully liquidated by the beginning of 2026." Id. at ¶ 41.

The Monitorship Entities have represented to the Monitor that … monthly expenses to investors comprised approximately $7 million per month. Id. at ¶ 44.

The Monitorship Entities have also represented that they recently signed an Indication of Interest with a large, national homebuilder to sell fifteen subdivisions in an all-cash transaction for $185 million. Id. at ¶ 45. This transaction was expected to close before the end of 2025 and, after factoring in pre-paid earnest money deposits, payments to lender, and other escrows, BSG Fund expects to receive approximately $155 million.[7] Id.

[7] Although this number is redacted, Broadstreet later disclosed this number in its February 2, 2026 Investor Update.

Needless to say, if this transaction closes, and the timing (end of year) and estimates $155 million hold, given current bank balances and other potential transactions … the Monitor believed that the Monitorship Entities will have sufficient funds to cover monthly obligations for the foreseeable future. Id. at ¶ 46.

In August 2025, after a series of possible asset sales and proposed redemptions that were not consummated, the Monitorship Entities advised the Monitor of another possible sale and proposed redemption of investors. Id. at ¶ 48. The current transaction that the Monitorship Entities wish to pursue is on that the Monitorship Entities have characterized in various Court filings as a "$3.7 billion" transaction. Id. This is the most significant and material transaction that the Monitorship Entities have pursued since the Monitor's appointment. Id. The contemplated transaction would eliminate all investors in BSG Fund – thereby eliminating *all* investors in the Monitorship Entities—thereby eliminating *all* investors' interest in the Fund and *all* investors' right to receive future distributions from the BSG Fund. Id.

The Monitor has had questions and concerns about the transaction, including that the proposed transaction did not seek to redeem investors for cash – instead, the investors are to receive stock in a SPAC (special purpose acquisition company) incorporated outside of the United States that could potentially be "locked up" for up to 42 months and that is receiving only 30% of the BSG Fund's infrastructure assets. Id. at ¶ 49.

The plan, generally, is for the SPAC to develop homes on the projects being purchased and sell them to end users, thereby capturing the upside that was typically obtained by the homebuilders that purchased BSG Fund's infrastructure lots after the infrastructure work had been completed. Id. at ¶ 50.

The SPAC will also be purchasing other properties from other entities and already has obtained $252 million, per SEC filings. Id. at ¶ 50.

The Monitorship Entities first wanted to conduct the redemption of all investors "in kind," which means by providing something other than cash in exchange for the investors' interest in BSG Fund. The "in kind" stock amount has evolved over time, because the transaction is fluid, but the current iteration of the transaction involves an investor receiving ***three time*** their current capital account in SPAC stock. Id. at ¶ 51. Nevertheless, because the investors have the current right to redeem their investment in the BSG Fund for cash, the Monitor thought it would be appropriate to give investors that option as well. Id.

The Monitorship Entities agreed with that recommendation, so the Monitorship Entities and the Monitor are currently working together to compose a redemption notice to be sent to all investors that gives them the choice of either being redeemed in cash (in accordance with the documents governing their investment, which typically required payment within 180 days) or, instead, accepting three times their

current capital account in restricted SPAC stock for which they would be foregoing all dividend distributions. Id. at ¶ 52.

The Monitor also asked the Monitorship Entities if they had the wherewithal, or a plan in place, to fund redemptions *in the event* they exceeded current bank balances, which the Monitor though was at least a possibility given (i) the involvement of a foreign-incorporated entity with no operating history; (ii) the more limited universe of assets that are being purchased by the entity (30% of the BSG Fund's infrastructure assets); and (iii) the potentially long-term restrictions that are being placed on the SPAC stock they would be receiving. Id. at ¶ 54.

In other words, while receiving stock valued at three times one's capital account is obviously attractive, the Monitor thought it possible that at least some investors, who had been accustom to receiving regular ~14% dividends with an unrestricted right to redeem their investment as they please, might be disinclined to, instead, accept stock that could be locked up for 42 months while no longer receiving dividends or having access to the funds they invested. Id. at ¶ 55.

The Monitorship Entities, in response, shared the Indication of Interest for the $155 million transaction discussed above. Id. at ¶ 56. The Monitorship Entities also confirmed that, if necessary, other assets could be sold to satisfy redemptions (which, again, the Monitorship Entities would have 180 days to fund). Id. The Monitorship Entities also shared details of other potential nine-figure transactions—to sell some or all of the remaining infrastructure projects—that are currently being discussed. Id. As of the filing of this report, the other transactions have not yet been memorialized in a writing. Id.

## XVIII. Broadstreet Initiated Its Scheme to Get Rid of its Remaining Investors in November 2025 by Issuing a Redemption Notice.

311) On November 13, 2025, a Zoom meeting was held for Broadstreet investors, where David Feingold discussed the redemption process and the proposed public company or SPAC transaction.

312) Feingold said the decision was driven by the fact that he was getting older, there needed to be a succession plan for when he's not able to run the company anymore and he thought handing over the investors to a startup company ran by young people was in everyone's best interest.

313) Feingold said that he demanded that Soulpower Acquisition Corporation make him the largest shareholder of SOUL stock.

314) Feingold said that he demanded that Soulpower Acquisition Corporation make all the shares restricted, including any shares he received. Feingold said that the "biggest shareholders should be more restricted than everyone else."

315) Feingold said that Soulpower Acquisition Corporation agreed to his demands.

316) Feingold said that as a result, he received 75 million shares of SOUL. Feingold said it is a big pay day for him if he does what he knows in his heart he is going to achieve.

317) Feingold went on to say that the average Broadstreet investor has been with Broadstreet about three years, and in three years Broadstreet is able to get its investors their capital back where other private equity firms take seven years. Feingold said "that's called not being average"

318) Feingold further said "At some point you are going to get a Redemption Notice. I mean this with all sincerity. **Whether you pick Option A or Option B. That's up to you**. Go talk to as many lawyers, accountants, whoever. **That's your decision**."

319) No questions were allowed during this Zoom meeting. But Feingold went over a list of pre-populated questions.

320) The next day, November 14, 2025, Broadstreet sent its investors the Redemption Notice via Docusign.[8]

321) Contained in the Redemption Notice packet was a cover letter from David Feingold; the Redemption Notice agreement for the investors to Docusign; Item 1 - a document

---

[8] Initially, Broadstreet sent its investors a Redemption Notice via Docusign on or about October 24, 2025. However, at the behest of the Monitor, Broadstreet resent the redemption notice on November 14, 2025 with more information.

entitled Additional Q&A Information Schedule; Item 2 - the Amended and Restated LLC Agreement of Broad Street Global Fund LLC dated September 2023; Item 3 – Summary of Lock-Up Agreement; and Item 4 – Contender Development, Inc. Calculated Value of Business Enterprise of NewCo. See the November 14, 2025 Redemption Notice Packet attached hereto as **Exhibit A**.

**a. Cover Letter to Redemption Notice.**

322) The cover letter from David Feingold states in pertinent part:

> We will be pursuing our business on a private basis. As a result, **we will be providing you two options to determine how you would like to exit from your investment**. The first option, known as Option A, will be to simply have you redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.
>
> The second option, which was completely voluntary on our part, and is being given to those who desire to participate in a new real estate enterprise with a new company, is known as Option B. Option B will be a public entity that is purchasing 21 of our infrastructure projects and will involve me personally. That option will allow you to receive stock valued at three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. That stock will have restrictions on trading or liquidating, which can be as long as 42 months (or possibly less, depending on the trading volume and pricing for the public entity). Option B will not entitle you to any quarterly, monthly, or annual distributions. Your Broadstreet investment will be traded for the stock in the public entity. That stock can increase over time or decrease. **That option is different from anything previously provided in your original documents that you signed. It is an entirely new venture.**
>
> In addition, I want each and every one of you to know that I personally will be taking the overwhelming majority of my compensation in the form of stock in the public enterprise and I will be the largest individual shareholder in that entity. ***I will be responsible for the operation of the real estate division of that enterprise***. I will also have restrictions on my ability to sell my stock. I will not be permitted to sell even a single share of stock for two years, regardless of the stock price or stock volume. Although I will not be the CEO of the public company, at nearly 60 years of age, I have other goals, primarily to increase my net worth and not caring much about my actual job title. Rest assured, ***I will be intimately involved in this new venture***. ***The new company will be run by a group of much younger and highly educated persons from Wharton, Harvard and Cornell*** who have a new economy view of real estate and financial services. They have a skill set that I simply do not possess to lead into this new world of decentralized finance, payments, stable coins and business transactions. ***My focus will be the real estate operations*** and I hope

> that the company, having a new economy aspect mixed with old economy assets, will allow for the type of investment valuation that an old world real estate company simply does not command in the market place.
>
> Nonetheless, I will be the largest shareholder, I will actively advocate for that which I believe will serve me personally best, and that is the success of the stock and any further additional benefits that I will lobby for the stock to have.
>
> Please read the attached redemption notice and its attachments carefully. Please also read the "Additional Q&A Information Schedule," which has additional questions and answers. What is best for me, may not be best for you and vice versa. **<u>The decision is solely yours to make.</u>** I have my own opinions, but they are just that, my opinions based on my goals, you need to make your own decision.

(Emphasis added.)

323) Most notably in this cover letter Feingold expressly told the investors in writing that (i) each investor will get to determine how they would like to exit from the BSG Fund, (ii) Option B is an entirely new venture and is different from anything previously provided in the original documents that the investors signed; and (iii) the decision is solely yours to make.

324) Broadstreet would later claim that it has the sole discretion to determine how the redemptions will be made in direct contraction to the representations Feingold made to the investors in this cover letter. Broadstreet cannot tell the investors that each investor will get to determine how they would like to be redeemed and then renege on that representation because one of the redemption options, while doable, is inconvenient to Broadstreet.

**b. The Redemption Notice.**

325) Along with this letter Broadstreet sent its investors the Redemption Notice for the investors to Docusign requesting that they identify which redemption option they wanted – cash or stock. The Redemption Notice states, in pertinent part:

> As an Investor in the Broadstreet Global Fund, LLC ("BSG Fund"), you are hereby advised of our full redemption of the entirety of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), that each investor executed to become an investor with

BSG Fund. **This redemption is binding** upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in or attached to this notice.

Some of the Sale Opportunities will generate cash from the sale of individual infrastructure and land projects and another Sale Opportunity will create the payment through common stock of a New York Stock Exchange listed company that is restricted. By “restricted,” we mean the stock you would be receiving has substantial restrictions on when it can be sold (restrictions could be for up to forty-two (42) months or less, depending on the price and trading volume of the stock). All restrictions are more specifically discussed in the draft Lock-Up Agreement attached as **Item 3**.

For your redemption, you will be given two choices, and you **must** make a selection. Under one option (Redemption Choice – A), the investor would receive, in cash, an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The second option (Redemption Choice – B) involves providing the investor with the payment of restricted (as defined above) common stock in a company named Soulpower Acquisition Corp. (NYSE symbol: Soul), which is purchasing 21 infrastructure projects from BSG Fund through an entity called SWB Holdings; which will then merge into Soul with those assets from BSG Fund and contain approximately $250 million in cash. You will be paid in stock equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis of this valuation of the assets being transferred to SWB Holdings and ultimately Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated at an arm’s length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. A copy of one such valuation is attached as **Item 4**.

**There will be no additional returns or consideration paid. No additional payments or preferred returns will be paid to you on or after November 14, 2025.**

**After this redemption, whether you choose choice A or B, you will no longer be an investor in BSG Fund, you will no longer receive preferred returns or other payments from BSG Fund, and there will be no additional amounts or returns paid to you by BSG Fund**.

This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as Item 2 and also available in the BSG Fund data room under the tab Operating Agreement.

**REDEMPTION CHOICE – A**

For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSG Fund.

**REDEMPTION CHOICE – B**

For the second choice of redemption, known as "Redemption Choice – B," you will be paid with the payment of restricted common stock in a New York Stock Exchange listed company equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis for this valuation of assets being transferred to SWB Holdings which will ultimately become Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold for public stock at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated on an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. The above-mentioned Operating Agreement will no longer govern any of your rights, or any of the terms or conditions on your investment, because you will no longer be an investor in BSG Fund. You will no longer receive any preferred returns or other payments from BSG Fund, because you will no longer be an investor in BSG Fund. You are also cautioned that the stock you are receiving contains substantial restrictions and conditions on when you can sell the stock, which are set forth in the document entitled Lock-Up Agreement attached as Item 3 and which has also been placed in the BSG Fund data room under the heading of Stock Redemption. You should read this document carefully to fully understand the nature of the payment of stock being made for Redemption Choice – B. In addition, you are urged to review the "Additional Q&A Information Schedule" that is attached as **Item 1**; click on the link provided in that schedule, and/or go to the website SEC.GOV, to read all of the public filings on the New York Stock Exchange Company whose stock you will be receiving. At the conclusion of this transaction, and after your stock has been transferred, you will no longer be an investor in BSG Fund.

All prior risk factors in any and all documentation that you received from BSG Fund are incorporated herein by reference and, in addition, you grant Broadstreet, Inc. a power of attorney to execute any and all documents necessary on your behalf in order to accomplish the matters set forth herein.

Neither the United States Securities and Exchange Commission nor any State Securities Administrator has approved or disapproved this redemption notice.

> We will no longer be open to any new outside investors. Thus, you will either be completely redeemed for cash as specified in Redemption Choice – A or you will participate in Redemption Choice – B and be completely redeemed for restricted stock as specified in Redemption Choice – B.
>
> **Going forward, you will no longer be a member of BSG Fund, your capital accounts will be a zero and you will not receive any other payments or preferred distributions.**
>
> Investors will have fourteen (14) days to select which redemption they are choosing.

(Emphasis added). Here, the majority of Plaintiffs elected Redemption Choice – A to receive a cash redemption, and this selection was **binding**.

**c. Item 1 the Additional Q&A Information Schedule.**

326) In lieu of taking questions at the November 13, 2025 Zoom meeting, Broadstreet included as Item 1 in the Redemption Notice Packet an Additional Q&A Information Schedule. Some of the most notable questions and answers contained in that document are as follows:

> Question 3: Is any cash also being paid, and, if so, how much? **No, the PUBCO transaction is an all stock deal.**
>
> Question 5: If, for example, $150 million in investors choose to redeem, what exactly is the plan to generate the monies needed to fund those redemptions? **We will not know for sure the extent of Broadstreet's redemption obligation until the complete redemption notice process is followed and completed. Nonetheless, we have a number of remaining assets available for sale, even excluding the 21 projects being sold to PUBCO, with indications that those assets are worth more than enough to cover all cash demanded. It would just require a sale of certain assets.**
>
> Question 6: I read that SWB Holdings will have $250 million in cash, but I have not been told if any of those funds are available to the monitorship entities to redeem investors. If so, how much? **The Asset Management Agreement provides us access to the cash which PUBCO will have for our operations. Nonetheless, we think our need to even access such capital is extremely remote based upon negotiations and offers that we have received on our assets that would be available for sale**.

Question 8: Is third-party financing available or lined up to fund redemption obligations? **We have been approached with a $500 million term sheet involving PUBCO stock to secure more funding if need be. At this point, the term sheet is under negotiation but again, we believe the value of our assets alone should suffice to meet any redemption requirement for cash.**

Question 16: If Broadstreet is keeping “70%” of the assets, will David Feingold also continue to have a role with Broadstreet? If so, how does he plan on simultaneously serving Broadstreet and PUBCO? Will Contender still serve as developer for Broadstreet’s remaining assets? If so, how will Contender, with finite resources, serve as developer for two entities that are competing in the same market and the same region? I have the similar questions for Joe Baldassarra and Steve Baldassarra, and Broadstreet’s other “partners.” **Broadstreet plans to sell its remaining assets and make distributions to its partners who have certain levels of ownership in the business. Feingold, the Baldassarras and the other partners will continue to maintain their roles with Broadstreet until such sale of assets is complete. Contender will act as developer for Broadstreet’s remaining assets until they are sold. Contender and PUBCO will not be competing as Broadstreet will not be expanding its business. Broadstreet will merely complete its existing business. The Baldassarras and the other existing partners of Broadstreet will be passive shareholders in PUBCO but will not have any other role with PUBCO.**

327) In the answers to questions 5, 6 and 8, Broadstreet represents that it has sufficient means to fulfil the cash redemption obligations.

328) In the answer to question 3, Broadstreet misrepresents that investors who select Option B to receive stock will not receive cash, since Broadstreet has entered into side letter agreements where it has agreed to return some of an investor’s cash or transfer a portion of their investment to Innovative Development Funds LLC (a company in the Broadstreet family) where they can continue to receive cash distribution if they select Option B.

329) In the answer to question 16, Broadstreet makes it clear that after already siphoning off 30% (over $300 million) of the money raised for the BSG Fund, the partners at Broadstreet are going to keep for themselves more than 70% (over $500 million) of the assets purchased with Broadstreet investors’ money.

330) Broadstreet's current position is that it can force all the BSG Fund investors to accept shares of a speculative, illiquid and restricted stock as an "in-kind" redemption while the partners at Broadstreet get to divvy up over $500 million of assets purchased with the BSG Fund investors' funds.

331) This is theft in broad daylight, and nothing in the PPM, Operating Agreement or any of the corporate documents gives Broadstreet the right to do this.

**d. Item 2 the Operating Agreement.**

332) Also, contained in the Redemption Notice Packet at Item 2 was the Amended and Restated Limited Liability Company Agreement of Broad Street Global Funds LLC dated as of September 2023, which provides the following regarding a forced redemption:

> Section 6.03 Required Withdrawals. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior **written notice** of a termination of all or any portion of such Member's Capital Account. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice **shall receive the fair value of its Capital Account** in connection with its withdrawal.

(Emphasis added).

333) The highly speculative, illiquid and restrictive stock that Broadstreet wants to force on its investors is not an "in-kind" redemption under the Operating Agreement. Section 6.03 states that in the case of a required withdrawal the members shall receive the **fair value** of their capital account.

334) Moreover, an "in-kind" redemption represents an investors pro rata share of the entire investment. In particular, Section 80a-2(a)(32) of the U.S Code defines a "redeemable security" as:

> "Redeemable security" means any security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, ***is entitled*** (whether absolutely or only out of surplus) ***to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof.***

15 U.S.C. § 80a-2(a)(32) (emphasis added).

335) Here, Broadstreet only uses **30%** of its infrastructure assets to pay for the SOUL shares that it is distributing to **all** its investors. Thus, Broadstreet investors are only receiving their pro rata share of 30% of the BSG Fund's infrastructure projects – not their pro rata share of the entire BSG fund. Since the BSG Fund investors' capital account represented their pro rata share of the entire fund, the BSG Fund investors are receiving shares that are worth significantly less than their capital accounts in the BSG Fund.

**e. Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo.**

336) Further, in the Redemption Notice Broadstreet claims that "The basis of this valuation of the assets being transferred to SWB Holdings and ultimately Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold at a valuation range of a low of $487 million to a high of multiple billion."

337) To support its calculated valuation of the assets being transferred to Soulpower Acquisition Corp., Broadstreet included in the Redemption Notice Packet Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo. This report was prepared by CohnReznick on October 2, 2025 for David Feingold of Contender Development, Inc.

338) In this report the total appraised value for the BSG Fund's 23 infrastructure projects included in this transaction is listed as $76,675,000 and the total gross revenue adds up to $2,253,806,014.

| Infrastructure Project included in the SOUL Transaction | Total Gross Revenue | Appraised Value | Appraised Value's Percentage of Gross Revenue | Amount Multiplied by the Appraised Value to Equal Total Gross Return |
|---|---|---|---|---|
| Brickyard | $14,700,000.00 | $575,000.00 | 4% | 25.57 |
| Chestnut Crossing | $15,367,998.00 | $1,810,000.00 | 12% | 8.49 |
| Dusty Road | $42,162,815.00 | | | |
| Freedom Florence | $19,668,762.00 | | | |
| Hardscrabble | $24,972,848.00 | $3,520,000.00 | 14% | 7.09 |
| Hawksbill | $212,639,297.00 | | | |
| Highway 357 | $6,463,422.00 | | | |
| Kendrick Creek | $22,577,545.00 | | | |
| Midway | $430,260,895.00 | | | |
| Mountain Drive | $22,033,115.00 | $1,835,000.00 | 8% | 12.01 |
| Oak Hills | $116,019,919.00 | $52,045,000.00 | 45% | 2.23 |
| Oak Hills II | $41,307,276.00 | $1,680,000.00 | 4% | 24.59 |
| Raeford | $20,055,000.00 | | | |
| Ray Road | $22,885,000.00 | | | |
| Rice Creek | $289,880,000.00 | | | |
| Ridge Road | $301,560,180.00 | $11,560,000.00 | 4% | 26.09 |
| Rockgate | $20,750,730.00 | $3,650,000.00 | 18% | 5.69 |
| Ted Farms | $20,400,649.00 | | | |
| Wakefield | $80,100,563.00 | | | |
| Catawba | $154,000,000.00 | | | |
| Mallard | $172,000,000.00 | | | |
| Pearson | $109,000,000.00 | | | |
| MacGregor | $95,000,000.00 | | | |
| | | | | |
| **TOTALS** | **$2,253,806,014.00** | **$76,675,000.00** | | |

339) Admittedly, there is no appraised value for most of the infrastructure projects, which is odd since Broadstreet/Contender Development, Inc. provided CohnReznick with the appraised value numbers. Broadstreet/Contender Development, Inc. should know how much of the BSG Funds were used to acquire each of the infrastructure projects. Even without an updated appraisal, at the very least each infrastructure project should have a value equal to the amount that

was spent to acquire the assets. Without this basic information (i.e. the cost of each infrastructure project), this document cannot be used to support Broadstreet's claim that at a minimum the infrastructure projects are valued at $487 million.

340) From the appraised values that were provided, it is clear that several of the infrastructure projects would have to increase their appraised value by 25 times the "Appraised Value" (basically going from $1 million to $25 million) to reach the "Total Gross Revenue" number that Broadstreet is using to claim that these infrastructure projects are worth billions.

341) Broadstreet has provided no evidence that they have ever been able to accomplish that, and in fact the only infrastructure project that Broadstreet has ever completed Highland Colony Estates (notably with non-Broadstreet investors' money) only had a gross return of 2.5 times the value of the land acquired for that infrastructure project.

342) Accordingly, there is no track record or any other basis that would support Broadstreet's representation the infrastructure projects are worth the combined $2.2 billion total gross revenue numbers contained in this report.

343) Moreover, even assuming, *arguendo*, that the total gross revenue numbers were accurate, they only represent gross revenue, which is the sales revenue before any costs or expenses are deducted.

344) So, while the total gross revenue adds up to $2.2 billion, this number cannot be used to determine the current value of the infrastructure projects involved in the Soulpower Acquisition Corp. transaction without knowing the projected expenses.

345) We do, however, know that Broadstreet intends on transferring over 30% of its infrastructure assets to Soulpower Acquisition Corp. Based on the numbers in Monitor's Third

Status Report, 30% of the infrastructure assets would represent $114,900,000[9] of investors' capital. Thus, assets that were acquired with approximately $114,900,000 of investors' capital is going to Soulpower Acquisition Corp, and **Broadstreet is keeping assets worth <u>$518,100,000</u>**[10] for itself and its partners.

346) In addition to the 70% of infrastructure assets, Broadstreet is keeping its investors investments in Crystal Lagoons, Self-Storage, Car Dealerships, Hotels, Land Banking, Durham, 1031 Exchange, TIC-Land, Annuities, TEFs, Fixed Income and Approximately 35 pre-IPOs. Id. at ¶¶ 29-31. All purchased with funds from Broadstreet investors.

347) As discussed below, the June 2, 2026 Monitor's Seventh Status Report reveals that the BSG Fund was obligated to redeem approximately $2 billion in stock. Thus, it appears that Broadstreet is claiming assets that were purchased with approximately $114.9 million of its investors' funds will be worth $2 billion in 3 ½ years, with no explanation of how that is possible.

348) Broadstreet's projects have absolutely no basis in fact or reality and appear to be entirely made up to hide the fact that Broadstreet is stealing assets acquired with approximately $518 million of the money raised from its investors.

349) And that's in addition to the over $300 million Broadstreet already collected in fees for five years of service that it hasn't and will never provide.

350) All while Plaintiffs have yet to make a profit on their investments in the BSG Fund, as the shares Broadstreet is trying to force them to accept are speculative, illiquid and could be restricted for the next 3 ½ years.

---

9 Calculated as follows: 0.30 x ($239,000,000 + $144,000,000) = $114,900,000. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 135 at ¶ 31.

10 Calculated as follows: $633,000,000 - $114,900,000 = $518,100,000. Id.

## XIX. Issues with Soulpower Acquisition Corp. and SPAC's in General.

351) Soulpower Acquisition Corporation (SOUL) is a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. It completed its Initial Public Offering (IPO) on April 3, 2025.

352) SOUL is a "family affair" run by two young brothers from Long Island, New York. Justin Lafazan, is the chief executive officer and chairman of the board and his brother Joshua Lafazan is the president.

353) Justin Lafazan (believed to be 29 or 30) has no prior experience in leading a large company; his background appears to be in motivational speaking and co-founding Next Gen HQ which provides a "full ecosystem to help Next Gen-ers across the world reach their goals and dreams[11]."

354) His brother, Joshua Lafazan (believed to be 32), is a former member of the Nassau County Legislature in New York. Joshua Lafazan is perhaps best known for introducing and promoting legislation that would have expanded Nassau County's human rights laws to designate police officers as a "protected class" empowered to sue Black Lives Matter protestors for damages[12].

355) From statements made by CEO Justin Lafazan, SOUL seems to have a decidedly ideological bent. As reported in *The Financial Times*[13] Justin Lafazan stated that

---

[11] https://www.nextgenhq.com/our-story (accessed October 23, 2025).

[12] https://www.nbcnews.com/news/us-news/n-y-county-exec-vetoes-bill-would-allow-police-sue-n1276568 (accessed August 6, 2026).

[13] *You Have $250m. Your mission: overthrow the World Bank. What do you buy?* The Financial Times published April 25, 2025. https://www.ft.com/content/d7d24470-a200-4a1a-bf88-09fd84b55075 (accessed October 23, 2025).

> "[SOUL] has officially filed our permit to start The New World Bank. I believe that the current The World Bank, similar to the United Nations, is an ineffective and morally corrupt organization. I believe that they are largely failing at their mission to boost economic prosperity for people around the world. I believe that the world does not need the 'Charity' of a 'Non-Profit' World Bank."

356) In an effort to accomplish its vision to create "The New World Bank," SOUL seeks to purchase certain unknown assets of Broad Street Global Management, which is in the midst of an SEC enforcement action. Further, SOUL also seeks to purchase assets of Bank of Asia (BVI) Limited, which is in the midst of court-ordered liquidation in the Virgin Islands and has caused a political scandal in the Virgin Islands[14].

357) In addition to the Plaintiffs' concerns about the youth and inexperience of SOUL's management, its nakedly ideological bent, and the quality of the assets it is acquiring, there are fundamental concerns about the track record and performance of SPACs in general[15].

358) The costs embedded in the SPAC structure are far higher than costs associated with traditional IPOs. Overall, mean and median market-adjusted returns to SPAC shareholders are negative 64% and negative 88% respectively.

359) In SPACs generally there are poor disclosure practices and sponsor incentives that are misaligned with shareholder interests. SPAC targets are more likely to be "pre-revenue" or low-revenue companies. Those companies may have little other than projections with which to communicate their value to investors. And aggressive projections could be one of the reasons SPAC shareholders go along with mergers that leave them with losses. The comprehensive analysis finds that SPAC mergers have resulted in systematically bad deals for shareholders.

---

[14] *Premier faces questions in HOA on failed Bank of Asia*, BVI News published on July 21, 2026. https://bvinews.com/premier-faces-questions-in-hoa-on-failed-bank-of-asia/#:~:text=The%20government's%20deposit%20in%20the,into%20the%20now%2Ddefunct%20bank. (accessed August 6, 2026)

[15] Klausner, Ohlrogge, Ruan, "A Sober Look at SPACs" 39 Yale Journal on Regulation 228 (2022).

## XX. The December 3, 2025 Hearing in the SEC Enforcement Action.

360) On December 3, 2025, a hearing was held in the SEC's enforcement action on Broadstreet's motion to discharge the monitor. During this hearing, counsel for Broadstreet made the following representations to the Court:

> "As you are also aware, Broad Street has obtained a $3.7 billion buyout and redemption of all of Broad Street's investors. Approximately, **83 percent of the investors have chosen stock**, and **17 percent have chosen cash**. As such, Broad Street no longer has any investors. Additionally, Broad Street had nearly 4,000 investors and never missed a payment to a single one of its investors."

> "Under Docket Entry 178, we have provided notice to the Court of the lawsuit Broad Street intends to file against him, the Monitor, now that redemption is complete and the damages number against him and his firm is set, including **$130 million in cash** and **$450 million in stock** that he forced Broad Street to pay to its investors that was not in any contract with investors, but that the Monitor demanded knowing that investors signed contracts to be paid substantially less."

See Pages 6 and 7 of the Transcript of December 3, 3035 hearing in Case 1:25-cv-20436-DPG (S.D. Fla.) DE 210.

## XXI. Broadstreet Misrepresents the Amount of Investors that Chose Stock verses Cash.

361) Broadstreet entered into side letter agreements promising investors cash if they Chose Option B to receive stock.

362) For example, Broadstreet sent a side letter dated November 22, 2025 to a BSG Fund investor where BSG Fund agrees to give an amount in cash and an amount of SOUL shares if the investor agrees to selecting Choice B in the redemption notice. See Side Letter Agreement attached hereto as **Exhibit H**.

363) In addition, Broadstreet offered side letter agreements to other investors with an option to continue receiving distributions through a company called Innovative Development Fund LLC, which they were told is part of the Broadstreet Family, if they choose Option B to receive stock. See Side Letter Agreement attached hereto as **Exhibit I**.

364) Broadstreet clearly was offering to move its investors across the street to a company called Innovative Development Funds, LLC, which its representatives claim is part of the Broadstreet family office, presumably so that it could claim that Broadstreet no longer has any investors.

365) Broadstreet also appears to be in the process of transferring assets purchased with money from BSG Fund investors to a company called Innovative Development Funds, LLC.

366) Regardless, Broadstreet's representation regarding how many of its investors chose stock over cash is a lie because it has numerous side agreements with the investors who chose Option-B for stock to funnel cash back to them.

**XXII. Broadstreet's February 2, 2026 Investor Update.**

367) On February 2, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-2]. In it, Broadstreet stated that:

> Collectively, the Stock and Cash payments (collectively referred to as the "Redemption Consideration") to be made to investors has a payment deadline of May 27, 2026, and the Redemption Consideration due is approximately $2.14 billion.
>
> The remaining 6% of the Redemption Consideration is payable as Cash and is reliant on asset sales of projects not sold for Stock, nor projects that have been set aside due to a litigation dispute, and thereby there are substantial assets remaining available through additional sales that are being procured for cash. Those sales are being pursued through negotiations with multiple different counterparties and among them two major multi-billion dollar publicly traded companies (hereinafter referred to as Purchaser #1 and Purchaser #2).
>
> Purchaser #1 offered to pay for certain projects a total of one hundred and eighty-five million dollars ($185,000,000) with a net of approximately one hundred and fifty-five million ($155,000,000) to be achieved and to be paid by December 31, 2025. **Such transaction did not close as anticipated** due to additional circumstances as discussed below (see "Monitor Relationship" below). Purchaser #2 offered to pay for certain projects the sum of four hundred and fifty million dollars ($450,000,000) with negotiations ongoing and continuing to focus on

> specific projects, the valuations of those projects, the expected delivery status of those projects (such as what phase of construction would be at completion on turnover) and such other details as possibly joint venturing future business endeavors, transaction structures and handling of future construction completion, to name a few.
>
> As the Deadline is approximately four months away, achievement of asset sales to satisfy the remaining Redemption Consideration is being pursued by this strategy and individual sales to other potential suitors.

(Emphasis added).

368) In this letter, Broadstreet acknowledges that the $185 million transaction discussed in the Monitor's Fourth Report and that Broadstreet was planning to use to fund the cash redemptions did not happen.

369) But Broadstreet tried to alleviate investors' concerns by claiming that there is another $450 million transaction that they are working on to generate the money necessary to fund the cash redemption.

370) Additionally, in this investor update Broadstreet begins claiming that 94% of its investors chose to receive a stock redemption. However, Broadstreet only gets to this number by artificially inflating the capital accounts of the investors who chose stock by three times (3x) their prior value to make the 18% of investors who selected a cash redemption appear to only be 6%.

371) Further proof of this is the fact that at the December 3, 2025 SEC enforcement hearing Broadstreet's attorney represented to the Court that 18% of Broadstreet investors opted for a cash redemption which amounted to $130 million of the capital accounts.

372) Yet on June 2, 2026, in the Seventh Status Report the Monitor reported that based on the investors' elections, the BSG Fund was obligated to redeem approximately $148 million in cash.

373) How does the percentage of the investors who made the cash election shrink from 18% to 6% when the cash redemption amount owed to those investor grew from $130 million to $148 million?

## XXIII. Broadstreet's February 25, 2026 Investor Update.

374) On February 25, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-3]. In it, Broadstreet states that the remaining 6% of the Redemption Consideration is payable as Cash and is reliant on asset sales of projects not sold for Stock, nor projects that have been set aside due to a litigation dispute, and thereby there are substantial assets remaining available through additional sales that are being procured.

375) Broadstreet goes on to describe two potential asset sales, one for $112 million and another for $65 million, that Broadstreet is pursuing to come up with the money to fund the cash redemptions. Regarding these potential asset sales Broadstreet states:

> Since the last letter, progress has been made as a result of multiple in person and virtual meetings with prospective buyers. Current Progress Update We can now report further progress regarding the cash sales being pursued. We have been currently marketing multiple entitled or near-entitled residential land projects in South Carolina, and a previously referenced purchaser is re-engaging as a prospective bulk buyer of lots across several of these communities. An executive of a previously referenced purchaser just recently visited the development offices to further focus on those projects of interest. Right now, a total sell out of those projects would yield more than $112 million.
>
> In addition, three new development companies/purchasers, two who are located in North Carolina and one who is located in Atlanta have begun negotiations across multiple projects of entitled or near-entitled residential land projects. Most projects are shown as "LDP in Hand," "Entitled Fully Permitting Underway," or annexed/rezoned awaiting plat approval, with detailed per-lot cost bases and targeted per-lot pricing indicating they are being actively positioned for sale of an assumed $65 million dollars of gross sale value for a total sell out.

376) Broadstreet further claimed that "Broadstreet investors are set to receive a multiple of value from their original investment and are set to receive such compensation in a timeline that is nearly twice as fast as the industry average of just returning the original investment value alone and not taking into account the returning of more than invested value."

377) This was another fraudulent representation to Broadstreet investors, including the Plaintiffs.

## XXIV. Broadstreet's March 23, 2026 Investor Update.

378) On March 23, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-4]. In an effort to reassure the investors who chose a cash redemption Broadstreet stated:

> The remaining approximately 6% of the total redemption consideration is expected from cash sales of real estate. We are pleased to report that a number of positive movements have been made with multiple parties. Although no definitive purchase and sale agreement has been executed as of this date, more detailed meetings and draft documents, which are the necessary precursor to such an event are taking place. We continue to be optimistic in achieving our goal even though there is presently a great deal of geo-political and financial market turmoil in the world. We do recognize that the overall markets and economy are matters that are outside of our control but again we comfort ourselves in our belief that we own unique assets. We remain positive and bullish about our abilities accordingly.

## XXV. Broadstreet's April 28, 2026 Investor Update.

379) On April 28, 2026, Broadstreet issued another update to its investors regarding the current status of the redemptions. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-5]. In it, Broadstreet states:

> Our primary major deal, that is our present focal point, involves the sale of approximately 26 of our infrastructure projects and the ultimate receipt of $3 Billion of the stock of a public company.
>
> In addition, we also have undertaken a process of selling a number of our other infrastructure projects for cash with the goal being to generate funds to pay those investors that elected to receive a cash redemption (See redemption process

discussed below). Presently, we have arranged for the sale of up to 9 projects for a total of $170 million in consideration from one publicly traded homebuilder and arranged the sale of up to another 15 projects in the amount of $120 million to yet another publicly traded homebuilder. The final documentation is being drafted involving those transactions as well as the final payoffs to lenders and third parties in order to determine the net amount of cash that can be received to make cash payments to investors. We presently have some arrangements we are finalizing including the assumption of certain debts by third parties to allow us to yield cash proceeds. We also have important tasks such as the securing of title insurance and confirmed payoff amounts, just to name a few open items. We do not expect the document drafting process to take long as we have utilized the land transfer documentation in prior transactions with the buyers and, as such, we think the document drafting process can be achieved in a timely manner provided the aforementioned issues are favorably resolved.

In November 2025, the Fund undertook a full redemption/withdrawal process for all investors. Under the redemption structure approved at that time:

- Approximately 94% of the total redemption consideration, representing roughly $2 billion, was to be satisfied through redemption payment in stock. That stock redemption is currently being implemented and is expected to close before the end of May 2026, as previously referenced to investors.

- The remaining approximately 6% of the redemption consideration is to be paid in cash through the sale of various Fund real estate assets as mentioned above.

380) Broadstreet spent the remainder of this letter reminding Broadstreet investors about the various provisions in the PPM and Operating Agreement, while ignoring the fact that the Redemption Notice, which is binding and required investor consent, amended and superseded the provision being discussed.

## XXVI. Monitor's Sixth Status Report.[16]

381) The Monitor issued his Sixth Status Report on May 5, 2026, most of which has also been redacted by Broadstreet. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 254. In it the Monitor reported, *inter alia*, that:

[16] The Monitor issued his Fifth Status Report on March 2, 2026, which was almost entirely redacted by Broadstreet.

> Pursuant to the November 2025 redemption transaction, BSG Fund gave its investors the option of selecting (i) the cash value of their capital account, payable in six months; or (ii) stock in a publicly-traded Cayman entity, valued at three times the value of their capital account, subject to a lock-up period of up to 42 months (or less, depending on the public entity's trading volume and share price).

382) From the Table of Contents, we know that the redacted portions of this report relate to (i) the status of Broadstreet's redemption of all investors, (ii) the redemption notice, and (iii) Broadstreet's Stock Redemption Obligations.

## XXVII. Broadstreet's May 14, 2026 Investor Update.

383) On May 14, 2026, Broadstreet issued another update to its investors regarding the current status of the redemptions. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-6]. It states in pertinent part that:

> The remaining 6% of the redemption value had elected cash consideration. As of this date, we have encountered two obstacles to completing that portion of the redemption by the last week of May. First, one of the structures that we expected to utilize was the assumption of certain of our debts by a third party. We have already drafted assumption documents accordingly. Such mechanism would allow us to free up cash proceeds from certain asset sales. The success of that now appears uncertain due to ongoing negotiation disagreements that we hope to amicably resolve. Second, one of our purchasers has attempted to negotiate what we deem to be too large a financial concession.
>
> Consequently, we can proceed with our stock transaction for the 94% of the total redemption payments so that the overwhelming majority amount of the redemption is pursued **and then delay or alter the cash representing just the 6% of the total redemption value**, a minority of the total redemption.
>
> Since we have dealt with many counterparties in the homebuilding arena, we do not feel compelled to be forced into the cash component deal and if necessary, we will cancel any or all of the cash sales transactions and then resume discussions with other parties who expressed interest in our assets and who are competitors to the present parties. Although we had hoped to complete asset sales to satisfy the cash component of our redemption transaction in a timely manner, we also recognize that if the sales do not yield appropriate proceeds, then we are under no pressure to accept the changes now served upon us by our counterparties and we can have their competitors acquire what we believe to be very valuable assets

(Emphasis added).

384) This letter makes it sound as if Broadstreet might not be able to come up with the cash redemption in time for the May 27, 2026 due date, but will provide cash to those investors at a later date.

## XXVIII. Broadstreet's May 22, 2026 Investor Update.

385) On May 22, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. See *Schulman*, Case No.: 1:26-cv-23998-DPG (S.D. Fla.) [DE 1-7]. This letter is the first time Broadstreet tells its investors who selected a cash redemption that they will be receiving stock instead.

386) The letter states in pertinent part that:

> Cash Sales – Process Hits Impasse
>
> Now, we can further report that we have reached a stalemate with our purchasers of the assets involving the cash liquidation. Even taking into account those investors who indicated a desire to receive stock instead of cash, that still does not alleviate the amount of sales necessary to fully satisfy the remaining investors who desire to receive cash by next week. **By way of example, we have a project for which we received an appraisal for nearly $24 million, but our purchasers have offered a maximum of $12 million. That is simply unacceptable and has resulted in an impasse preventing a larger transaction**.
>
> Selling at a price the Manager has determined to be roughly half of fair value would disregard that valuation and impose precisely the losses Section 6.07(b)(ii) is designed to avoid.
>
> We also want you to understand the good faith with which we pursued the cash option before reaching this point. Of the total redemption value, approximately 94% of investors elected stock and only approximately 6% elected cash. Satisfy that cash component depended on selling certain assets at a **reasonable price**, and we devoted substantial effort to closing those sales. As described above, that process reached an impasse.
>
> In light of the above, management has elected to complete the Redemption of the small minority of investors remaining who had elected a cash redemption by instead redeeming them in the form of an "in-kind" redemption, with payment being made in stock. The stock payment will be the same class of stock, from the same reverse triangular merger transaction, as that being issued to all other investors. That means

> you are being paid a 3x multiple of your investment, calculated as previously described in the redemption notice.

(Emphasis added).

387) As an initial matter, nowhere in the Redemption Notice does it state that the cash redemption is dependent upon selling certain assets at a **reasonable price**.

388) Instead of honoring the cash redemption election that the Redemption Notice said was binding, Broadstreet is forcing all the investors in the BSG Fund to take shares of the Cayman Island SPAC as an "in-kind" redemption.

389) Notably, Broadstreet did not say that they were providing any additional consideration to the Cayman Island SPAC for taking these additional investors. Thus, presumably Broadstreet is keeping the assets that it valued at $148 million that were going to be used to satisfy the cash redemptions for itself and its partners. This is an additional theft of investor assets.

390) Broadstreet goes on to claim in this letter that the reason why it cannot honor the cash redemptions is because it "would have required liquidating assets at roughly half of their value."

391) Broadstreet relies on Section 6.07(b) to justify its decision not to liquidate based on the language that says *disruption in investment markets make pricing and/or liquidation of some or all Company or Series assets difficult or would result in losses in the Company or a Series attempted such liquidations* (Section 6.07(b)(ii)).

392) To satisfy the $148 million cash redemption request Broadstreet would have had to sell assets Broadstreet determined were valued at $296 million.

393) Ignore the fact that a thing is only worth what someone is willing to pay for it thus rendering Broadstreet's assessed value meaningless, Broadstreet could have sold assets in its possession to satisfy the cash redemption obligations without incurring a loss.

394) Excluding the assets pledged to the Soulpower SPAC transaction, Broadstreet still had assets that were acquired with over $500 million of its investors' capital.

395) Liquidation of what Broadstreet claims would have been $296 million in assets would not have resulted in a loss, because the Company would have gotten rid of all its investors and still would have had a profit of at least $200 million.

396) Accordingly, Broadstreet cannot rely on Section 6.07(b)(ii) to justify not selling assets to satisfy its cash redemption obligations.

397) The real reason Broadstreet chose not to sell those assets is because Broadstreet wanted to keep proceeds from the sale of those assets for itself and its partners.

## XXIX. Broadstreet's May 28, 2026 Investor Update.

398) On May 28, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. See **Exhibit J**. In it Broadstreet states in pertinent part:

> Further and previously announced, the results of the Redemption were that approximately 94% of the redemption value of our investors elected to be redeemed in the form of stock payment from a reverse triangular merger transaction. The remaining approximately 6% of the redemption value had elected cash consideration but are also being redeemed for stock as permitted in the Investor Documents signed by each and every investor and thus binding on every investor.
>
> In short, we believe that our deal, which provides for a nearly 3x payment in kind is outstanding and provides the best upside potential based on the information previously discussed.

## XXX. Monitor's Seventh Status Report.

399) The Monitor issued his Seventh Status Report on June 2, 2026, most of which has also been redacted by Broadstreet.[17] See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 269. In it the Monitor reported, *inter alia*, that:

---

17 From the Table of Contents we know that the redacted portions of this report relates to the redemption transaction and the Monitor's formal recommendation.

> As a result of the Redemption Notice, the BSG Fund (i) ceased paying quarterly or monthly dividends to investors; and (ii) was obligated to pay the redemption consideration – cash or stock – by May 27, 2026 (*i.e.*, 180 days from the redemption election date). Id. at ¶ 5. Based on the investors' elections, the BSG Fund was obligated to redeem approximately $2 billion in stock and approximately $148 million in cash. Id.
>
> Since then, the Monitorship Entities represented that approximately 94% of the "Redemption Consideration" or "value of the redemption" selected stock and 6% of the "Redemption Consideration" or "value of the redemption" selected cash. See, e.g., Feb. 25, 2026 Investor Update Letter and May 22, 2026 Investor Update Letter. Id. at ¶ 16.

## XXXI. Monitor's Eight Status Report.

400) The Monitor issued his Eight Status Report on July 2, 2026, a significant portion has been redacted.[18] See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 299. In it the Monitor reported, *inter alia*, that:

> [O]n the eve of the May 27, 2026 redemption deadline, the Monitorship Entities reversed course and rejected the Monitor's recommendation to include a cash redemption option in connection with the BSG Fund's full-investor redemption transaction. Id. at ¶ 5.
>
> [O]n June 2, 2026, counsel for Defendants Broadstreet, Inc. and Mr. Feingold advised the Monitor that "Defendants and Relief Defendants plan to file a motion with the Court by this Saturday at the latest to address the issues arising from the attached document," but did not advise the Monitor what relief they would be seeking. Id. at ¶ 6.
>
> Subsequent to the filing of the report, counsel for Defendants Broadstreet, Inc. and Mr. Feingold advised the Monitor that, instead of a motion, they would be filing a separate lawsuit seeking a declaratory judgment about the redemption rights and discretion afforded by the BSG Fund's governing documents. Id. at ¶ 7.
>
> On June 6, 2026, Defendant Broad Street Global Management LLC filed [this lawsuit] against five investors, in which it seeks a declaratory judgment confirming its ability to redeem those investors "in kind" with stock in a Cayman company named Soulpower Acquisition Group ("Soul"). Id. at ¶ 8.

---

[18] From the Table of Contents we know that the redacted portions of this report relate to (i) the Monitor's Recommendation and Broadstreet's recent filings, (ii) the impact on investors, and (iii) the status of the stock component of the redemption.

> Since the filing of the Seventh Status Report, the Monitorship Entities advised that approximately 687 investors had elected cash. Id. at ¶ 12. The Monitorship Entities previously advised that the redemption value of the cash investors was approximately $148 million. Id.
>
> On December 9, 2025, the Monitorship Entities advised that Broadstreet will need approximately $2 billion in stock to redeem the investors who elected to receive stock. Id. at ¶ 15. Given the Monitorship Entities' recent decision also to redeem investors who elected cash with stock, Broadstreet will now need approximately $2.45 billion in stock to redeem all of the investors. Id.
>
> The Monitorship Entities have widely reported that SWB, LLC will contribute approximately $3 billion worth of Soul stock in exchange for the selected Broadstreet infrastructure projects. Id. at ¶ 16.

## XXXII. Broadstreet's July 27, 2026 Investor Update.

401) On July 27, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. See **Exhibit K**. In this letter Broadstreet states:

> The two exit transactions include: (a) the sale of our technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion based on valuation. Considering that our invested capital was approximately $1.2 billion, that yields a profit of $2.4 billion and a 3x multiple on invested capital based on valuation.

402) Yet, in footnote 2, Broadstreet admits that it is using "Manager discretion in determining value." In other words, Broadstreet is making these numbers up.

403) A thing is only worth what someone is willing to pay for it. Since these shares are restricted, they are essentially worthless.

404) Moreover, the calculated values of the infrastructure projects Broadstreet provided its investors in November 2025 claims that the total gross revenue (before expenses) for these projects adds up to $2.25 billion, not $3 billion. They arrive at these numbers by claiming that some of these infrastructure projects will generate gross revenue more than 25 times the project's

appraised value. That is an incredible return, one that is not supported by the historical returns of any of Broadstreet's completed infrastructure projects.

405) Broadstreet's valuation of the assets in Altcoin/Z Squared transactions suffers from the same over valuation concerns.

406) Thus, Broadstreet is falsely claiming that it sold two of its business divisions for stock in publicly traded companies on the NASDAQ and NYSE for a combined value of $3.6 billion.

407) Again, why is Broadstreet inflating the value of these shares, so that it can fraudulently claim that it is entitled to keep the over $500 million in assets acquired with its investors' capital.

408) Accordingly, the update letters Broadstreet keeps sending to its investors are part of the fraud they are committing.

**PLAINTIFF SPECIFIC FACTS**

<u>Nikhil Patel and Nipuna Patel</u>

409) Nikhil Patel is 64 years old and a retired physician. Nipuna Patel is 65 years old and a retired medical office manager. Nikhil managed the investments for himself and his wife Nipuna. Nikhil told Akhil Morada that preservation of principal, dependable income and access to their funds were important to them. Nikhil also informed Mr. Morada that they were not interested in investments involving substantial speculation, significant market volatility, or an unreasonable risk of losing their principal. Mr. Morada stated that the BSG Fund investments he was recommending were suitable for their investment objectives and risk tolerance. Nikhil relied on Mr. Morada's representations when making his decisions to invest in the BSG Fund.

410) In a text message sent June 27, 2025 Akhil Morada wrote "Judge has officially closed case as SEC is in process of settling this. In a few weeks all this will be behind us."

411) Later, in an attempt to get Nikhil to select Choice B in the November 2025 Redemption Notice, Joseph Baldassarra sent him two side letter agreements. In one of the side letters Broadstreet promised to return some of his investment in cash and some of it in shares of SOUL if Nikhil agreed to select Option B in the Redemption Notice. In the other side letter Broadstreet promised to return some of his investment in the form of an investment in Innovative Development Fund, LLC that would pay quarterly distributions of 14% annually and the rest in shares of SOUL if Nikhil agreed to select Option B in the Redemption Notice. It was up to Nikhil to propose how much of his investment would be returned in cash/Innovative and how much would be returned as shares of SOUL. In investigating Innovative, Nikhil called its office and found out that Innovative and Broadstreet have the same receptionist. Ultimately, Nikhil selected Choice A because he needed his retirement investment returned to him in cash, and Mr. Morada assured him that if he selected Choice A, Broadstreet would return his equity balance in cash within approximately 180 days.

412) In May 2026 when Broadstreet notified investors that they were going to redeem all the BSF investors in cash, Nikhil contacted Joseph Baldassarra. Mr. Baldassarra informed Nikhil that Broadstreet no longer has sufficient cash to satisfy the cash redemption requests and that **<u>Broadstreet no longer had assets</u>** available to satisfy those requests.

<u>Nimish Patel</u>

413) Nimish Patel was introduced to Broadstreet through Akhil Morada in December 2022. During their initial discussions, Nimish told Mr. Morada that he did not have cash readily available to invest. Mr. Morada asked me, in substance, whether he had a retirement account.

Nimish told him that he did have retirement funds but understood that he could not simply withdraw those funds from his IRA for an investment. Mr. Morada responded, in substance, "Don't worry. I'll show you how to get that money out through Directed IRA." He then explained the Directed IRA process and guided Nimish through transferring retirement funds so they could be invested in Broadstreet opportunities.

414) Before making his first investment in January 2023, Mr. Morada encouraged Nimish to send the investment funds before he received the investment documents to review. When Nimish received the Client Information Sheet the portion related to his finances were already completed. The boxes selected indicated that Nimish's annual income, net worth and liquid assets were significantly more than what they were. During a phone conversation, Nimish asked Mr. Morada why those boxes were checked and informed Mr. Morada that he did not meet those financial qualifications. In response, Mr. Morada instructed Nimish to ignore the checked boxes, to print the form, complete only his personal information by hand and send it back to him. The Subscription Agreement and the Investor Questionnaire also had all the accredited-investor questions prepopulated when Nimish received them. At the time Nimish did not understand that the documents were representing that he personally had selected or verified accredited-investor criteria that he had never been asked to provide. The same process repeated itself for all Nimish's other investments in the BSG Fund.

415) Mr. Morada said to Nimish that the investments were safer than investing in the stock market. He represented that Nimish's principal would be protected. He represented that Nimish would receive a fixed return. He said that the investments would provide regular fixed-interest distributions. He presented the investments as appropriate for retirement savings because they would avoid the volatility associated with the public stock market. Mr. Morada represented

that if Nimish ever need his money he could redeem his investment in three to four days. These representations were particularly important to Nimish because he was investing his retirement funds rather than discretionary money that he could afford to lose. In November 2025, Nimish selected Choice A for a cash redemption, but now Broadstreet is refusing to return his money to him.

Jyoti Patel, Harshad S. Patel and Khushbu Patel

416) Jyoti Patel and Harshad S. Patel are married, and Khushbu Patel is their daughter. Jyoti manages her families investments in the BSG Fund. Jyoti Pate made their investments in the BSG Fund through Akhil Morada. Mr. Morada told her that their BSG Fund investments would provide both attractive returns and significant tax benefits through available write-offs. Jyoti relied on Mr. Morada's representations when making her decisions to invest in the BSG Fund. In November 2025, Jyoti selected Choice A for a cash redemption her and Khushbu Patel's investment, but selected Choice B for a stock redemption for her husband Harshad S. Patel.

Mandakini Patel

417) Mandakini Patel is 69 years old and retired. Her husband is 76 years old and retired. They are both in poor health and cannot afford to wait for years for speculative and highly restricted stock to potentially become valuable or liquid. She was introduced to Broadstreet through Akhil Morada. As a retired investor, Mandakini told Mr. Morada she was interested in obtaining a stable and dependable return rather than pursuing speculative or highly volatile investments. Mr. Morada told her that the BSG Fund investments would provide fixed returns. Mandakini relied on Mr. Morada's representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Mr. Morada told her if she selected Choice A she would get her equity balance. Mandakini selected Choice A for a cash redemption. Mandakini also attended a meeting

with Joseph Baldassare, during which he represented that investors who elected cash redemption would receive the equity value of their investments back in cash. At no time during that discussion was Mandakini informed that Broadstreet could later disregard her cash election and substitute for restricted stock.

<u>Jit Patel and Karishma Gupta</u>

418) Jit Patel and Karishma Gupta are married and are both physicians. When they first invested in Broadstreet they were newlyweds and still completing their medical residency training. Akhil Morada was their principal point of contact at Broadstreet. At the time, Karishma was not an accredited investor. They raised this concern with Mr. Morada, and he told them not to worry about being accredited and that Broadstreet or his company would "take care of it." Mr. Morada repeatedly told them that they could get their money back when needed. They relied on this and other representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Jit was told directly by Mr. Morada that Innovative Funds was owned and managed by Broadstreet or people associated with Broadstreet, and if they selected Option B for stock, they could get a portion of their investment returned as cash through Innovative. They ultimately selected Option A for a cash redemption.

<u>Kinjalkumar Patel and Bhumika Patel</u>

419) Kinjalkumar Patel and Bhumika Patel are husband and wife. Akhil Morada was their Broadstreet representative. Mr. Morada was fully aware of their financial situation and told them that they could still invest in the BSG Fund even though they technically did not qualify as accredited investors. For their Broadstreet Tennessee investment, Mr. Morada told them that they would double their money in about twelve months, and that if the doubling did not happen there was a minimum return of around 15%. That didn't happen. In two years, there was only one

distribution and the investment never doubled. They maintain that they were never given a choice about their crypto investment being converted to shares in Z Squared.

420) On July 5, 2025, Kinjalkumar told Mr. Morada that he is going to need to pull some money out next year around February, and Mr. Morada told him, "Sure we can accommodate." Based on this representation, Kinjalkumar invested another $[redacted]. To fund the BSG Fund investments they exhausted their savings and liquidated a separate stock portfolio. Now, despite opting for a cash redemption, Broadstreet is refusing to return their money back to them and is no longer paying the distributions that they were dependent on.

<u>Dinesh Thakker and Shashikala Thakker</u>

421) Dinesh Thakker manages the investments for himself and his wife Shashikala Thakker. Mr. Thakker was introduced to Broadstreet through Akhil Morada. Akhil told him that the investment in Broadstreet is secured and pays high interest approximately 14% to`16%. Regarding the SEC Enforcement Action, Mr. Morada told him that the allegations lacked merit and represented that Broadstreet had prevailed or that the matter had been closed or dismissed. Regarding the November 2025 Redemption Notice Joseph Baldassarra told Mr. Thakker that Broadstreet had sufficient funds to honor Choice A cash redemptions and investors who selected Choice A would receive the equity value of their investments in cash within 180 days. Mr. Thakker formally elected Choice A Cash Redemption in November 2025. Mr. Thakker made and maintained his investments based in part on representations concerning the stability of the investments, the existence and value of underlying assets, expected returns, the status of the SEC action, and the availability of cash redemption.

<u>Sanjay Gupta and Anita Gupta</u>

422) Sanjay Gupta and Anita Gupta, ages 63 and 57, respectively are a working-class couple employed in Academic Institute who invested a substantial portion of their personal savings and retirement funds with BSG Fund. Akhil Morada presented the real-estate infrastructure and alternative-coin investments as legitimate opportunities with potential financial and tax benefits. Mr. Morada assured them they would be able to access or withdraw their money when needed. Based on these representations and believing that their money would remain accessible when needed, they proceeded with those investments.

423) Given their age, their approaching retirement, and the fact that these funds represented a substantial portion of their financial security, they ultimately chose Option A—the return of their money—in November 2025. Broadstreet has since decided not to give them their cash and now they must worry about ordinary financial obligations, including car payments, tuition expenses for their son, household expenses, and their long-term retirement security. What was supposed to provide financial stability has instead created extraordinary uncertainty and distress. Sanjay recently underwent open-heart surgery, making the continuing financial and emotional stress particularly difficult to manage.

<u>James Andrew Ho</u>

424) James Andrew Ho primary contact at Broadstreet was Akhil Morada, and they communicated through WhatApp. Mr. Morada represented to James that Broadstreet makes 30-35% on the MCA Series, that Crypto Mining is Broadstreet's most profitable venture and they have a big cushion with over $100 million in reserves, and that land infrastructure is their primary business, and BSG is a $3 billion fund. Regarding Broadstreet Tennessee, Mr. Morada told James that the upside is his investment will double and worst case is 14.6% annually. Regardless, after

a year he will be able to pull his money out immediately. Mr. Morada to James that the Data Center investment is a good income fund. James relied on these representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Mr. Morada told James "$100k investment gives us $300k in stock @$10. Book value @16 we make around 500% on that number. Selling 5.5% a month - in 4 months u could possibly take ur principal out. + you get 100% write off on the investment for 2025. Try doing $1m." Jon Pecorella from Broadstreet also called him in November of 2025 and told him that the SOUL stock via SPAC would be one of the best investments he could make and that anything David Feingold gets involved with will become successful. James ultimately selected Option A for a cash redemption.

<u>Steven Schulman</u>

425) Steven Schulman is a practicing physician. His primary contact at Broadstreet was Benard Jasmin. Mr. Jasmin always reassured him that cashing out was an option with a 6-month time frame, and if there was any degree of urgency, he could receive his money sooner. In April 2024, to make Dr. Schulman feel better about investing in Altcoin Mr. Jasmin wrote you've mentioned your friends' past Madoff type experiences, so for full transparency I am sending you a picture of my personal deposits into the Altcoin Mining Fund from last week. Regarding the November 2025 Redemption Notice Mr. Jasmin told Dr. Schulman if he selected option B for stock, he would get Broadstreet to enter into a side letter with him so that he would be moved over to Innovative where he could still get distributions. Dr. Schulman rejected Mr. Jasmins offer and selected Choice A for a cash redemption.

<u>Ankur Anand</u>

426) Ankur Anand is a practicing physician. His primary contact at Broadstreet was Benard Jasmin. Regarding the Daytona Beach hotel project, Bernard Jasmin told Dr. Anand that

the investment was expected to produce approximately a three-to-five-times return over about five years. His statements were consistently optimistic, and he presented the projected returns as likely to occur rather than simply as a remote possibility. Dr. Anand does not recall Bernard discussing significant risks such as construction delays, cost overruns, difficulty selling the property, loss of principal, or the possibility that the projected returns would not be achieved. Bernard said that the infrastructure investment would provide a guaranteed 14.25% annual return, paid quarterly. In the summer of 2025, Dr. Anand told Bernard that he wanted his investment returned in cash and that he wanted to exit as quickly as possible. Bernard responded that the redemption request had been submitted and told Dr. Anand that the cash would be returned within approximately six months. Dr. Anand never received his redemption payment.

<u>Gregory Lovallo</u>

427) Gregory Lovallo is a practicing physician. His primary contact at Broadstreet was Todd Sanders. From Dr. Lovallo's communications with Mr. Sanders he understood that the purpose of his investment in Triller was to obtain an ownership interest in Triller before it became publicly traded or otherwise completed a liquidation event. Dr. Lovallo relied on Mr. Sanders' representations when making this investment in February 2021. Since the time of his investment, the Triller investment has not produced the liquidity event, return, or ownership benefit that Dr. Lovallo expected based upon the representations made to him. Mr. Sanders also solicited an investment in the Hilton Element Hotel Opportunity in February 2022. Mr. Sanders told Dr. Lovallo that once the hotel and related operations became functional, he would benefit from his percentage interest in the revenue generated by the project. Despite the property reaching a stage at which it was developed into a Hilton property, Dr. Lovallo has not received the ownership

interest or continuing revenue participation that he understood he was purchasing. Dr. Lovallo relied on representation from Mr. Sanders when making this investment.

Robert T. Harper

428) Robert T. Harper is 72 years old and completely blind. Mr. Harper invested in the BSG Fund through his broker Brandon Leon of Phoenix Financial. Upon information and belief, Broadstreet has an ownership interest in Phoenix Financial. Mr. Harper told Mr. Leon that he was not interested in a long-term investment. Mr. Harper explained that, because of his age, he was looking for an investment that would provide regular quarterly distributions and reasonable access to his money. Mr. Leon recommended investing in infrastructure projects with Broadstreet. Mr. Leon told Mr. Harper that the infrastructure investment would pay approximately 14.6% interest annually, and that Mr. Harper would have access to his money after approximately six months.

429) Mr. Harper also attended a Zoom presentation on March 12, 2024, where David Feingold and Joseph Baldassarra discussed the infrastructure investment. They also represented, among other things, that the infrastructure investment would have 14.6% annual return, with distributions paid quarterly. Based upon the information provided by Mr. Leon and the representations made during the Zoom meeting, Mr. Harper believed he was investing in a genuine real estate and infrastructure business that would generate regular income. In March and July 2024, Mr. Harper invested in the BSG Funds infrastructure investment.

430) Because Mr. Harper is completely blind, he necessarily depends upon others and upon accurate verbal and written communications when making financial decisions. In November 2025, Mr. Harper selected Option A for a cash redemption, but now Broadstreet is refusing to return his money to him.

Howie Mann

431) Howie Mann's primary contact at Broadstreet was Bernard Jasmin. Mr. Jasmin said to Howie that he would get 14.9% annual interest distributions if he invested in the BSG Fund. Howie relied on these representations when deciding to invest in the BSG Fund. In the November 2025 Redemption Notice he selected Choice A for a cash redemption. Broadstreet asked him for his bank wiring information so they could send him the cash redemption, and he provided it to them. Then in May 2026 Broadstreet informed him that they were not going to give the cash redemption.

William Joseph Moroney

432) William Joseph Moroney is a 72-year-old retiree. He unknowingly invested in Broadstreet through Todd Sanders, who had previously sold investment to me in the L3 Funds, another private equity fund that Mr. Sanders previously raised money for. In May 2022, Mr. Sanders sold the Weatherstone investment to Mr. Moroney on the promise that he would make 15% plus on the original investment. But that never happened. Mr. Moroney relied on this representation when deciding to invest in Weatherstone. When Mr. Sanders pitched this investment to Mr. Moroney it was his understanding that this was just another investment in the L3 Funds. Mr. Moroney earned no income from his investment in Weatherstone. All distributions paid to him were used to reduce his original $[redacted] investment to an equity balance of $[redacted]. Since Broadstreet reduced its equity balance with every distribution he received, Broadstreet unilaterally converted his Weatherstone investment into an interest free loan. In the November 2025 Redemption Notice he selected Choice A for a cash redemption.

Theodore "Ted" Chesner

433) Theodore "Ted" Chesner's primary contact at Broadstreet was Bernard Jasmin. In April 2022, Mr. Jasmin told Ted that Broadstreet planned to build what was represented to him as the first high-end AC Marriott hotel in Daytona Beach, Florida. Mr. Jasmin stated that the investment was expected to generate approximately 40% annual returns from revenue produced by the hotel. Ted understood that those returns would begin once the hotel was completed and operational. Mr. Jasmin told Ted that the hotel was expected to be completed by 2025. In reliance on these representations, Ted invested $[redacted] in the AC Marriott hotel in Daytona Beach, Florida investment. To this day, construction has not begun on this hotel, and Ted has not received a single distribution from this investment.

434) In November 2025, Ted received the Redemption Notice from Broadstreet offering to give him his $[redacted] back in cash if he selected Option A, which would mean that Ted gave Broadstreet an interest free loan for the past four years. Knowing that Ted still selected Option A for a cash redemption. Ted did not want the stock. Ted recently learned that Broadstreet will not honor his decision to make a cash withdrawal of his money that Broadstreet has held interest free for the past four years.

Steven Stiles

435) Steven Stiles is a 78-year-old retired civil engineer. He first invested in the BSG Fund through his investment advisor Tarek Hussain. Mr. Stiles investment decisions were based largely on representations that Mr. Hussain made that he would receive quarterly dividend distributions based on an approximate 14.6% annual interest payments and that he would have the ability to request a partial or full redemption of his investment at any time, subject to the terms of the Fund's governing documents, not exceeding a 6-month time period.

436) In June 2025, Mr. Stiles sold a property he owned, and he used the proceeds from that sale to make his largest investment in the BSG Fund in July 2025 by purchasing another member's membership interest. A few months later, in October/November 2025, Mr. Stiles was informed that the distributions that he was dependent on from his investments would stop and he would have an option on how he wanted to exit the BSG Fund. Mr. Hussain told Mr. Stiles if he didn't make a selection then he would receive the default option of receiving a cash redemption. Based on this representation, Mr. Stiles didn't make any selection and now Broadstreet is refusing to return his money to him.

Yatkin Khanna and Alya Capital LLC

437) Yatkin Khanna is 50 years old doctor who invested a substantial amount of his personal savings in the BSG Fund directly and through his company Alya Capital LLC. Beginning in 2017, Akhil Morada represented to Dr. Khanna that he was an employee of Broadstreet and solicited investment in prelaunch IPOs. As the years passed Mr. Morada solicited investments in infrastructure, crypto, altcoin mining fund and other from Dr. Khanna. Dr. Khanna told Mr. Morada that his purpose in making these investments was to preserve and responsibly grow capital over the long term. Dr. Khanna did not intend to place his money into an investment from which he could not reasonably obtain access to his funds. The security of his principal, the ability to obtain reliable returns, and the availability of his invested funds were important considerations in his decision-making.

438) Regarding the BSG Fund investments that Mr. Morada recommended, he made representations regarding the anticipated returns, their underlying business or assets, and Dr. Khanna's ability to recover or access the money he invested. Of particular importance to Dr. Khanna was his understanding concerning liquidity and the eventual return of his investment. Mr.

Morada never told Dr. Khanna that his capital would be indefinitely inaccessible or that he could be compelled to remain invested without a reasonable means of recovering his principle. Dr. Khanna relied upon the information Mr. Morada communicated to him when deciding whether to entrust his funds with Broadstreet.

<u>AAYU Health, LLC</u>

439) The sole owner of Plaintiff, AAYU Health, is Abhishek Lunagariya.

440) Mr. Lunagariya was first approached by Akhil Morada around March 2023. Morada told Mr. Lunagariya about his firm Broadstreet and investment opportunities there.

441) After that, Mr. Lunagariya received multiple calls and texts from Morada. He was constantly trying to persuade Mr. Lunagariya to invest with him. Morada was also constantly begging Mr. Lunagariya to send additional clients to him. Morada made numerous promises to Mr. Lunagariya that if he invests with him, Mr. Lunagariya would never miss a distribution payment.

442) Mr. Lunagariya made AAYU Health's initial investment in Crypto/Altcoin Mining - 28% Annual Return around May 2023. All investments in the BSG Fund were made through Mr. Lunagariya's company, AAYU Health.

443) After that Morada tried to persuade Mr. Lunagariya to invest in other projects such as self-storage, auto-dealership, crystal lagoon, hotel etc. Mr. Lunagariya declined those investments. Mr. Lunagariya told Morada that he only wanted to invest in funds where he has the flexibility to redeem AAYU Health's investment for cash anytime he wants.

444) Morada offered the IF9 Infrastructure - 16% Annual Return investment around November 2023. Morada told Mr. Lunagariya that it was safe as they have contracts from builders

for several years out. Morada also assured Mr. Lunagariya that AAYU Health's money would only be used for this particular investment fund, and it would not be comingled with other funds.

445) The reason Mr. Lunagariya chose this investment over other offered investment was simple. There was a limited upside in profit (even though Broadstreet could make infinite returns), but the investment would pay 16% per year and the returns were guaranteed. And Mr. Lunagariya was promised AAYU Health could redeem any time after one year in the investment, with no question asked, and full principle returned with maximum 6-month redemption. Mr. Lunagariya was repeatedly told that 6 months was the maximum AAYU Health would have to wait, but most BSG Fund investors were receiving their redemption within a month, and those investors still received their distribution while they waited for their withdrawal. Mr. Lunagariya gave up infinite upside potential for this flexibility of redeeming AAYU Health's investment for cash anytime he wanted.

446) Morada continued to try to persuade Mr. Lunagariya to invest in other funds throughout. Mr. Lunagariya simply declined as he only wanted to invest in funds with flexibility to redeem and get AAYU Health's cash back anytime he wanted. Mr. Lunagariya never invested in projects with long-term and undefined maturity dates, as his primary goal was liquidity at the expense of giving up enormous upside.

447) Mr. Lunagariya invested AAYU Health in Broadstreet Tennessee in June 2024. The terms were simple. AAYU Health's money would only be used for this particular investment fund, and it would not be comingled with other funds. The Broadstreet Tennessee fund will go public, and AAYU Health would be able to exit with 2X return of its initial investment (no mention of lock-in period or restricted stock). Until Broadstreet Tennessee goes public, I would receive 14.6% annual distribution.

448) From February 2025 onwards, when Mr. Lunagariya started asking about SEC investigation, Morada repeatedly reassured him that lawsuit was withdrawn by SEC as no wrongdoing was found. Again, Morada assured Mr. Lunagariya that all investors who requested redemption have been paid and there have been no distributions missed.

449) When Mr. Lunagariya asked Morada about the status of AAYU Health's Broadstreet Tennessee investment around April 2025, he told Mr. Lunagariya it cannot go public because the SEC is not allowing it.

450) Around end of May 2025, Mr. Lunagariya receive an email inquiring about how AAYU Health would want to proceed in the event Broadstreet gets taken over by another firm. Mr. Lunagariya was asked if AAYU Health would like to get stock in a public company or get a cash redemption. At that time, Mr. Lunagariya chose the cash redemption. Morada tried to convince Mr. Lunagariya numerous times to choose stock option. Morada told Mr. Lunagariya, if he wants cash, he can arrange for someone to take over AAYU Health's stock and give it cash, but he should choose stock. Morada told Mr. Lunagariya that the May 2025 email was just testing investors' interest and was not legally binding.

451) In November 2025, Mr. Lunagariya received an email from Broadstreet about an emergency meeting, and options were given: A cash, B stock. Morada tried to persuade Mr. Lunagariya several times before and after the meeting to choose Option-B stock. Morada told Mr. Lunagariya that he is missing out on the big upside in SOUL many times.

452) Mr. Lunagariya was also offered half cash, half stock option if he chooses Option-B for stock. Mr. Lunagariya even received a side-letter documenting this agreement. Despite all Broadstreet's efforts, Mr. Lunagariya declined the side letter and chose Option-A for cash.

453) Mr. Lunagariya's investment objective was simple. He chose a limited upside in profit (even though Broadstreet can make infinite returns; AAYU Health's distributions were capped). Mr. Lunagariya chose it because AAYU Health's returns were guaranteed, regardless of company situation. Essentially it was like a debt investment and not an equity investment. And Mr. Lunagariya was promised anytime redemption after one year in the investment, with no question asked, and full principle returned with maximum 6 month waiting period for the redemption.

454) Mr. Lunagariya emailed Broadstreet and Morada about AAYU Health's cash redemption a few days before May 27, 2026, as the six-month deadline was approaching. Mr. Lunagariya copied the SEC and the Monitor at that time. Mr. Lunagariya has yet to get any clear response from that email.

455) Morada texted Mr. Lunagariya me on June 10, 2026 that "no one is getting cash back all getting stock please review last few updates"

<u>Alfred Lehouillier</u>

456) Plaintiff, Alfred Lehouillier, was a landscape contractor for about 20 years, and then he managed his own stock portfolio for the next 23 years. Mr. Lehouillier is now semi-retired as he still have a few investments in the stock market that he personally manages.

457) In 2023, Mr. Lehouillier had been working with a stockbroker named Tarek Hussain at Network 1 for several years. At that time, Mr. Lehouillier's primary focus was stock trading. During their conversations, Mr. Hussain would periodically mention that he was investing in a type of private-market real estate investment. Mr. Lehouillier initially told Mr. Hussain that he had little interest in it because he was actively engaged in stock trading.

458) By the end of 2023, however, the type of stock trading Mr. Lehouillier had been doing, which was referred to as syndicate trading, had essentially dried up. At that point, Mr. Lehouillier became more interested in hearing about the private investments Mr. Hussain had been discussing with him.

459) Mr. Hussain also mentioned that he had invested in Altcoin Mining through a new company he became affiliated with, Broadstreet. On December 13, 2023, Mr. Lehouillier invested $[redacted] in Altcoin Mining with Broadstreet. This was the first private investment that Mr. Lehouillier ever made. Mr. Hussain told Mr. Lehouillier that the investment would generate approximately a 28% annual return and that his money needed to remain in the business for one year. After that one-year period, Mr. Lehouillier understood that he could withdraw his money if he chose to do so.

460) Mr. Lehouillier subsequently made investments in several other opportunities offered through Broadstreet. Mr. Lehouillier understood that these investments generally had similar policies regarding the ability to receive his money back after the applicable holding period.

461) At first, everything appeared to be going well. Mr. Lehouillier received the distributions from the various investments, and the reinvestment distributions also appeared to be proceeding as expected. Based on what Mr. Lehouillier was seeing, he had no reason at that time to believe that there would be a significant problem with his investments.

462) At some point, Mr. Lehouillier received a letter concerning the crypto-mining segment of the business. The letter indicated that the company had received an offer for that portion of the business. Mr. Lehouillier understood at the time that they were not quite ready or willing to accept the offer.

463) Later, however, another communication informed investors that the offer had been accepted. Mr. Lehouillier understood that, as part of the transaction, investors essentially had no choice but to receive stock in the newly merged company, Z Squared, rather than simply receiving their investment back in cash. The stock Mr. Lehouillier ultimately received is now trading under the symbol ZSQR, and its decline in value has resulted in Mr. Lehouillier losing more than half of the money represented by that investment.

464) It was not long after the Altcoin Mining sale was announced that investors were informed that the larger Broad Street company itself was going to be sold or was in the process of being sold and merged with another company.

465) Initially, this sounded like another very positive development. They were told that the transaction would provide investors with approximately a three-times multiple of their investment. Based on those representations, it appeared that the transaction could potentially result in a very substantial return.

466) Despite the attractive projected multiple, Mr. Lehouillier was concerned about having all his remaining investment tied up in stock. After he had already signed the documents accepting the stock, Mr. Lehouillier specifically asked Mr. Hussain to have slightly more than half of his remaining investment returned to him in cash. Mr. Lehouillier sent that request to Mr. Hussain by text message on December 8, 2025, and he responded that this would not be a problem and that the details would be worked out later. Mr. Lehouillier relied on Mr. Hussain's response and continued to believe that he would be able to receive the portion of his investment that he requested in cash, with the remainder being handled through the stock transaction.

467) After that, however, there were numerous delays. Broadstreet sent a series of letters and communications to investors explaining the status of the transaction and the efforts being made to generate the cash necessary to satisfy investors who had requested cash.

468) As time went on, it became increasingly apparent that Broadstreet was having difficulty selling the various projects and investments that it needed to sell in order to generate sufficient cash to pay investors who had requested cash. The process continued to be delayed.

469) The last distribution Mr. Lehouillier received from the Altcoin Mining investment was on March 14, 2025.

470) A few months later, the distributions from his other investments also began to stop. The Public Storage distribution ended on September 15, 2025. The Data Center distribution ended on October 31, 2025. The Tennessee Land Development distribution ended on November 1, 2025, and the MCA distribution ended on November 15, 2025.

471) Eventually, another letter was sent to investors explaining that, because of market conditions, Broadstreet had been unable to sell certain assets for the prices it had originally expected or wanted to receive. The communication also stated, in substance, that the documents investors had signed did not guarantee that investors would actually receive cash. Instead, the documents provided that investors were obligated to accept the stock under the terms of the transaction rather than having a guaranteed right to receive their requested cash back.

472) As the delays continued and the distributions from his various investments stopped, it became increasingly apparent that the situation was very different from what Mr. Lehouillier had originally understood when he made these investments. What had initially been presented to Mr. Lehouillier as investments providing substantial annual returns, with the ability to receive his money back after the applicable holding period, had ultimately resulted in his money being tied

up, his distributions stopping, and a significant portion of the value being converted into stock that subsequently declined substantially in value.

<u>Ayan Bhattacharya</u>

473) Mr. Bhattacharya is a 48-year-old married individual based in Pennington, NJ. He works in management consulting with a focus on Artificial Intelligence.

474) In October 2024, Mr. Bhattacharya was introduced to Jay Reddy, a partner at Broadstreet, through a friend Sachin Shah. Mr. Shah is an investor in Broadstreet and has been named as one of the defendants in the S1 document filed on June 6, 2026 for Z Squared common stock - which was one of the dissolution strategies by Broadstreet of its cryptocurrency funds.

475) Mr. Bhattacharya made his initial Broadstreet investment on October 8, 2024 in the IF8 Infrastructure – 14.63% Annual Return Series.

476) On October 18, 2024, Mr. Reddy sent Mr. Bhattacharya Broadstreet's presentation for its Data Center investment. After speaking with Mr. Reddy and reviewing the presentation Mr. Bhattacharya made an investment in Data#1 -19% Annual Return on October 30, 2024.

477) On December 22, 2024, Mr. Reddy reached out to Mr. Bhattacharya about Broadstreet's Self Storage investment and sent him the presentation for that investment. Specifically, Mr. Reddy told Mr. Bhattacharya that Broadstreet has a partnership with Public Storage. This investment pays a preferred 10% rate during construction. The rate increases as the occupancy of the storage units increases and are capped at 30%. Mr. Reddy told Mr. Bhattacharya that he would get 85% and Broadstreet keeps 15% of the profit when its sold. Mr. Reddy also said Mr. Bhattacharya would receive a 50% tax write off. Initially, Mr. Bhattacharya only wanted to invest $[redacted] into this investment but Mr. Reddy told him that the minimum investment in public storage is $[redacted] On December 25, 2024, Mr. Reddy told Mr. Bhattacharya that if he want to get

in this investment then he had to wire the money to him by December 31, 2024. Based on these representations Mr. Bhattacharya invested in Self-Storage – Soft Costs 50% Deduction on December 30, 2024.

478) On January 6, 2025, Mr. Reddy messaged Mr. Bhattacharya on WhatsApp to tell him that Broadstreet will be having their final closing for the Tennessee investment on January 14, 2025. To convince Mr. Bhattacharya to invest in Broadstreet Tennessee, Mr. Reddy told him that the stock is getting listed by August 2025. The S1 filing is already done. The IPO price of the stock is $7.50. Broadstreet is offering the same stock to their existing clients at $3.75. Mr. Reddy said that it is 100% profit if the stock stays at the same price. If the stock falls below the purchase price, Mr. Bhattacharya can ask Broadstreet to convert his original investment to Broadstreet's infrastructure product and Broadstreet will transfer the original investment amount to infrastructure and pay 14.63% prorated interest from the original date of investment till Mr. Bhattacharya chooses to transfer the funds to infrastructure. Based on these representations Mr. Bhattacharya invested in Broadstreet Tennessee on January 13, 2025.

479) Mr. Bhattacharya reinvested his distributions from his Broadstreet investments.

480) Mr. Bhattacharya reviewed the various fund documents, prospectus, and did his due diligence looking at the SEC and other sources prior to investing. However, this was the first time Mr. Bhattacharya forayed into Private Equity after 20 years of investing with his 401K through Vanguard and personal brokerage accounts.

481) On October 16, 2025, Mr. Bhattacharya attended in person the annual Broadstreet Investor event in South Carolina where he felt there was something gravely wrong as there was no clarity on the Fund's future and he heard multiple conversations where Broadstreet representatives were telling investors they should be satisfied if they received a return of their capital as part of

the payouts to date. Given that Mr. Bhattacharya had only made his first investments in Broadstreet 10 months prior, alarm bells started ringing.

482) In the November 2025 Redemption Notice, Mr. Bhattacharya selected Option A – for a cash redemption as Broadstreet notified they were dissolving their investments portfolio. By selecting this option Mr. Bhattacharya was expecting a cash distribution of his equity in 180 days.

483) To this day, Mr. Bhattacharya has not received the cash redemption that he selected.

<u>Paula Darby and Stephen Darby</u>

484) Paula Darby and Stephen Darby are both 77 years old.

485) Paula is a retired elementary school teacher, who worked in early primary grades, pre-K through fourth grade, for 25 years.

486) Stephen was a Manufacturer's Representative in the Plumbing and Heating Industry. His company was engaged by a manufacturer to promote, market and sell their products. He worked in that capacity for 46 years before his retirement in December of 2020

487) In early 2019, Stephen was contacted by Todd Sanders, who is currently a partner at Broadstreet. A friend referred Mr. Sanders to Stephen. At the time Mr. Sanders was selling pre-IPO stock offerings with Richard Cardinale of L3 Capital Advisors. Stephen invested $[redacted] from his IRA. These investments proved to have a successful return.

488) In early 2021, Mr. Sanders was with Phoenix Financial and with his encouragement Stephen invested into the L3 Capital Hotel Fund. Richard Cardinale was the manager. There was a dividend paid for a short time and then that abruptly stopped.

489) In December of 2023, Mr. Sanders sent Stephen information about Broadstreet. Stephen had $56 thousand in an IRA and Mr. Sanders suggested Stephen should invest it in the

Broadstreet Infrastructure offering. Mr. Sanders advised Stephen to transfer the $56,000 from an existing IRA to Directed IRA and from there he would purchase the Broadstreet Infrastructure.

490) On January 30, 2024, Mr. Sanders sent Stephen the Docusign document that he had to complete "ASAP" (Mr. Sanders's words in his text) to get in by the February 1 close. Stephen signed. It was paying 14.63% which Stephen chose to reinvest.

491) Stephen’s investing with Mr. Sanders continued throughout 2024 as Stephen invested in other Broadstreet offerings, through his IRA, that he was moving from Vanguard to Directed Trust IRA. It was always a quick decision Stephen had to make before an offering was closing. Stephen felt he never was never provide time for an attorney to review the documents or to receive outside advice from counsel.

492) The Darbys last investment was on January 31,2025. Mr. Sanders assured Stephen that he’s never seen it take longer than 60-90 days for one of his clients to withdraw their investment in the BSG Fund. The only exception to being able to withdraw funds in 60-90 days was storage facility investment, which Mr. Sanders said it paid 10% until they were built and then when they sold the units the investors got a pro-rata share of the profits.

493) On June 6,2025 Mr. Sanders sent a text informing Stephen that he had great news. Broadstreet was selling 40% of their infrastructure development business for $500,000,000 in cash! Mr. Sanders proceeded to advise the Darbys to choose Option B but from the beginning Darbys chose Option A.

494) On May 22, 2026, the Darbys received a letter from Broadstreet informing them that they were going to receive an "in-kind" stock redemption that would be locked up for 3 years.

Alexander Joseph and Haley Joseph

495) The Josephs are a married couple who live in the South Florida area. Alexander Joseph and Haley Joseph are both 47 years old.

496) Alexander is the owner of a health care company. They invested a significant portion of their family's life savings in the BSG Fund.

497) In November 2023, Alexander was introduced to Akhil Morada through a mutual friend.

498) Mr. Morada represented that he worked at the BSG Fund and was a partner in the company.

499) Mr. Morada pitched a fund referred to as "the crypto fund," described specifically as a crypto mining operation rather than an investment tied to crypto market value. The pitch included: a 28 percent targeted annual dividend; a negative K-1 providing a tax benefit in addition to distributions; and an assurance that the principal could be returned with approximately six months' notice if requested. Mr. Morada specifically assured Alexander that a downturn or crash in crypto prices would not negatively affect the investment, since returns were based on mining operations rather than crypto asset value.

500) Mr. Morada also referenced his own personal investment in the crypto deal.

501) Based on these representations, the Josephs agreed to invest, one hundred thousand and another fifty thousand dollars later in the BSG Fund's Altcoin Crypto Mining Series.

502) Between September 2024 and March 2025, the Josephs received four distributions: three payments of seven thousand dollars each, in September 2024, December 2024, and March 2025, and one payment of three thousand five hundred dollars, totaling twenty-four thousand five hundred dollars.

503) Based on these payments and Mr. Morada's continued reassurances, the Josephs were encouraged to remain invested and to consider further investment, including a separate Tennessee real estate deal promising fourteen percent annual returns, with potential for more if the property sold.

504) The original crypto investment was rolled into approximately fourteen thousand shares of a security referred to as Z-squared, priced initially at fifteen dollars per share, and they were supposed to receive a fifty percent bonus allocation as part of the conversion terms.

505) Steven Shmulewitz of Craft Investment acted as the broker, not for the conversion, but as the broker the Josephs could deal with who is managing their stocks and would and could help sell them when the restrictions are removed.

506) Two restrictions apply to the Z Squared shares that the Josephs received. Only 5 percent of their total shares are released into their personal account per month, and even once released, the shares cannot be sold unless the stock trades at approximately 16 dollars per share for 10 consecutive days. ZSQR stock has since fallen to the low 2-dollar range, far below the 16-dollar threshold required for shares to become sellable, leaving the investment largely illiquid. These restrictions will not be removed until sometime in October 2027.

507) Later, the Josephs were told that the BSG Fund was selling all its assets and will convert their ownership in the Tennessee investment into shares of SOUL equal to 2.5 times their capital account. Their [redacted] dollars in the Tennessee investment, comprised of the original [redacted] dollars they invested plus unpaid 14 percent interest, is still pending the conversion into SOUL shares at 3 times and has not yet been completed. It is their understanding that once the conversion is completed, these shares will also have a similar restriction as the Z Squared shares

but will last for approximately 3 ½ years. The Josephs were not told that their investments could be locked up for this long when they made their investments in the BSG Fund.

508) Earlier this year, before the Z Squared conversion was finalized, Mr. Morada approached Alexander multiple times on behalf of other investors who wanted to cash out rather than convert to shares of ZSQR. Mr. Morada offered Alexander the opportunity to purchase their 2.5x share allocations at the original purchase price, meaning Alexander could have acquired approximately [redacted] dollars' worth of ZSQR stock for a [redacted]-dollar investment. However, Alexander decided not to make any additional investments.

509) Following the conversion, Z Squared's share value declined sharply. Mr. Morada has continued to communicate with Alexander, describing the decline as temporary and denying any fraudulent conduct.

<u>Derek A Kahn</u>

510) Mr. Kahn run several ventures, including MindHyv, a freelance and portfolio-management business, DC Tile & Stone. In November 2024, Mr. Kahn invested $[redacted] with Broadstreet Global Fund LLC, into a series called BSG Series CM LLC, managed by Broadstreet Global Management LLC and marketed to him as a "Crypto/Altcoin Mining" investment carrying a 28% annual "Targeted Annual Payment."

511) Mr. Kahn signed subscription documents on November 14, 2024. Steven S. Baldassarra, identified to him as Broadstreet's COO, signed as counterparty on Broadstreet's behalf. Mr. Kahn's $[redacted] contribution was wired in three installments between November 27 and December 2, 2024, and became effective as of December 1, 2024.

512) Within about a month of funding, Broadstreet's own 2024 Schedule K-1 allocated a $[redacted] loss to Mr. Kahn — 62% of his invested capital — leaving an ending capital account

of $[redacted]. No document Broadstreet has ever provided to Mr. Kahn explains the basis for that loss.

513) In January 2025, Mr. Kahn learned that the U.S. Securities and Exchange Commission had filed a fraud complaint against Broadstreet Global Management LLC, Broadstreet Inc., and its principals David Feingold, Joseph Baldassarra, and Steven Baldassarra (SEC v. Feingold et al., S.D. Fla., No. 1:25-cv-20436-DPG, filed January 29, 2025). That complaint alleges the fund raised over $1 billion from investors and diverted roughly $170 million of it to its principals personally, while making "almost no investments." It names BSG Series CM — the specific series Mr. Kahn invested in — as having received approximately $199 million from investors.

514) On March 1, 2025, Mr. Kahn received a single cash distribution of $[redacted]. That remains the only cash distribution he has ever received from this investment, notwithstanding the 28% annual return he was promised, which would total approximately $[redacted] by now had it been paid as represented.

515) On March 21, 2025, Broadstreet sent Mr. Kahn a written notice titled "Broadstreet Analysis — Alt Coin Mining Operation and Sale of Operations to PubCo," announcing a planned sale of the mining operation to a public company. The notice stated that investors who, like Mr. Kahn, joined after May 2024 would receive "their investment back plus fifty percent" — i.e., $[redacted] on Mr. Kahn's $[redacted] investment — to be paid in stock "in approximately 90 days." The same notice announced that further quarterly distributions were being suspended because of the sale process. It mentioned only in general terms that Mr. Kahn shares would be subject to leak-out provisions and volume-weighted-average-price conditions comparable to SEC Rule 144; it did

not specify the actual $16.31 price floor or 18-month schedule that ultimately governed Mr. Kahn's shares.

516) The same March 21, 2025 notice included a market-analysis appendix, offered to investors as part of the rationale for the transaction's timing, whose own supporting charts were captioned as showing "synthetic data" rather than real historical data, with footnotes pointing to what appear to be AI-tool-generated files.

517) On June 24, 2025, without any vote by Mr. Kahn or any other investor, BSG Series CM's mining hardware was exchanged for Z Squared Inc. stock under an "Amended and Restated Asset-for-Share Exchange Agreement." Broadstreet claims that its own governing documents gave its Manager sole, contractually "final and conclusive" authority to value fund assets and exchange them for other securities, with no ability for Mr. Kahn to object or block the transaction.

518) From September 2 through 4, 2025, Mr. Kahn personally traveled to Broadstreet's operations in Greenville, South Carolina, to seek direct answers about the status and timing of his investment. During the entirety of this trip, the Broadstreet representative refused to discuss the Altcoin fund, and all talks were about investing additional funds.

519) Broadstreet's own "Final K-1" for BSG Series CM, dated December 31, 2025, records only $[redacted] of "tax capital transferred to public entity" against Mr. Kahn's $[redacted] original investment, with an ending capital account of $0. This is the same investment for which Mr. Kahn had been told, in writing, to expect $[redacted].

520) On February 28, 2026, at 7:19 PM, Mr. Kahn texted Steven Sconzo of Broadstreet: "Just wondering, instead of the money we have going through the IPO. Can I just transfer the 750k to a different position in Broadstreet?" Mr. Sconzo replied: "No sir, everyone receives the stock." Mr. Kahn responded, "Okay, thanks." Mr. Sconzo did not dispute or correct the $[redacted]

figure Mr. Kahn referenced, and confirmed that stock — not a cash alternative or a transfer to a different position — was mandatory for every investor. This exchange occurred roughly two months after Broadstreet's own December 31, 2025 K-1 had already recorded only $[redacted] of tax capital transferred for these same shares, and about two months before Z Squared began public trading.

521) On April 27, 2026 — about 13 months after the "approximately 90 days" Mr. Kahn had been told to expect — he was issued 47,161 shares of Z Squared Inc. (Nasdaq: ZSQR). Those shares carry a resale restriction requiring a 10-day volume-weighted-average price above $16.31 before any shares may be sold, plus an 18-month leak-out schedule capping releases at approximately 5.5% of his position per month — specific terms that were never disclosed to Mr. Kahn alongside the $[redacted] figure he had been given. That same day, Broadstreet's investor portal (JuniperSquare) separately recorded this same event as a full "Redemption" of Mr. Kahn's original $[redacted] investment — a third, inconsistent characterization of what Mr. Kahn actually received.

522) ZSQR has traded above the $16.31 resale-restriction floor for only a brief period since it began trading, reaching a 2026 high of $16.73 on June 18, 2026, before falling roughly 82% to a 2026 low of $2.91 on September 1, 2026. Its sharpest decline coincided with July 6, 2026, the date Mr. Kahn's first monthly leak-out tranche (and other investors' tranches) became eligible for sale. As of September 9, 2026, ZSQR closed at $3.00 per share, making Mr. Kahn's 47,161 shares worth approximately $[redacted] — about 28% of the $[redacted] the investor portal describes as "redeemed," and about 24% of the $[redacted] Mr. Kahn was told in writing to expect. Most of Mr. Kahn's position remains legally unsellable under the $16.31 price condition regardless of how much time passes.

523) The gap between what Mr. Kahn was promised and what he has actually received — combined with the ongoing uncertainty over how much of his original $[redacted] principal is actually recoverable — has required his family to significantly cut discretionary spending, including reducing the trips needed to visit elderly family members. Mr. Kahn and his family are now completing repairs to their current home so that they can sell it and relocate closer to family, specifically because they can no longer absorb the ongoing cost of traveling back and forth to maintain those relationships.

524) Over the roughly 22 months since Mr. Kahn made this investment, he has had to independently assemble and cross-reference subscription documents, K-1s, SEC filings, trading data, and broker-verification records to understand what happened to his money — work that would ordinarily be handled by a fund's own reporting or by regulators, not by an individual investor. This has amounted to many hours of stressful financial planning, undertaken to protect his family's financial security against an outcome Broadstreet's own representations did not prepare them for.

525) The clearest cost to Mr. Kahn family has been personal rather than financial. The reduction in his families discretionary travel funds meant they were unable to visit Mr. Kahn’s wife's grandmother — a family member they were all very close to — before she passed away. They were not present for her passing, an absence Mr. Kahn attributes directly to the financial strain this investment's failure to perform as represented has placed on his family.

526) Mr. Kahn is troubled by what he believe is a pattern of inconsistent and, at times, contradictory representations from Broadstreet: a $[redacted] value represented in writing and never corrected when he raised it again by text fourteen months later; a $[redacted] “Redemption” recorded on the investor portal; a $[redacted] internal transfer recorded on his own K-1; and a $16.31-per-

share SEC cost basis implying yet a fourth figure (approximately $[redacted] nominal) — none of which reconcile with each other or with the roughly $[redacted] his position would be worth today if it could be traded. It is also troubling that Z Squared's own SEC filings disclose a valuation error in the underlying exchange itself, in which the independent valuation assumed newer, more valuable mining hardware than what was actually transferred.

527) Mr. Kahn seeking the return of money he earned and entrusted to Broadstreet in good faith, based on specific written and verbal representations that did not hold up. This has affected his family's financial security, their plans, and their relationships. Mr. Kahn is entitled to answers, transparency, accountability, and, most importantly, the recovery of the funds he entrusted to Broadstreet.

<u>Manish M. Patel</u>

528) Mr. Patel is 59-year-old and a Physician living in the South Florida area.

529) Mr. Patel got involved with Broadstreet approximately five years ago when one of his friends suggested them to him.

530) Mr. Patel was first contacted by Akhil Morada, a senior managing director at Broadstreet, Inc., and then later by Joseph Baldasarra.

531) Mr. Patel invested both his personal and IRA account money with them in pre-IPO securities and then Joseph Baldassarra convinced Mr. Patel to invest in the BSG Fund's Altcoin Mining/Crypto and Infrastructure investments.

532) Last year they told Mr. Patel that they could offer 3x return if he agreed to convert his investment into a stock deal and convinced him by saying that most of their investors are opting for it. However, Mr. Baldassarra did not disclose the risk involved with it or that Mr. Patel would have a longer than 18 months or more of mandatory hold where he could not sell anything.

533) Broadstreet converted Mr. Patel's Crypto investment into ZSQR stock at $16 and gave him stock they claim was equal to 1.5x of his investment (not 3x his investment which was promised to convince him to sign up) and now that stock is trading at $2.50 and Mr. Patel can't sell anything for at least 18 months.

534) Mr. Patel was told that his remaining investment will be converted to SOUL stock so Mr. Patel can't withdraw any funds now and Broadstreet does not know how long that will take to implement or what that stock will be worth when the restrictions are lifted.

Hitesh R. Dalal and Ravi H. Dalal

535) Hitesh R. Dalal is 66 years old and retired. His son, Ravi H. Dalal, is 35 years old and works as a networking engineer at Cisco.

536) They have a joint investment in Broadstreet's Crypto/Altcoin Mining fund.

537) A neighborhood friend introduced the Dalals to Vikas J. Patel, a partner at Broadstreet, Inc.

538) Hitesh told Vikas that his investment goal was to receive a steady income as dividend/distribution for his retirement years. Vikas told Hitesh that Broadstreet was a solid passive income investment.

539) On the phone call with Vikas, Hitesh was told to keep the "Accredited" investor space blank. However, the signed and completed document that someone at Broadstreet filled out shows Hitesh as an "Accredited" investor.

540) The Dalals total investment in the Crypto/Altcoin Mining fund is $[redacted]

541) The Dalals investment in the Infrastructure fund was $[redacted], which Hitesh was allowed to withdraw in full for medical treatment for his wife.

542) The Dalals also requested a full withdrawal in cash of their investment in the Crypto/Altcoin Mining fund, but instead Broadstreet involuntarily converted their investment into restricted shares of Z Squared (ZSQR).

543) Hitesh is now surviving solely of his Social Security income.

<u>Edlene Zimiles and Andrei Zimiles</u>

544) Edlene Zimiles and Andrei Zimiles are a married couple who invested a significant portion of their life savings in the BSG Fund. Andrei Zimiles is the trustee of the Andrei Zimiles Revocable Living Trust (the "Trust") and personally handled its Altcoin investment.

545) In March 2024, Glenn Hechler, their contact for Broadstreet transactions, called them to recommend that they invest in the Altcoin Series in BSG Fund. Mr. Hechler provided them with the pitch deck for this investment, which stated that there was a 6-month redemption period.

546) On March 7, 2024, Andrei Zimiles sent Mr. Hechler an email with eleven questions about the altcoin mining opportunity to conduct his due diligence on this investment, which Mr. Hechler answered during a phone call.

547) On April 13, 2024, the BSG Fund entered into side agreements with Edlene Zimiles and the Trust to induce them to invest in the Altcoin Series. The April 13, 2024 Side Letter is attached hereto as **Exhibit L**. In these agreements, the BSG Fund agreed that:

a. The Investor shall be paid an annual return of 28% (the “Return”) which shall be made in equal quarterly payments and is to be made as a preferred return meaning before other payments as described hereafter. Each quarterly payment of the Return is to be paid before any management, performance, or expenses are paid for the quarter. In addition, there will be no capital calls for investors.

b. In the event the business is sold, the investor shall receive the percentage of purchase price based on the percentage amount of capital that the investor invested in comparison to the total sum raised by the fund for this sub-series.

c. The Payment is being made from returns achieved by BSG in the investment of the Investor's funds as provided in the private placement documents of BSG related to the altcoin mining subseries and as reflected in the data room of BSG.

548) The Side Letter Agreements were counter-signed by Steven Baldassarra as Managing Member.

549) Edlene subscribed $[redacted] and the Trust subscribed $[redacted], with a second tranche (Edlene a further $[redacted] on October 29, 2024; the Trust a further $[redacted] on November 14, 2024), for Altcoin totals of $[redacted] and $[redacted], respectively.

550) In March 2025, Broadstreet sent Edlene Zimiles and the Trust the Altcoin Mining Participant Vote agreement discussing a potential sale of the Altcoin investment to a publicly traded company. This document suggested that they might receive cash in exchange for their ownership interest in the Altcoin Series, although it stated that all consideration was "expected" to be paid in stock. Clause 8 referred conditionally to "In the event" the transaction was "stock rather than cash," and clause 11 repeated "if stock is the consideration paid." It also stated that if stock is received rather than cash, management may negotiate a stock lock up period to protect the stock price of any acquiring entity.

551) The Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus,

material information was missing from the Altcoin Mining Participation Vote, such that Edlene Zimiles and the Trust did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series. Had this missing information been disclosed, they would not have signed the Altcoin Mining Participant Vote.

552) The Altcoin Series (BSG Series CM) was converted into restricted stock of Z Squared, Inc. through an asset-for-share exchange and a merger with Coeptis Therapeutics Holdings. Coeptis, CP Merger Sub, and Z Squared signed their merger agreement on April 25, 2025. The governing Asset-for-Share Exchange Agreement between pre-merger Z Squared (now Z Squared OpCo Inc.) and BSG Series CM exists in three versions on EDGAR (accession 0001683168-26-003388, CIK 0001759186): the June 24, 2025 Amended and Restated agreement set 40,446,956 OpCo shares at $16.00, with a VWAP lock-up, an 18-month leak-out, and a $35.00 two-consecutive-trading-day suspension; the February 10, 2026 First Amendment restated the consideration to 44,062,947 OpCo shares at $16.31; and the April 23, 2026 Second Amendment extended the lock-up, leak-out, and the $35.00 trigger to transferees.

553) The Form S-4 registration (Reg. No. 333-288329) was declared effective in late December 2025. The Coeptis-Z Squared merger closed April 24, 2026; the ticker changed from COEP to ZSQR. On April 27, 2026, restricted ZSQR shares were issued to BSG Series CM members in book-entry form at Continental Stock Transfer, and the 18-month leak-out began. BSG Series CM subsequently reported a pro-rata distribution of all 41,521,276 ZSQR shares to its members on April 30, 2026, in a Form 4 and a Schedule 13D/A signed by Steven Baldassarra.

554) The specific allocations of Edlene Zimiles and the Trust, as confirmed by Continental, were as follows: Edlene received [redacted] restricted ZSQR shares (account 927), and the Andrei Zimiles Revocable Living Trust received [redacted] (account 535). Both Edlene's and the

Trust's original confirmations (each bearing Advice 2032972, for accounts 927 and 535, respectively) carried restriction code C180E with a legend tying the restriction to the June 24, 2025 agreement while quoting a $16.31 VWAP; a corrected confirmation (Advice 2039835) for the Trust replaced it with codes C180G (the S-4 leak-out and lock-up, terminating October 27, 2027) and C180H (a Rule 144 legend).

555) Between April 29 and May 15, 2026, Edlene Zimiles and Andrei Zimiles questioned the $16.31-versus-$16.00 legend and the meaning of code C180E. Continental's Chief Compliance Officer, Michael Mullings, explained that a statutory Securities Act restriction applied on top of the contractual lock-up and leak-out and that a corrected statement and explanatory letter would issue; their registered address was also updated. A Z Squared Shareholder Update dated May 13, 2026 described the two restriction legends, a no-shorting policy, the leak-out (one-eighteenth per month above a $16.00 VWAP, capped at 5% of average daily volume, with the $35.00 two-day override), the Form S-4, and a forthcoming Form S-1 resale registration, with the restrictions under that agreement expiring October 27, 2027. The same notice contained an express threat: "Any investor found to be in violation of the no shorting policy or the Leak-Out Agreement will have their account frozen at the transfer agent level and will be referred to the SEC and FINRA for further investigation and enforcement action." It added: "These consequences are serious and irreversible. Please govern accordingly." The notice was signed by Z Squared Inc. and was sent to Andrei Zimiles by Continental with his book-entry confirmation on May 15, 2026. Selling-stockholder questionnaires were executed for the Trust (April 17, 2026) and Edlene (May 7, 2026).

556) BSG Series CM reported the distribution on a Schedule 13D/A and a Form 4 as "pro rata." The company's public filings explain that BSG received 44,062,947 shares of the pre-merger Z Squared entity (now OpCo), which were converted in the merger into 41,521,276 shares

of the public company's common stock. That explanation reconciles the aggregate share counts; it does not establish that Edlene Zimiles's and the Trust's individual allocations were accurate or that they received the proportional share of sale proceeds promised in their side letters. Edlene Zimiles and the Trust dispute that the distribution satisfied those obligations and seek a full accounting of how the consideration was valued and allocated, including any consideration allocated to Broadstreet or its affiliates. Merely describing the distribution as "pro rata" does not demonstrate that they received what they were owed.

557) The First Amendment changed the lock-up threshold from $16.00 to $16.31. The original book-entry legends for Edlene Zimiles and the Trust tied the restriction to the June 24, 2025 agreement while quoting a $16.31 VWAP, and a corrected statement had to be reissued with different codes. Z Squared's May 13, 2026 Shareholder Update nevertheless stated a $16.00 VWAP threshold. Accurate cost-basis and restriction disclosure matters under the antifraud provisions and is necessary for accurate tax reporting; the need for a correction is consistent with the SEC's allegation that Broadstreet made false statements about recordkeeping and financial statements. These inconsistencies are particularly troubling given the express threat of account freezes and regulatory referrals for noncompliance.

558) The ZSQR shares held by Edlene Zimiles and the Trust are restricted securities under lock-up and leak-out terms and Rule 144 legends, with resale governed by the S-4 (Reg. No. 333-288329) and a Form S-1 (Reg. No. 333-296653) declared effective on June 16, 2026, subject to the continuing contractual lock-up and leak-out restrictions. As of the date of this declaration, neither Edlene nor the Trust has sold any of the ZSQR shares received in connection with their Altcoin investments. If unregistered, non-exempt securities were sold, Section 12(a)(1) gives a

purchaser a rescission remedy against the seller; misstatements in a registered offering can implicate Section 12(a)(2).

559) The side letters promised a 28% preferred annual return and pro-rata participation in sale proceeds. Converting the position into restricted stock locked up to October 27, 2027, with no preferred-return cash and constrained liquidity, appears to defeat those bargained-for economic terms, and thus is a breach of the terms of the side letter agreement. The side letters were counter-signed by Steven Baldassarra, tying the breach to the controlling individuals.

560) Converting investors into a single restricted, thinly traded post-merger stock raises loyalty, care, suitability, and disclosure concerns, especially given irregular and inconsistent communications regarding share count, cost basis, and the restrictions on Edlene Zimiles's and the Trust's shares.

561) The investment sold to Edlene Zimiles and the Trust was a family of Altcoin Mining investments with a 28% preferred annual return, payable quarterly, no capital calls, depreciation benefits, and defined economics on sale. The Z Squared conversion is a pivot from their original investment, and thus it is not the investment they bought.

562) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of Edlene Zimiles's and the Trust's original investment decision and were not fully disclosed before their consent was solicited.

563) If Broadstreet relies on the sale vote, that document still points to a stated expected economic outcome: investment back plus 100% for pre-May 2024 capital and investment back plus 50% for later capital (200% and 150% of invested capital, respectively), with Broadstreet/affiliates paid only after investors receive their entire remuneration. The vote

reinforced those value representations by stating: "All investors are expected to receive stock at a value higher than their original investment if stock is the consideration paid." Restricted shares that cannot be freely sold at that value are not the same as cash purchase price or promised remuneration. The restrictions limited Edlene Zimiles's and the Trust's ability to realize those stated values through a sale of the shares. The fact that the vote contemplated stock consideration does not establish that the shares actually delivered provided the value represented.

564) The Selling-stockholder questionnaires, Oppenheimer instructions, holder representation letters, and transfer-agent documents were steps taken to mitigate losses in connection with the announced or completed Z Squared transaction and were not intended by Andrei Zimiles as consent to give up the side letter agreement or sale-value rights.

565) For these reasons, Edlene Zimiles and the Andrei Zimiles Revocable Living Trust seek to rescind the Z Squared conversion of their Altcoin Series investment and seek other available relief, including restitution, damages, and an accounting, in the alternative where necessary.

<u>Brian Lee</u>

566) Brian Lee is a 51-year-old anesthesiologist living in the Los Angeles area.

567) Mr. Lee's friend (also an anesthesiologist) introduced him to a broker by the name of Allan Babaian, who previously worked with Joseph Stone and later with New Age Venture Capital or VCS Venture Securities.

568) Mr. Lee was interested in pre-IPO investments, and his understanding was that Mr. Babaian would gain access through the secondary market, while aggregating smaller investors such as himself to purchase these shares. Investments that Mr. Lee considered included SpaceX,

Flexport, Hark, and Anthropic. Mr. Lee had strongly considered Anthropic in March of 2024 but got cold feet due to the risky nature of these investments and incredibly high fees.

569) Ultimately, as an alternative, Mr. Babaian sold Mr. Lee on the Broadstreet's Infrastructure fund as a "safe" investment for more risk-averse investors such as Mr. Lee and many of his other physician clients.

570) Mr. Babaian cited the 14% return and relatively easy redemption after 1 year, which only required a 6-month waiting period. Broadstreet was described as an incredibly successful and stable business, providing the infrastructure build-out for master planned communities, with home builders such as Lennar and D.R. Horton already committed to and under contract for their lots.

571) Mr. Babaian, himself, claimed he had been on a tour in South Carolina, and described Feingold as incredibly personable, always available, and even held a huge annual investor family event that Mr. Lee would be invited to attend.

572) Mr. Lee received the slide deck, reviewed a sample contract, and listened to a very basic introductory zoom call to prospective investors by Feingold. Mr. Lee ultimately invested in August 2025.

573) Mr. Lee's $[redacted] investment represented approximately 25% of his after-tax income, and all his liquid savings. Mr. Lee counted on this steady growth to outpace the stock market with the benefit of a significantly less risk.

574) This was not marketed to Mr. Lee as a high risk/high reward investment. Mr. Lee's understanding was that by utilizing private investors, Broadstreet was able to obtain more capital than they could receive in traditional banking loans. The 14% return was seen as the cost of doing business for Broadstreet. The only cost for Mr. Lee was a 6-month lockout period. And the only

risk was if the business went belly up, which seemed absolutely improbable to Mr. Lee given the contracts Broadstreet had established with the biggest homebuilders.

575) In addition, Mr. Lee was told about Broadstreet's new venture into Tennessee, but that was being offered in stock, rather than the 14% cash return investment. Furthermore, the Tennessee project was described as a completely different arm, and Mr. Lee preferred the security of the established South Carolina infrastructure fund.

576) Mr. Lee did not expect the co-mingling of all Broadstreet ventures or anything that transpired since.

577) Ultimately, this is a significant amount of savings for Mr. Lee and his family. The cost of living in Los Angeles does not allow Mr. Lee and his family to have much in terms of disposable income. They live within their means and send their kids to public school. The investment Mr. Lee made in Broadstreet was meant to be a secure investment in his family's future.

<u>Michael Patel</u>

578) Mr. Patel is a 47-year-old insurance agent living in the South Florida area, who invested his entire life savings in the BSG Fund.

579) Mr. Patel comes from a blue-collar family and was raised in the New York City metro area. Mr. Patel has worked in the insurance business for 20 years. He has osteo arthritis in both shoulders and knees, and type II diabetic, which impacts his overall work ability.

580) Mr. Patel first invested in Broadstreet in March 2023 through Nihar Patel, a partner at Broadstreet, Inc.

581) He trusted Nihar Patel and others at Broadstreet. Nihar Patel lured him into investing in the BSG Fund by suggesting he start with a small investment to prove to him that the BSG Fund was real and a good investment.

582) Nihar Patel also told him that after one year he would be able to withdraw his funds.

583) Based on Nihar Patel's representations and recommendation, in March 2023, he invested $[redacted] in the BSG Fund's IF8 Infrastructure series and initially it paid the 14.63% annual return that Nihar Patel claimed it would. Thus, the BSG Fund appeared to be a legitimate investment.

584) As a result, Nihar Patel convinced him to invest the rest of his life savings in the BSG Fund.

585) In March 2025, after only receiving one distribution payment, the distributions from his Altcoin/Crypto Mining investment stopped. He was informed that this investment would be converted to restricted shares of Z Squared and he would no longer receive distribution payments. This was not the investment that Nihar Patel sold to him. Had Nihar Patel disclosed that he would not be receiving quarterly distributions and his money would be locked up for years in a publicly traded company, he would not have made this investment.

586) Then, in the Fall of 2025, he received an email from Broadstreet informing him that he would not be receiving distributions from any of his other BSG Fund investments.

587) At the time, Broadstreet gave its investors an option to receive a cash redemption or shares of stock that Broadstreet claimed were worth three times his capital account.

588) He elected to receive a cash redemption instead of receiving shares of SOUL.

589) Nihar Patel told him that instead of the 14.63% and 19% annual distributions he was receiving quarterly from his BSG Fund investments in Infrastructure, MCA, and data center, upon redemption the BSG Fund would pay him cash worth the full value of his capital account plus a 6% return.

590) In May 2026, Broadstreet sent him a letter informing him that it would not be honoring his cash redemption request and that it would be giving him shares of SOUL instead.

591) He was shocked by this news. He and his family were planning on buying their home this year. This caused significant disruption and uncertainty in his life.

592) He trusted Nihar Patel and Broadstreet with everything, and they are attempting to run him and all the other investors out of the BSG Fund.

Howard Jeffrey Siegel and Karen Siegel

593) Plaintiff Howard Jeffery Siegel is a 76-year-old chiropractor.

594) Mr. Siegel manages the investments for himself and his wife Karen Jane Siegel.

595) Mr. Siegel became involved with Broadstreet through a friend. His niece worked there for one and a half years and said things were going great.

596) Mr. Siegel's contact at Broadstreet was Albert Chcoury. Mr. Chcoury is a partner at Broadstreet, Inc.

597) Mr. Chcoury told Mr. Siegel that there was a one-year hold before he could withdraw the money he invested.

598) The Siegels began investing in the BSG Fund in May 2024 with an initial investment of $[redacted].

599) After that, Mr. Siegel was told that Broadstreet was branching out into Tennessee and it was a great investment because a man by the name of Mark (an attorney) was heading it up. The Siegels invested $[redacted] in Broadstreet Tennessee.

600) The Siegels also made addition investments in IF8 Infrastructure and BSG PTT, for a total investment in the BSG Fund of $[redacted]

601) In November 2025, when Broadstreet offered shares of SOUL, the Siegels elected Option A to receive a cash redemption.

602) At the time, Mr. Chcoury to Mr. Siegel that there was a Monitor, so everything was safe, and Broadstreet had plenty of assets to cover their investment.

603) Mr. Chcoury told Mr. Siegel that he would receive his money back within six months. Then when it came time to pay, Broadstreet informed the Seigels that they were not going to honor the cash redemptions and everyone was going to receive restricted shares of SOUL.

604) Some of the money the Siegels invested in the BSG Fund was supposed to be used to help their son and his wife by a home. Their son currently lives with them along with his 9-month-old baby. The rest of money was also supposed to be for Mr. Siegel's retirement. At 76 years old Mr. Siegel still has to work to support his family because of the money Broadstreet is refusing to return to him.

Blue Volley LLC

605) Blue Volley is a limited liability company whose sole member is Aaron Jonas. Mr. Jonas formed Blue Volley for the sole purpose of holding his investments in the BSG Fund.

606) Mr. Jonas is 56 years old and works as Director of Business Development at Mill Road Dairy.

607) Mr. Jonas first became involved with Broadstreet after a friend told him about the company and gave him its contact information. In approximately February 2024, Mr. Jonas initially spoke with Abe Beyda, who subsequently introduced him to Albert Chcoury. Mr. Chcoury became Mr. Jonas's primary Broadstreet contact and remained his primary contact throughout his investment relationship with Broadstreet.

608) Virtually all of the information communicated directly to Mr. Jonas—probably 99% or more—came through Mr. Chcoury. At the same time, Mr. Jonas did not rely solely on his conversations with Mr. Chcoury. Throughout the period he invested, Mr. Jonas also reviewed as much of the available information and documentation as he reasonably could through the Broadstreet investor portal and other materials Broadstreet made available to investors. Nothing Mr. Jonas saw in those materials caused him to believe that his understanding from Mr. Chcoury was incorrect or that the investments involved materially different risks, restrictions, or liquidity issues from what he had been told.

609) Mr. Jonas's consistent understanding from dozens of conversations with Mr. Chcoury was that these were relatively safe, income-producing investments.

610) Regarding the real-estate investments, Mr. Jonas was generally told that investors could earn approximately 14% annually, while Broadstreet's underlying projects were earning approximately three times that amount. Mr. Jonas understood that investors were essentially receiving approximately one-third of the economics.

611) Mr. Jonas was also told that the real-estate investments were relatively safe because of how the projects and contracts were structured. Significant amounts of money would be received upfront or throughout development, and Broadstreet supposedly had contracts that substantially reduced the amount of capital at risk.

612) Regarding Altcoin/Alt Mining, the investment documents themselves described an approximately 28% annual return, and the investment's name referenced that return. Again, Mr. Chcoury told Mr. Jonas that the underlying business was earning roughly three times what investors were receiving.

613) Mr. Jonas specifically remembers discussing the risks associated with cryptocurrency. Mr. Chcoury explained that the operation was not taking significant cryptocurrency price risk because the coins being mined were sold promptly rather than accumulated. Mr. Jonas therefore understood that the business was not sitting on large cryptocurrency holdings that could collapse in value. Mr. Jonas was also repeatedly given the impression that the mining operation was making a substantial amount of money.

614) These explanations were very important to Mr. Jonas's decision to invest.

615) One of the most important representations Mr. Jonas remembers was that he could get his principal back if he needed it.

616) Mr. Jonas was told this on many occasions because liquidity was one of his most important questions before he even began investing.

617) Mr. Jonas recalls that there was a period of approximately three months or so associated with withdrawals. He was also repeatedly given the impression that, in practice, money could often be returned considerably sooner.

618) Importantly, Mr. Jonas never understood these investments to mean that his capital could be inaccessible for years.

619) Mr. Jonas believed he had three significant protections: steady income, profitable underlying businesses, and the ability to recover his principal within a relatively short period if necessary.

620) Those factors made Mr. Jonas comfortable investing increasingly large amounts of money.

621) Mr. Chcoury repeatedly made Mr. Jonas comfortable with Broadstreet and its management. Mr. Chcoury spoke very positively about David Feingold's character and gave Mr. Jonas the impression that Feingold was looking after investors' interests.

622) Mr. Jonas also participated in many of Feingold's investor calls. Mr. Jonas recalls that those calls were consistently very positive and emphasized how well the businesses were performing. Mr. Jonas does not remember being warned that Broadstreet was experiencing problems that might ultimately eliminate investors' cash distributions and convert their investments into long-term restricted public-company stock. To the contrary, Mr. Jonas recalls that Feingold's reports were consistently very optimistic about how well Broadstreet and its investments were doing.

623) Mr. Jonas also traveled to South Carolina to see Broadstreet-related properties, which increased his confidence that substantial real assets supported the investments.

624) In addition, on multiple occasions during the period Mr. Jonas was investing, he was told that Broadstreet was in an extremely positive cash-flow position. Mr. Jonas recalls being told something to the effect that Broadstreet had approximately $50 million in the bank because of the success of its investments.

625) Those representations gave Mr. Jonas additional confidence that Broadstreet was financially strong and that the investments were performing successfully.

626) All of Mr. Jonas's direct Broadstreet investments were made and held through his company, Blue Volley LLC. Accordingly, the Broadstreet investment interests described below, including the ZSQR shares resulting from those investments and the interests associated with the anticipated SOUL transaction, are held in the name of Blue Volley LLC. Mr. Jonas personally

made the investment decisions and had the communications with Mr. Chcoury and Broadstreet described in this statement.

627) According to the most recent Broadstreet investor report for Blue Volley LLC, approximately $[redacted] was invested directly into Broadstreet investments.

628) Mr. Jonas's reported distributions totaled only approximately $[redacted].

629) A substantial portion of those distributions came from the Alt Mining investment paying approximately 28%.

630) Mr. Jonas began investing in approximately May 2024, initially with about $[redacted], and continued making additional investments during approximately June 2024, July 2024, September 2024, November 2024, and January 2025, with additional investment activity later.

631) Most of the meaningful income Mr. Jonas received occurred between approximately August 2024 and February 2025.

632) The last substantial payment Mr. Jonas remembers receiving was approximately $[redacted] on February 26, 2025. After that, payments became very small or stopped.

633) Mr. Jonas entered Alt Mining relatively late compared with many earlier investors.

634) Mr. Jonas was told that earlier investors had arrangements under which they could potentially receive approximately twice their investment value if the mining company was sold. It was never expressed to Mr. Jonas that this might be a stock deal with long-term restrictions. Because Mr. Jonas entered later, he was not originally promised that same benefit.

635) When Broadstreet decided that the Alt Mining investment would become Z Squared (ZSQR) stock, Mr. Jonas was told that he would receive approximately a 50% increase in value, rather than the larger benefit some earlier investors received.

636) At the time, however, Mr. Jonas considered the 50% increase extremely attractive because he was being told that Z Squared was expected to perform very well and become liquid relatively quickly. In addition, according to Broadstreet's communication, Mr. Jonas had no option to simply get his money back instead of accepting the ZSQR transaction.

637) Mr. Chcoury expressed considerable enthusiasm about Z Squared. **At one point, Mr. Chcoury told Mr. Jonas, based upon Mr. Chcoury's understanding at the time, that Mr. Jonas would receive an additional doubling after his 50% increase.** This temporarily led Mr. Jonas to believe he could receive approximately three times his original value.

638) Months later, when Mr. Jonas discovered that this was inaccurate, he called Mr. Chcoury about it. Mr. Chcoury apologized for the misunderstanding and explained that the transaction was not what he had originally thought.

639) Mr. Jonas was also shown very optimistic potential stock valuations, including an analysis contemplating a price **as high as approximately $80 per share**.

640) Mr. Jonas understood that ZSQR might begin trading around $16 per share, with significant potential upside from there very quickly.

641) An extremely important issue for Mr. Jonas is that when Alt Mining was being converted into ZSQR, he was never told at the outset that he would face an 18-month restriction, a 1/18-per-month limitation, VWAP requirements, prohibitions against hedging or shorting, or the other restrictions that ultimately applied.

642) Had Mr. Jonas known about those restrictions, he would have pursued whatever alternatives were available to try to recover his money because he could not afford to have his capital inaccessible for that length of time.

643) Also, Mr. Chcoury had actually discussed with Mr. Jonas that if Mr. Jonas wanted to protect himself against stock-price risk, he could potentially hedge or short the stock. This made Mr. Jonas considerably less nervous about receiving stock because he believed he could protect himself against a substantial decline in its value. Mr. Jonas and other investors subsequently learned that this was prohibited.

644) Mr. Jonas does not believe Mr. Chcoury intentionally gave him incorrect information. Mr. Jonas's impression is that Mr. Chcoury did not know the eventual restrictions himself. Based on what Mr. Jonas observed, Broadstreet appeared to provide changing information to investors and, Mr. Jonas believes, to Mr. Chcoury as well. The parameters of the ZSQR transaction changed over time, which is one reason Mr. Jonas believes Mr. Chcoury himself did not initially understand what the final restrictions and terms would be.

645) Had Mr. Jonas understood from the beginning that his investment could be locked into restricted stock for this length of time, it would have materially changed how he viewed the transaction.

646) The direct ZSQR allocation associated with Mr. Jonas's Broadstreet investments, held through Blue Volley LLC, is approximately 94,321 shares.

647) In addition to the direct Broadstreet investments held through Blue Volley LLC, Blue Volley LLC also invested approximately $[redacted] through the separate Alt Solutions/BSG ALTS structure, an arrangement Mr. Chcoury created for Mr. Jonas and several other investors.

648) The purpose, as Mr. Jonas understood it, was to allow those investors to obtain an additional Z Squared opportunity shortly before the company was expected to go public, with an anticipated step-up in value of at least approximately 50%.

649) Through that transaction, the investors purchased an interest associated with another person's Broadstreet/Alt Mining investment that ultimately became ZSQR stock.

650) The attributable ZSQR position associated with Blue Volley LLC through the Alt Solutions/BSG ALTS structure is approximately 10,301 additional ZSQR shares.

651) This $[redacted] is separate from the approximately $[redacted] reflected on the Broadstreet investor report for Blue Volley LLC.

652) Mr. Jonas had approximately $[redacted] invested in BSG series that were expected to become part of the SOUL transaction.

653) Broadstreet investors were presented with an election involving receiving their invested cash back or accepting stock represented as having approximately three times the value.

654) Mr. Jonas understood what the documents said regarding the cash option. His understanding was that choosing cash essentially meant receiving his invested principal without the potential three-times stock value.

655) Mr. Jonas selected the 3x SOUL option.

656) An important reason for Mr. Jonas's decision was his understanding, based substantially upon what Mr. Chcoury told him, that the transaction was progressing and that the stock could become valuable and liquid within a relatively short period. Mr. Jonas understood that even in a worst-case scenario it might take approximately a year and a half for him to receive his 3x return, but that waiting longer could produce a much better result, which made the additional wait seem worthwhile.

657) Again, Mr. Jonas was never given any indication at the time he made this decision that there would be substantial long-term restrictions on selling the stock or an inability to hedge

against losses. Mr. Jonas did not learn about these restrictions until he was already committed to the transaction.

658) At the time, Mr. Jonas believed that once the stock became publicly traded very soon, he would be able to sell at least some of his shares at an earlier stage and take some money off the table. This was important to Mr. Jonas because it would have allowed him to recover some cash and maintain his cash flow while continuing to hold the remainder of the stock for the potential upside. Mr. Jonas did not understand at the time that restrictions would prevent him from doing that.

659) Based upon Mr. Jonas's expectation that SOUL would proceed relatively quickly, and his understanding that the underlying real-estate assets were strong enough that the stock had the potential to significantly outperform over the short or medium term, in about August 2025 Mr. Jonas subsequently invested approximately another $[redacted] into the SOUL-related opportunity after Mr. Chcoury told him about the anticipated 3x election.

660) Had Mr. Jonas known that the transaction could remain incomplete for such an extended period, that substantial stock restrictions might apply, that there were risks he did not understand, that relatively little information had been provided to him by Broadstreet regarding the full scope and structure of these investments, and that the circumstances surrounding Broadstreet would subsequently develop as they did, Mr. Jonas would not have made the same decision.

661) Therefore, Mr. Jonas's total capital exposure related to these investments is $[redacted].

662) Another issue that has become extremely important to Mr. Jonas concerns what assets were actually going into Z Squared and SOUL.

663) Mr. Jonas's understanding, based upon the information available to him at the time, was that the underlying mining equipment and assets associated with Alt Mining would become part of Z Squared, and that the applicable Broadstreet real-estate and related assets would become part of the SOUL transaction.

664) Mr. Jonas was never given the understanding that substantial assets acquired or developed with investor money might remain outside these two transactions and continue to be owned or operated by Broadstreet management, partners, affiliates, or related entities.

665) Mr. Jonas has only recently begun to understand that this may have occurred. He does not presently know all the facts and expects that through discovery in this litigation he will learn exactly what happened.

666) However, if Mr. Jonas had understood at the time that substantial assets funded with investor capital might not be included in ZSQR or SOUL, that would have materially changed his decision. Combined with the loss of cash distributions and the restrictions on the stock, Mr. Jonas would have wanted to pursue every reasonable avenue available to recover his money rather than accepting these stock transactions.

667) The timing of Mr. Jonas's additional investments is particularly important.

668) The approximately $[redacted] Alt Solutions investment and approximately $[redacted] additional SOUL investment occurred around the same period.

669) Mr. Jonas borrowed approximately $[redacted] against his home in July/August 2025 through a home-equity line to fund those investments.

670) Mr. Jonas did this because he believed these opportunities would become liquid within a relatively short period. His expectation was approximately 3–12 months at most for ZSQR and approximately 12–18 months for SOUL, not years.

671) Mr. Jonas therefore continues to incur borrowing costs associated with money he borrowed based upon his expectation of relatively near-term liquidity.

672) Mr. Jonas wants to be precise about one fact: he never personally submitted a request to Mr. Chcoury to redeem his principal or stock before these transactions occurred.

673) Mr. Jonas's concern is not that he asked for redemption and Broadstreet refused him at that time. Rather, Mr. Jonas invested substantial amounts because the ability to obtain his money back within a reasonable period was repeatedly presented to him as part of what made these investments relatively safe.

674) That representation materially affected Mr. Jonas's willingness to continue adding capital.

675) Mr. Jonas specifically remembers sending Mr. Chcoury an email relatively early in their relationship summarizing and asking numerous questions following one of their telephone conversations.

676) In particular, Mr. Jonas sent Mr. Chcoury a recap of a long list of his understandings about how the investment fund worked. One of Mr. Jonas's primary questions, before he even began investing, was to confirm again that he would be able to obtain his money back within a relatively short period if he wanted it.

677) Mr. Chcoury did not respond substantively to those questions by email. Instead, Mr. Chcoury told Mr. Jonas that he would discuss them with him by telephone.

678) Mr. Jonas and Mr. Chcoury subsequently spoke by telephone, and Mr. Chcoury clarified the information for Mr. Jonas again, including Mr. Jonas's understanding regarding the ability to obtain his money back. That conversation gave Mr. Jonas additional confidence to begin investing with Broadstreet.

679) Unfortunately, Mr. Jonas has been unable to locate that email. Some time ago, while trying to reduce his stored email volume, Mr. Jonas deleted older archived emails, and he believes that email may have been among the messages deleted.

680) Mr. Jonas mentions this because he distinctly remembers the communication and subsequent telephone conversation, but he does not want to suggest that he presently possesses documentary evidence that he no longer has.

681) Looking back, the most important point is that Mr. Jonas did not invest approximately $[redacted] believing that he was placing essentially his entire investment capital into highly speculative, long-term investments that could leave him without meaningful income or access to his principal for years.

682) Mr. Jonas invested because he was repeatedly told that the underlying businesses were highly profitable, that the investments were relatively safe, that he would receive substantial ongoing income, and that he could obtain his principal back within a relatively short period if he needed it.

683) Those representations mattered enormously to Mr. Jonas. They are why he became comfortable investing increasingly large amounts of money and, ultimately, why he was willing to borrow approximately $[redacted] against his home to make the additional Alt Solutions and SOUL-related investments.

684) Instead, despite investing approximately $[redacted], Mr. Jonas's Broadstreet investor reports reflect only approximately $[redacted] in distributions, and he has now gone a substantial period without the income and liquidity he expected. A significant portion of Mr. Jonas's investment has instead become tied to ZSQR and the proposed SOUL transaction, with

restrictions, delays, and risks that he did not understand when he originally invested or when these transactions were presented to him.

685) Had Mr. Jonas known from the beginning that the income could stop, that he could lose access to his principal for years, that his investments could be converted into restricted public-company stock, that he could be prohibited from selling or hedging that stock as he had expected, that the transactions could experience these lengthy delays, or that substantial questions could later arise concerning the use and disposition of the underlying investor-funded assets, he would not have invested these amounts on the terms that he did.

Naresh Parbhoo, Dharmista Parbhoo and Jiten Parbhoo

686) Naresh Parbhoo (61) and his wife Dharmista Parbhoo (56) run their own business. Their son Jiten Parbhoo (29) is a financial professional.

687) Jiten found Broadstreet online in early April 2023 and reached out. His main contact was Steven Sconzo, a Partner in Broadstreet's Greenville, SC office. Jiten also spoke by phone with Joseph Baldassarra, Broadstreet's President. Mr. Sconzo and Broadstreet presented these as investments with consistent, high returns, and on that basis Jiten invested in the Infrastructure, Crypto/Altcoin Mining, Crystal Lagoon and Tennessee series. Broadstreet automatically reinvested Jiten's distributions into its Merchant Cash Advance series, which it described as a "14% annualized income opportunity."

688) Mr. Sconzo invited Jiten to an investor Zoom presentation on May 3, 2023 and encouraged him to bring his father. Jiten did not attend Broadstreet's June 2023 open house, but his parents did, and Mr. Sconzo met them there. Afterward, Mr. Sconzo followed up with Jiten repeatedly about his parents investing, and they made their first investment in August 2023.

689) Over the next two years, Broadstreet and Mr. Sconzo continued marketing new offerings to Jiten and his parents by email and phone. These included an Altcoin deal at an "Estimated Return 28% Annually," a Land Banking deal at an "Expected Estimated Return 51.5% Annually," and the Tennessee sub-series, advertised as offering "100%+ upside potential alongside 14.6% downside protection."

690) Distributions from the Altcoin investment eventually stopped, followed by the other investments. Broadstreet's investor updates stated that Altcoin investors would receive Z Squared stock, with no cash redemption option.

691) In October 2025, Mr. Sconzo held a call with Jiten and his parents about Broadstreet's plan to exit investors. On December 10, 2025, Jiten and his parents informed Mr. Sconzo in writing that they had chosen Redemption Option A, the cash redemption. Broadstreet later informed them that they had no choice but to accept Soulpower (SOUL) stock instead. Jiten and his parents have repeatedly requested that Broadstreet honor their cash redemption election, but Broadstreet has failed to do so.

692) The money invested in Broadstreet represents all of Naresh and Dharmista Parbhoo's retirement savings. Broadstreet's failure to pay distributions and return principal upon request has caused the Parbhoo family serious financial strain and stress. Naresh and Dharmista have been forced to continue working longer than planned and have postponed their retirement because they no longer have access to the cash flow or principal from their retirement savings upon which they had relied.

<u>Kentan Kumar Patel</u>

693) In December 2024, Kentan Kumar Patel was approached by Jignesh Acharya and Akhil Morada of Broadstreet, Inc to invest into Broadstreet Tennessee.

694) Initially, Mr. Patel only wanted to invest [redacted] in Broadstreet Tennessee. However, Mr. Acharya told Mr. Patel that the minimum requirement for this investment was $[redacted]. Mr. Acharya and Mr. Morada convinced Mr. Patel to make the $[redacted] investment by promising a return of 14.6% annually that would be paid quarterly.

695) Mr. Patel's distributions were reinvested, and in November 2025 his distributions stopped.

696) At that time, Broadstreet offered Mr. Patel the option to redeem his investment in cash or receive shares of SOUL. Mr. Patel elected Option A for a cash redemption. However, 6 months later Broadstreet sent him an email claiming that they could not sell some of the assets at a reasonable value. As a result, Broadstreet is now forcing Mr. Patel to receive shares of SOUL instead of the cash redemption that he was promised.

<u>Roberto Sada</u>

697) Plaintiff Roberto Sada's friend, Justin Shamp, introduced him to an investment fund in which one of Mr. Shamp's friends had reportedly invested for several years and received favorable returns. Having recently sold a property, Mr. Sada had funds available and was seeking a safe, low-risk investment. The opportunity appeared attractive because it offered quarterly distributions and a tenancy-in-common (TIC) ownership arrangement.

698) While visiting Justin Shamp in Denver, Colorado, Mr. Sada participated in an initial Zoom meeting with representatives of the company, including its owner. Justin Shamp, Mr. Sada's brother Armando, and Mr. Sada's father Jaime also attended. Following that meeting, the company invited them to Greenville, South Carolina, and paid for flights and hotel accommodations for Justin Shamp, John LeTourneau, Armando Sada, Jaime Sada, and Roberto Sada.

699) They arrived in Greenville on January 16, 2024, and toured residential properties, cryptocurrency mining operations, and land sites. That evening, they attended a dinner with company representatives. Those present were Joe Baldassara, company president; Dave Berger, who conducted the leasing tour; Michael Pellegrino, partner; Adam Kramer, agent; Armando Sada; Jaime Sada; Justin Shamp; John LeTourneau; and Roberto Sada.

700) After the trip, Mr. Sada and the others remained in contact with the company and began reviewing the investment documentation. On March 5, 2024, Mr. Sada retained attorney Michael Anselmo. The legal review and contract negotiations took approximately one year.

701) Before signing, Mr. Sada requested one change to the agreement, specifically to the Amendment to Article VI, Section 6.02. His purpose was to protect his investment during the 60-day period following a request to withdraw funds. The original provision permitted the company to invest his money in any type of financial instrument during that period. Mr. Sada considered this to present an unacceptable level of risk. Accordingly, he requested that the provision be amended to limit such investments to approved, low-risk instruments.

702) Once the agreement was finalized, Mr. Sada signed the documents, transferred the funds, and received his first quarterly distribution. Mr. Sada has been invested in the BSG Fund for over two years and during that time he has only received one interest distribution payment of $9,134.75.

703) Subsequently, the company informed the investors that the U.S. Securities and Exchange Commission (SEC) had become involved. Several months later, company representatives stated that the company would need to be divided because, according to their explanation, the SEC had determined that it had become “too big and powerful.”

704) The company then presented what it described as a favorable exit package, under which investors would receive their invested capital back, together with shares. However, the explanations and proposed arrangements continued to change from week to week. Mr. Sada later learned of allegations that the company's president and his brother had misappropriated company funds.

705) The company subsequently presented a new proposal with three options:

a. **Option A:** Receive repayment of the invested funds after 180 days.

b. **Option B:** Receive shares subject to substantial restrictions during the first several years.

c. **Option C:** Invest in a new fund associated with Adam Kramer.

706) Although company representatives pressured Mr. Sada to select Option B, he firmly declined. He selected Option A and signed the document requesting repayment of his invested funds.

707) The 180-day period expired without repayment. The company then provided further explanations for the delay, and Mr. Sada's calls went unanswered. Several weeks later, the company issued an update stating that only approximately 20% of investors had requested repayment. Because those investors represented a minority, the company stated that it had decided to distribute shares to all investors instead.

708) The company also reported that it had negotiated a land sale for approximately $240 million, but that the prospective buyer subsequently withdrew from the original agreement and sought to pay only half of the initially agreed price.

709) After selecting Option A, Mr. Sada relied on the company's commitment to return his invested funds within 180 days. The company failed to repay those funds by the agreed

deadline. It also informed him that any distributions previously paid on his investment would be deducted from the original principal.

710) The failure to return his funds caused Mr. Sada significant financial hardship. As a result, he received notices to vacate in two different months, faced eviction, incurred legal fees, and fell behind on payments. He lost all his credit cards, and his credit score was severely damaged. His vehicle also came close to being repossessed.

711) Mr. Sada eventually obtained temporary employment requiring long hours. Despite those efforts, his earnings are barely sufficient to cover approximately half of his rent and basic food expenses.

712) On October 7, 2026, Mr. Sada received a telephone call from the office of Mike Pellegrino inviting him to invest in their new fund, The Christine Cohen Dolly Investment Fund.

713) More recently, the company issued another update attributing the ongoing difficulties to investors who had not signed documents accepting the shares or designated a broker to receive them.

714) Despite Mr. Sada's documented election to receive repayment under Option A and the expiration of the stated 180-day period, he has not received the return of his invested funds.

Shreyas Patel

715) Shreyas Patel (38) works as an engineer in the power generation industry. His wife, Pinalven Patel (37) is an accountant but is currently not working so she can care for their two young children. Shreyas Patel's parents, both in their 70s, also live with them, and his father has significant health challenges. This situation has caused considerable financial and emotional stress for their family.

716) Shreyas Patel was introduced to Mr. Akhil Morada through a family friend in late 2023. Mr. Morada presented the Crypto fund as offering a 28% annual return and an 80% tax write-off in the first year.

717) Mr. Patel has serious concerns about how his investment was solicited from the outset. When asked to complete the “Client Information Sheet,” Mr. Patel provided accurate information reflecting his family’s financial circumstances. Mr. Morada then asked Mr. Patel to change the figures. Mr. Patel now believe these changes were intended to portray the Patels as accredited investors, even though they did not qualify at the time. Any characterization of the Patels as wealthy, accredited investors would therefore misrepresent their circumstances.

718) Mr. Patel is concerned that similar practices may have been used with other investors. Mr. Patel also has a complete transcript of his WhatsApp communications with Mr. Morada that demonstrate pressure tactics, solicitation and manipulation.

719) Mr. Morada also verbally told Mr. Patel that he could withdraw his investment at any time after the first year by providing 2-4 weeks' notice. Regarding the ZSQR shares, Mr. Patel’s understanding is that they were not given a choice. When the redemption survey concerning SOUL Power stocks was circulated, Mr. Morada asked Mr. Patel to select “Option B".

720) As of today, Mr. Patel still has no control over any of his ZSQR shares that would allow him to sell them if and when the applicable resale conditions are met. Mr. Patel has repeatedly contacted parties engaged by Broadstreet, including Craft Capital Management, seeking assistance. Having to repeatedly pursue access to his own investment has added to his frustration and distress.

721) Mr. Patel seeks to recover his full reported investment balance in cash for all his BSG Fund investments, including his original principal, distributions, and reinvestments.

<u>Lakshmanan Maddy</u>

722) Lakshmanan Maddy (47) works as an engineer in the financial services industry, and his wife, Divya Maddy (41), works part-time as a teacher. They have two school-aged daughters, one in her junior year of high school and the other in middle school. Both of Mr. Maddy's parents are in their 80s.

723) The money Mr. Maddy invested represented savings he had set aside for his daughters' college education. The potential loss of these funds has caused significant concern for his family.

724) In late 2023, a family friend introduced Mr. Maddy to Mr. Akhil Morada. Mr. Morada presented the Crypto Alt Coin Fund as an investment offering a 28% annual return and an 80% tax write-off in the first year. In hindsight, Mr. Maddy deeply regrets placing his trust in Mr. Morada and Broadstreet Global.

725) Mr. Maddy has serious concerns about how the investment was solicited from the outset. When asked to complete the Client Information Sheet, he provided accurate information about his family's financial circumstances. He now has concerns that changes to, or the handling of, this information may have been intended to portray his wife and him as accredited investors, even though they did not meet the applicable qualification requirements at the time.

726) Any characterization of Mr. and Mrs. Maddy as wealthy or accredited investors would not accurately reflect their financial circumstances. Mr. Maddy is also concerned that similar practices may have affected other investors.

727) Mr. Morada verbally represented to Mr. Maddy that he could withdraw his investment at any time after the first year by providing two to four weeks' notice.

728) Regarding the ZSQR shares, Mr. Maddy's understanding is that he was not given a choice in the matter. When the redemption survey concerning SOUL shares was circulated, Mr. Morada instructed him to select "Option B."

729) To date, Mr. Maddy still does not have control over any ZSQR shares that would allow him to sell them if and when the applicable resale conditions are met. He has repeatedly contacted parties engaged by Broadstreet, including Craft Capital Management, seeking assistance in resolving this issue. Having to repeatedly pursue access to his own investment has added to his and his family's frustration and distress.

730) The Maddys seek to recover their full reported investment balance in cash for all their BSG Fund investments, including their original principal, distributions, and reinvestments.

<u>Balmukund R. Patel</u>

731) Balmukund Patel (76) is a retired laboratory technician and his wife, Kumud Patel (72), is a housewife. This investment represents major portion of their life long savings. Mr. Patel got in contact with Mr. Akhil Morada through a family friend in 2024. Mr. Morada indicated the Crypto fund as offering a 28% annual return so the Patels didn't expect it to be converted in illiquid and speculative stocks. This ordeal has caused very stressful financial situation for the Patels, especially being in their 70s and retired.

732) The Patels seek to recover their full reported investment balance in cash for all their BSG Fund investments, including their original principal, distributions, and reinvestments.

<u>Jay Patel and Dharitri Patel</u>

733) Jay Patel and Dharitri Patel are husband and wife. They were introduced to Mr. Akhil Morada in late 2023 through a friend. Mr. Morada pitched the IF8 Infrastructure fund at a 14.63% annual return and the Crypto fund at a 28% annual return with a 60% first-year tax write-

off. Based on the Client Information Sheet Mr. Morada had the Patels submit, they believe Broadstreet improperly qualified them as accredited investors. Mr. Morada verbally assured Jay Patel that their funds could be withdrawn after one year with 2–4 weeks' notice.

734) Regarding the ZSQR/SOUL shares, Mr. Morada directed the Patels to select "Option B" on the redemption survey, leaving them with no control to sell these shares.

735) The Patels have received no documentation on how the their investment in IF8 Infrastructure will be disbursed, and their repeated requests for updates have gone unanswered. Outreach to Craft Capital Management has similarly yielded no resolution.

736) The Patels seek to recover their full reported investment balance in cash for all their BSG Fund investments, including their original principal, distributions, and reinvestments.

<u>Jiten. Patel</u>

737) Jiten Patel is 44 years old and works as a pharmacist. He first heard of Broadstreet through a family member who was an early investor in the company. She had reached out to several family members regarding investment opportunities. Mr. Patel contacted her and, after speaking with her, was referred to Akhil Morada.

738) Mr. Patel first communicated with Mr. Morada on October 27, 2024, via phone and text. Mr. Morada explained the different investment options but steered him toward the altcoin investment due to its advertised 28% annual dividend, paid quarterly at a rate of 7%. Mr. Patel recalls asking how liquid his investment capital would be if he ever wanted to withdraw for any reason. Mr. Morada told him that withdrawal would be an option, although it could take several months to receive his money back.

739) Mr. Patel's original plan was to invest $[redacted] of his savings. However, Mr. Morada strongly encouraged him to put the entire amount into the altcoin investment and wire the

funds by October 30 to receive the first quarterly payment in February. Shortly after Mr. Patel transferred the funds, Mr. Morada sent an email on November 7 stating that the altcoin investment would be closed to new investors on November 31. In light of this, Mr. Patel decided to invest an additional $[redacted] from his savings, along with $[redacted] from his IRA brokerage account. Both transfers were completed before December 2024.

740) Approximately three months later, Mr. Patel received his one and only quarterly dividend as expected. Shortly after March 2025, investors were informed that all dividend payments would be halted due to the pending merger or buyout of the altcoin investment, a process that took approximately one year to finalize. Mr. Patel also believes that during this blackout period, investors were unable to withdraw their money from the investment, effectively leaving their funds frozen.

741) When it came time to vote on the merger or acquisition, investors were provided with limited details beyond the representation that they would receive 1.5 times the value of their investments in the form of stock. Mr. Patel believes that investors were asked to vote either in favor of or against the sale, but he is unsure how the final decision was determined, other than that all investors would be subject to the same outcome. Had he known the allegations concerning Broadstreet that have since come to light, as well as how investor funds were being used or potentially misused, he would not have voted in favor of the sale, although he acknowledges that his vote might not ultimately have affected the outcome.

742) From the moment Mr. Patel first heard of Broadstreet and the altcoin investment promising 28% annual returns, he was skeptical. He thought the returns sounded too good to be true, and the word "Ponzi" repeatedly came to mind. However, his family member, an early investor, spoke highly of the company, assured him that it was legitimate, and stated that she had

been receiving quarterly dividend payments every three months, along with income from the company's other investments. Mr. Patel was also assured by Mr. Morada that he could withdraw his investment at any time.

743) Mr. Patel finds it suspicious that Broadstreet was attempting to bring so many new investors into the company before its November deadline, only to pivot approximately six months later towards a merger with Coeptis to form Z Squared. He has three other close relatives who, like him, became first-time investors in Broadstreet and invested in the same altcoin investment during approximately the same period.

744) Although Mr. Patel is not as wealthy as some other investors and did not invest as much as others may have, his total investment of $[redacted] represents a substantial portion of his savings and IRA funds. The potential loss of these funds is particularly concerning given current inflation and the high cost of living.

<u>Laura Ann Goffredo</u>

745) Plaintiff Laura Ann Goffredo is a 40-year-old teacher employed by the New York City Department of Education.

746) Plaintiff maintained an investment account with the BSG Fund in her individual name. Plaintiff and her husband jointly evaluated and decided to make the investment, although Plaintiff was the named account holder and investor.

747) Plaintiff's husband is a licensed real estate agent who became acquainted with Michael Pel-legrino ("Mr. Pellegrino") through lunch-and-learn presentations conducted at real estate offices. Through this relationship, Mr. Pellegrino introduced Plaintiff's husband to investment opportunities offered through Broadstreet.

748) Mr. Pellegrino served as the primary Broadstreet representative communicating with Plain-tiff's husband concerning the investment opportunities. Plaintiff and her husband discussed the proposed investment and ultimately decided to invest funds in the BSG Fund in Plaintiff's name.

749) Mr. Pellegrino represented that Broadstreet was involved in legitimate real estate and infrastructure development projects, including projects undertaken in conjunction with builders and other development partners.

750) Plaintiff and her husband were provided information concerning Broadstreet, its investment opportunities, and its business operations. Plaintiff's husband also conducted independent re-search, including reviewing information available through Broadstreet's website and investment materials.

751) Mr. Pellegrino represented that the Broadstreet infrastructure investment offered an annual return of approximately 14.6%. Based upon the representations and information provided, Plaintiff and her husband reasonably believed that the investment involved legitimate real estate and infra-structure-related projects capable of generating regular investment distributions.

752) Plaintiff invested funds in Broadstreet's infrastructure investment through the BSG Fund.

753) Following her investment, Plaintiff received distributions from Broadstreet. These distributions reinforced Plaintiff's and her husband's belief that the investment was performing in accordance with the representations made by Mr. Pellegrino and Broadstreet.

754) An essential consideration in Plaintiff's decision to invest was the understanding that she would have the ability to withdraw or redeem her investment and receive the proceeds in

cash. Plaintiff and her husband did not understand that Broadstreet could subsequently refuse a cash redemption and instead compel Plaintiff to accept restricted stock.

755) In connection with the November 2025 redemption process, Broadstreet presented investors with an election between a cash redemption, designated Redemption Choice – A, and a stock redemption, designated Redemption Choice – B.

756) Mr. Pellegrino discussed the proposed stock redemption with Plaintiff's husband and represented that the stock transaction could ultimately provide approximately three times the value of Plaintiff's investment. Mr. Pellegrino encouraged Plaintiff's husband to consider remaining invest-ed through the proposed stock transaction because of its purported potential value.

757) Notwithstanding these representations, Plaintiff and her husband expressly rejected the proposed stock redemption. Plaintiff deliberately elected Redemption Choice – A, requesting that her investment be redeemed and paid in cash.

758) Plaintiff selected the cash redemption because she and her family needed access to the in-vested funds. Plaintiff did not wish to have her investment involuntarily converted into speculative stock of uncertain value, subject to restrictions on transferability or liquidation.

759) At the time Plaintiff elected Redemption Choice – A, Plaintiff understood that Broadstreet would honor her election and return the redemption amount calculated pursuant to the Redemption Notice in cash.

760) Instead, Broadstreet subsequently informed its investors that it would not honor the cash redemption election and would instead redeem or convert her investment into shares of stock.

761) Plaintiff did not consent to this substitution of stock for cash. The proposed stock redemption was contrary to her express election and inconsistent with the representations upon which she and her husband relied when deciding to invest.

762) Broadstreet's refusal to honor Plaintiff's cash redemption election has caused substantial financial hardship and deprived Plaintiff and her family of access to funds they expected and needed for family financial obligations.

763) Had Plaintiff known at the time of her original investment that Broadstreet could refuse to return her investment proceeds upon redemption or could compel her to accept restricted stock notwithstanding an express cash election, such information would have been material to her in-vestment decision.

764) Plaintiff relied upon the representations concerning the nature of Broadstreet's investment projects, the anticipated investment distributions, and the ability to redeem her investment for cash. Plaintiff has suffered damages as a direct and proximate result of Defendants' conduct.

<u>Toni Daru</u>

765) On or about September 1, 2022, Toni Daru was solicited by Daniel Amaneira, a partner at Broadstreet, Inc., who obtained her contact information through a childhood friend who was already investing with him. Based on that relationship and the representations made to her, Ms. Daru decided to invest $[redacted] in the BSG Fund.

766) On or about November 17, 2022, Ms. Daru wired $[redacted], representing half of her life savings, with the promise of earning a 14% return. She was assured that she could retrieve her principal at virtually any time, although she was advised that the redemption process could take up to six months.

767) Beginning in March 2023, Ms. Daru received quarterly redemption payments through September 2025. Subsequently, investors were notified by email that they had to choose between two options. Option A was to receive a cash redemption, minus all interest previously paid, while Option B was to accept stock.

768) Ms. Daru selected Option A because she needed her principal returned and did not want to invest in stock. She was willing to relinquish the interest payments to recover her original investment and move forward, taking with her a very hard lesson and recognition that she had made a bad financial decision.

769) Just a few days later, following a conference call, a new DocuSign agreement was circulated that presented different terms. Ms. Daru was then advised that she could receive her full $[redacted] investment, reportedly due to SEC involvement, or accept the stock option. She again elected to receive her money.

770) After several additional DocuSign agreements and further changes to the available options, the cash redemption option was ultimately eliminated. Ms. Daru was informed that her only remaining choice was to accept stock, accompanied by representations that it would be worth three times the amount of her investment. In effect, she felt forced to sign up for the stock option and open a brokerage account, which cost her an additional $50.

771) Ms. Daru repeatedly contacted Daniel Amaneira and pleaded for his assistance in recovering her cash investment, but her efforts were unsuccessful.

772) Ms. Daru's financial circumstances make this matter especially urgent. Mr. Amaneira was aware that she had suffered a serious accident resulting in a head injury and vision loss. The severity of those injuries ultimately forced her to leave her employment. Because she

had recently started a new job, she did not qualify for disability benefits through that employer. She also incurred more than $[redacted] in medical bills as a result of the accident.

773) Ms. Daru is a 57-year-old single mother who has raised her son independently since he was three years old. She has received no paternal support in years and has spent tens of thousands of dollars navigating the family law system. She pursued this investment in part because she hoped it would help provide financial stability for her family.

774) The $[redacted] she invested represented half of the life savings she accumulated through a real estate transaction. Other than those savings, she has largely lived paycheck to paycheck. She is currently unemployed and faces the possibility of foreclosure on her home if she cannot recover these funds. She is also concerned that she may be unable to continue paying her son's college tuition.

775) Ms. Daru entered this investment in good faith, relying on the representations regarding the anticipated return and her ability to access her principle. She repeatedly chose the cash redemption option when it was offered, only to see the terms change and the cash option ultimately disappear.

<u>Jerry Marion</u>

776) Jerry Marion is 51 years old. Mr. Marion has been in operations and logistics for most of his career. However, Mr. Marion has recently started to create a clothing brand. Mr. Marion has 2 kids in college. Mr. Marion learned about Broadstreet from a hometown friend. He had recently been called by a guy named Ron Cantalupo with Phoenix Financial out of Florida. Mr. Marion contacted Mr. Cantalupo to learn about the BSG Funds offerings in infrastructure. Broadstreet flew Mr. Marion out to see their operation. Mr. Marion saw infrastructure and crypto mining. Mr. Marion also met with Joe Baldesssari at his office in Greenville. Mr. Marion invested

in infrastructure and in crypto mining. Mr. Marion only received a few dividends from the BSG Fund before they decided to pivot to SOL and Z Squared. In November 2025, Mr. Marion entered into a side letter with Broadstreet to redeem some of his investment in cash and some in stock. To this day Mr. Marion has not received the cash or the stock promised in his side letter.

<u>Lisa Shapiro and Asils Holdings LLC</u>

777) Ms. Shapiro is 50 years old and the sole owner of Asils Holdings LLC.

778) Ms. Shapiro began investing the BSG Fund in June 2024 through Michael Pellegrino, a partner at Broadstreet, Inc.

779) Mr. Pellegrino convinced Ms. Shapiro to take the money she received from her divorce and invest it in the BSG Fund's Altcoin Series because it would provide her with a reliable source of income to fund the next chapter of her life. Mr. Pellegrino told her that the Altcoin Series paid a 28% annual distribution and promised her that she would be able to pull her money out whenever she needed it.

780) Ms. Shapiro's divorce was finalized on June 6, 2024, and she made her first investment in the BSG Fund the next day on June 7, 2024.

781) Ms. Shapiro ultimately invested the following into the Altcoin Series:

a. $[redacted] from her personal account;

b. $[redacted] from her IRA account; and

c. $[redacted] from her Asils Holdings LLC account.

782) Ms. Shapiro also invested $[redacted] in BSG Fund's IF8 Infrastructure investment but was able to withdraw this entire investment by March 2025 to help her purchase a home.

783) In March 2025, eight (8) months after Ms. Shapiro made her initial investment, the distributions stopped.

784) Ms. Shapiro received an email from Broadstreet informing her that they would be converting her Altcoin Series investment into shares of a publicly traded company. Ms. Shapiro was not given a choice to opt out the conversion or to have her funds returned to her.

785) Ms. Shapiro's Altcoin Series investment was ultimately converted into restricted shares of ZSQR, and she will not know what those shares are worth until the restriction is lifted which probably will not happen until October 2027.

786) To make matters worse, even if the shares were not restricted Broadstreet still did not give Ms. Shapiro the correct number of shares.

787) When Broadstreet converted Ms. Shapiro's Altcoin investments into stock in Z Squared Inc. (ticker ZSQR), two things should have applied to her.

788) First, the "Participant Vote" dated March 21, 2025 that she signed states that anyone who invested the Altcoin Series after May 2024 would get an extra 50% on top of their initial investment. All of Ms. Shapiro's investments were made after May 2024, so this applies to her investment.

789) Second, Ms. Shapiro has a text message from David Feingold — sent to Broadstreet/BSG staff the day ZSQR started trading on Nasdaq — where he told the team that the average investor's cost basis was $4 to $10 per share, with earlier investors getting the better (lower) end of that range. Thus, Ms. Shapiro's $[redacted] investment in her personal account, with the 50% bonus, should have been worth $[redacted] in stock. At $4 to $10 a share, that should have gotten her somewhere between about [redacted] and [redacted] shares. Instead, Ms. Shapiro only received [redacted] shares in total, which works out to an effective price of $15.90 a share, above even the top of the range Feingold described to his own staff. That means Ms. Shapiro is

missing at least [redacted] shares in her personal account alone, and possibly well over a million shares compared to the lower end of the range.

790) In addition, the same $15.90-per-share rate was applied to the $[redacted] in Ms. Shapiro's Asils Holdings LLC account, which received 94,321 shares — almost exactly the same unfavorable rate. So combining Mr. Shapiro's personal and Asils Holdings accounts (the full $[redacted] that was eligible for the 50% bonus), Ms. Shapiro is missing at least [redacted] shares, and possibly over 1.6 million shares compared to the lower end of Feingold's own stated range.

791) Upon information and belief, the Baldassarra brothers restructured the share pricing after the fact to keep the extra shares for themselves.

792) ZSQR is trading at $2.40 a share as of today. If Ms. Shapiro could trade at that price, her shares would be worth $[redacted] in total — broken down as $[redacted] for her personal account, $[redacted] for her IRA account, and $[redacted] for her Asils Holdings account.

793) Against the $[redacted] she put in, and the $[redacted] in distributions she received, Ms. Shapiro would still have a net out of pocket loss of $[redacted] if the ZSQR shares were not restricted.

794) And that does not include the additional loss from not receiving all the shares she was supposed to receive.

795) Broadstreet's decision to change Ms. Shapiro's investment from an income-generating investment into illiquid and restrictive shares of ZSQR has put her in serious financial trouble.

796) Broadstreet has stopped paying interest to her and has not returned any more of her money, and that has pushed Ms. Shapiro deeply into debt.

797) Ms. Shapiro now owes the IRS over $[redacted], and she has already paid more than $300,000 in interest on money she has had to borrow just to keep afloat.

798) Ms. Shapiro cannot keep up with her regular bills, and she is at risk of losing the new home she just bought.

<u>J Five LLC</u>

799) J Five LLC is owned by Soon Jung. Mr. Jung was introduced to Broadstreet in approximately December 2024 through a work colleague who was also an investor in the company. The colleague recommended Broadstreet as an investment opportunity and introduced Mr. Jung to Akhil Morada, whom Mr. Jung understood to be an investor and partner at the firm. Based on the representations made to him, Mr. Jung ultimately invested in Broadstreet's cryptocurrency investment fund and in its Tennessee land investment.

800) Prior to investing, Mr. Jung had multiple telephone conversations with Akhil Morada regarding the investment opportunities. During these conversations, Mr. Morada personally assured Mr. Jung that the cryptocurrency investment would generate consistent quarterly returns and that he would be able to redeem his original investment after six months without any financial penalty. These assurances were extremely important to Mr. Jung because he was committing a substantial portion of his lifetime savings and wanted to know that he would have access to his money after a defined period.

801) At no point during these conversations did Mr. Morada inform Mr. Jung that his cryptocurrency investment could be converted into shares of a publicly traded company. Mr. Jung was never informed of a potential merger involving Z Squared, nor was he told that his investment could ultimately be repaid in stock rather than cash. His understanding was that he was making a

cash investment with quarterly distributions and the ability to redeem his principal after six months.

802) Mr. Jung specifically did not want to invest in stocks. The ability to recover his principal in cash was one of the primary reasons he agreed to invest. Had he known that his money could be converted into stock subject to substantial selling restrictions, he would never have made the investment.

803) Mr. Jung was also reassured by his colleague, who had introduced him to Broadstreet and was himself an investor. The colleague subsequently told Mr. Jung that he had received similar representations regarding the investment. This further reinforced Mr. Jung's belief that the redemption terms described to him were legitimate.

804) With respect to the Tennessee land investment, Mr. Jung invested additional funds after being offered a pre-IPO price of $3.75 per share. He was specifically told that if the company did not go public by June, the investment would be converted into a standard infrastructure investment providing a 14.6% annual return, with prorated access to his funds. Mr. Jung has preserved screenshots of text messages documenting these representations.

805) These terms were important to Mr. Jung's decision because he believed there was an alternative arrangement that would allow him access to his invested capital even if the anticipated public offering did not occur. He would not have invested had he understood that his money could become inaccessible for an indefinite period.

806) Mr. Jung was subsequently given an option regarding the Tennessee investment, and he specifically elected to have his entire investment returned to him in cash. He did not choose to receive stock. Despite making this election, his money has not been returned.

807) The cryptocurrency investment also failed to operate as it had been represented to Mr. Jung. Although his account reflected one distribution, this amount was simply added to his investment balance. He was never actually paid the money, nor was he given an opportunity to withdraw it. As a result, Mr. Jung has never received any cash distributions from his cryptocurrency investment despite being assured that it would generate consistent quarterly returns.

808) Even more concerning, Mr. Jung's original cryptocurrency investment was ultimately converted into Z Squared (ZSQR) stock. These shares are subject to significant restrictions that have made them essentially impossible for him to sell. This was fundamentally different from the investment that Mr. Morada had described to Mr. Jung and that he had agreed to make.

809) Mr. Jung began to suspect that something was seriously wrong after learning of the SEC filing involving Broadstreet. His concerns increased when he repeatedly attempted to obtain information about redeeming his investments. He asked multiple times when he would be able to withdraw his money, but he was never provided with a clear answer or a definite redemption date. Instead, he was repeatedly told that he would have to wait.

810) Despite the original assurance that he could redeem his cryptocurrency investment after six months without penalty, Mr. Jung has never been given that opportunity. He has not even been offered the option of withdrawing his funds subject to a penalty. Similarly, despite specifically electing to receive his Tennessee investment back in cash, that election has not been honored.

811) This situation has had a substantial financial impact on Mr. Jung. The money he invested represented a significant portion of his lifetime savings. He made these investments based

on the understanding that he would have access to his principal after the specified periods. He never anticipated that such a substantial amount of his money would become inaccessible indefinitely.

812) Because he has been unable to recover these funds, Mr. Jung's long-term retirement plans have been significantly disrupted. He has also been forced to obtain additional lines of credit to cover ordinary financial obligations and compensate for the lack of access to money that he reasonably expected to have available. This has created additional financial obligations and stress that he would not otherwise have incurred.

813) Mr. Jung believes that he was misled into investing with Broadstreet through specific representations made directly to him by Akhil Morada. He relied on Mr. Morada's assurances regarding quarterly distributions, the ability to redeem his principal, and the nature of the investments. Mr. Jung was never informed that his cryptocurrency investment could be converted into restricted stock, that he would be unable to access his principal after six months, or that his election to receive the Tennessee investment back in cash might not be honored.

814) Had he known the actual circumstances, Mr. Jung would not have invested any money with Broadstreet. He did not agree to have his lifetime savings locked away indefinitely, nor did he agree to have his cryptocurrency investment converted into stock that he could not realistically sell.

815) Mr. Jung feels that his trust was violated and that he was induced to make these investments based on representations that turned out to be materially different from what actually occurred. This was not simply a situation where an investment performed poorly or lost value. His primary concern is that the fundamental terms upon which he agreed to invest, particularly his ability to access and redeem his money, were not honored.

816) Mr. Jung is seeking to recover his invested funds and hold the parties responsible accountable for the representations that led him to entrust Broadstreet with such a substantial portion of his savings.

<u>Lagoon Investment LLC</u>

817) Lagoon Investment LLC is owned by six physicians. Its manager is Parag Brahmbhatt, a 43 year old physician. One of Mr. Brahmbhatt's friends in Greenville, SC introduced him to Akhil Morada. In November 2025, Lagoon Investment LLC requested a cash redemption. Lagoon Investment LLC emailed Broadstreet asking for its money back and Broadstreet never responded.

<u>DAT Anesthesia LLC</u>

818) Dat Vu is a 39-year-old Certified Anesthesiologist Assistant (CAA) who also works as a licensed real estate agent with eXp Realty in Georgia and Florida. He has practiced anesthesia for approximately 10 years and worked in real estate for more than 12 years. Before investing in Broadstreet, Mr. Vu had never invested in a private equity fund.

819) Mr. Vu made his Broadstreet investments through his company, DAT Anesthesia LLC, a Georgia limited liability company organized on April 26, 2018. Mr. Vu is the company's sole member and manager. The company provides anesthesia services and holds the company's investments. Mr. Vu personally provided the funds for these investments and transferred them to DAT Anesthesia LLC so the company could make the investments. On February 28, 2025, Broadstreet had Mr. Vu sign two "Third Party Payment Letters," one for IF8 and one for Data#1. Each letter states that Mr. Vu provided the funds for DAT Anesthesia LLC to invest and that he relinquished all rights to the money in favor of the company. Broadstreet never asked Mr. Vu to

sign a similar letter for his Altcoin investment, and no one explained why Broadstreet needed these letters at that time.

820) Mr. Vu first learned about Broadstreet in approximately December 2023 from his friend Sandeep Dave. Mr. Dave told him that he had a friend at Broadstreet named Richie. Mr. Dave was very open about trying to get people to invest in the fund. Based on Mr. Vu's email records, he received Broadstreet's Real Estate Infrastructure Development presentation on December 12, 2023, but decided not to invest at that time. He received the Altcoin Mining presentation on March 23, 2024, and again decided not to invest.

821) On November 18, 2024, Mr. Vu received the Data Center presentation offering a 19% annual return paid monthly. The monthly payments caught his attention. The presentation stated that the offering was “Exclusively For Pre-Existing Investors.” Mr. Vu also knew that some of his coworkers had started investing, which made him curious. He asked Mr. Dave whether he had personally invested and who else he might know who had invested. Mr. Vu spoke with some of those individuals, who appeared to be receiving their returns, and subsequently decided to invest. He made his first investment in Altcoin Mining one week later, on November 25, 2024.

822) Mr. Dave referred to “Richie” and “Richie's partner” as his Broadstreet contacts. Mr. Vu's Data#1 investor questionnaire lists “BROADSTREET (BSG14), rich@bsgfund.com, 305-910-6847” as a contact copied on his distribution and tax notices.

823) Mr. Vu was told that each investment would pay a fixed annual return in cash. The return was stated in the name of each investment on every document he signed:

a. Crypto/Altcoin Mining: “28% Annual Return,” paid quarterly.

b. IF8 Infrastructure: “14.63% Annual Return,” paid quarterly.

c. Data#1: "19% Annual Return," paid monthly, with a five-year term and 30% of the profit when the data centers were sold.

824) Based on his email records, Mr. Vu received the following Broadstreet investor presentations: the Real Estate Infrastructure Development presentation on December 12, 2023; the Altcoin Mining presentation on March 23, 2024; and the Data Center presentation, titled "Investing in Data Centers – 19% Annual Return … Exclusively For Pre-Existing Investors," dated October 2024, on November 18, 2024. Mr. Dave sent the Data Center presentation to him again on January 17, 2025.

825) The infrastructure presentation stated that homebuilder contracts were "non-cancelable," backed by "the full faith and credit" of Fortune 500 homebuilders, and that lots were presold "to minimize risk." The data center presentation stated that the centers were "pre-leased" and that investors' payments had "priority." Mr. Vu reviewed these presentations before making his investments.

826) The infrastructure presentations stated a "1 year minimum" and "180-day notice for redemption." Apart from those provisions, no one told Mr. Vu of any restriction on recovering his money in cash. Broadstreet later sent him a Redemption Notice asking whether he wanted his money back in cash or wanted to accept stock. Before investing, Mr. Vu was never told that Broadstreet could refuse to return his investment in cash and instead pay him in stock.

827) No one told Mr. Vu that Broadstreet could retain up to 30% of his investment as upfront fees. His monthly statements consistently showed his full investment balance, with no fees deducted.

828) Before any of his investments, neither Broadstreet nor Mr. Dave told Mr. Vu that the SEC was investigating Broadstreet. No one informed him of the SEC lawsuit filed on January 29, 2025.

829) Mr. Vu electronically signed the Altcoin subscription documents on November 25, 2024, and Broadstreet accepted them on November 26, 2024. He received only one quarterly payment of $[redacted].

830) On December 9, 2024, shortly after his first investment, Mr. Vu emailed Broadstreet at juniper@bsgfund.com and info@broadstreetglobalfund.com, requesting access to the data room and the fund's audit reports for the preceding three years. He believed these materials would be available to any investor who requested them. Soon afterward, Mr. Dave approached Mr. Vu in person and, in an angry manner, demanded to know why he had requested access to the data room and audit reports. Mr. Dave instructed him to send an email withdrawing the request. On December 11, 2024, Mr. Vu emailed Broadstreet, stating, “Please disregard the request.” He never received audited financial statements or access to the data room before making his next two investments.

831) Mr. Vu signed the IF8 documents on January 13, 2025, and Broadstreet accepted them on January 14, 2025. Mr. Vu invested in IF8 because Mr. Dave told him that he had to invest in infrastructure first to qualify for the data center deal, which the presentation described as “Exclusively For Pre-Existing Investors.” Mr. Vu received three quarterly payments totaling $[redacted]. The payments stopped after October 2025.

832) Mr. Vu first received the Data Center presentation on November 18, 2024. Following Mr. Dave's January 17, 2025 text messages about the new data center deal, Broadstreet

sent Mr. Vu the Data#1 subscription documents on Sunday, January 26, 2025, and he signed them the same day. Broadstreet accepted his subscription on January 28, 2025.

833) Mr. Vu has since learned that the SEC filed its lawsuit against Broadstreet's executives on January 29, 2025, after Broadstreet accepted his subscription but before his money arrived. No one informed him about the lawsuit, and Broadstreet retained his money. Had he known about the SEC investigation or lawsuit, he would not have made this investment. Mr. Vu received nine monthly payments totaling $[redacted]. The payments stopped after November 2025.

834) On February 19, 2025, Broadstreet sent Mr. Vu an "Altcoin Mining Participant Vote" for Q4 2024 to sign. The document described an "expected twenty-eight percent annual payment" and did not mention the SEC lawsuit. Mr. Vu signed it the same day. He received a second Participant Vote for Q1 2025, which he signed on April 18, 2025. No one explained to him the purpose of these votes.

835) On April 27, 2026, Mr. Vu's Altcoin investment was converted into 4,905 shares of Z Squared (ZSQR) stock, held through Continental Stock Transfer and transferred to an account at Craft Capital Management.

836) On May 1, 2026, Daniel Furst of Craft Capital Management (dfurst@craftcm.com) explained by email that the shares were issued at $15.90 per share: 3,270 shares corresponding to Mr. Vu's $[redacted] investment, plus [redacted] "premium" shares, representing a 50% premium, for a stated value of $[redacted] "at the start of trading."

837) Mr. Furst stated that Mr. Vu could not sell any shares until ZSQR had traded long enough to reach a 10-day volume-weighted average price of $16.00. After that threshold was reached, Mr. Vu could sell at most 1/18th of his shares, approximately 5.5%, per month until the stock closed at $35 or more for two consecutive days.

838) Mr. Vu continues to hold all [redacted] shares. ZSQR closed at $4.035 on October 16, 2026, making his shares worth approximately $[redacted] on paper. He has been unable to sell them.

839) On November 14, 2025, Broadstreet sent Mr. Vu a Redemption Notice offering cash under Option A or stock purportedly worth approximately three times his account value under Option B. For both IF8 and Data#1, Mr. Vu elected to receive stock under Option B. He chose stock because the Redemption Notice stated that the stock would be worth approximately three times his account value. At that time, he was unaware of the SEC case or the problems that have since been reported. Had he known the full circumstances, he would have elected cash to recover his investment.

840) Broadstreet never clearly explained to Mr. Vu why his payments stopped. When he asked Mr. Dave, Mr. Dave told him that something was going to be acquired by another person or company. He provided no further explanation, leaving Mr. Vu without a clear understanding of why the payments had stopped. Broadstreet failed to keep investors adequately informed.

841) Had Mr. Vu known any of the following circumstances, he would not have invested:

a. That the SEC had been investigating Broadstreet for more than two years and had sued its executives on January 29, 2025.

b. That Broadstreet could retain up to 30% of his money as upfront fees while his statements continued to show his full investment balance.

c. That his distributions could be paid from other investors' money rather than from investment profits.

d. That Broadstreet could refuse to return his money in cash and instead provide restricted stock.

e. That the data centers' only tenant was Broadstreet's own cryptocurrency-mining business.

842) Mr. Vu invested because he wanted a steady return based on what Mr. Dave told him, what he observed other investors receiving, and what Broadstreet's documents and presentations stated. He did not want speculative or illiquid stock. He invested with the expectation of receiving cash distributions and recovering his capital in cash.

843) These losses have caused Mr. Vu considerable stress. He borrowed money to make these investments and continues to make monthly loan payments even though the investments have stopped paying.

<u>RG Partners, LLC and PRS Partners, LLC</u>

844) RG Partners and PRS Partners are both Texas limited liability companies whose sole member is Dr. Prem P. Gogia. Dr. Gogia is 72 years old and semi-retired. Minesh Patel, a partner at Broadstreet, Inc., convinced Dr. Gogia to invest in the BSG Fund. In November 2025, Dr. Gogia chose Option A for his companies to receive a cash redemption. To this day, they have yet to receive the cash redemption that they were promised.

<u>John P. Arvig</u>

845) John P Arvig is 84 years old and retired. Mr. Arvig lives in Minnetrista MN with his wife and children and grandchildren nearby. Mr. Arvig heard about Broadstreet from a friend that thought Broadstreet would be a good company to invest with. Mr. Arvig's sales representative was Bernard Jasmine, a partner at Broadstreet, Inc. Mr. Arvig investment in the BSG Fund began with two properties that were being developed on May 18th 2002. Squires Point, and then a week later one called Weatherstone. These properties were giving some returns but slower than what Mr. Jasmine had hoped for. So, Mr. Jasmin recommended that Mr. Arvig transfer his funds to

another one of Broadstreet's options, which Mr. Jasmin claimed would be much safer than housing developments. The investment Mr. Jasmin was referring to was IF8 Infrastructure. The investment was performing well until the distributions stopped. In November 2025, Broadstreet gave Mr. Arvig an option to receive a cash redemption or receive shares of SOUL. Mr. Arvig selected the cash redemption option. Despite his selection, Broadstreet never provided the cash redemption.

Alok Vardya

846) Alok Vardya is 63 years old. Following a 26-year career in the Information Technology industry, he began investing in real estate in 2011. Since then, he has managed a group of investors participating in syndicated commercial real estate investments. His investment portfolio currently includes more than 75 syndications.

847) Over the past 15 years, Mr. Vardya has developed considerable experience evaluating and investing with various real estate sponsors and operators. Broadstreet is one of several firms with which he has established an investment relationship.

848) Mr. Vardya was introduced to Broadstreet in the summer of 2022 through a personal friend. As part of his initial due diligence, he visited Broadstreet's headquarters in Greenville, where he met with several company executives.

849) During this visit, Broadstreet representatives provided presentations about the firm and arranged tours of several of its ongoing projects. The visit was primarily a sales and marketing presentation intended to familiarize prospective investors with the company and its investment opportunities.

850) Mr. Vardya began investing with Broadstreet in the fall of 2022. His primary sales contact at Broadstreet was Vikas Patel.

851) At the time of his investments, Mr. Vardya understood, based on representations made by Broadstreet, that each fund carried a one-year lockup period, after which investors would have the ability to request redemption of their investments.

852) In November 2025, Broadstreet issued a redemption notice offering investors certain options. Mr. Vardya specifically elected to receive a cash redemption. However, he was subsequently informed that a cash redemption would not be provided. This was inconsistent with his understanding of the investment terms and the redemption options presented to investors.

853) Beginning in 2022, Mr. Vardya repeatedly asked Broadstreet whether it had engaged an independent third-party accounting firm to conduct annual audits of its financial statements. Over the following years, Broadstreet representatives consistently indicated that the company was in the process of retaining an independent auditor. Despite these repeated assurances, to his knowledge, no independent annual financial audits were ever completed or provided to investors. Given his experience with other commercial real estate sponsors, Mr. Vardya found the prolonged absence of independently audited financial statements concerning, particularly as the firm continued to solicit and accept investor capital.

854) Another aspect of Broadstreet's business practices that struck Mr. Vardya as unusual was its willingness to pay expenses associated with prospective investors' visits to its headquarters and properties. Broadstreet organized and funded onsite visits as part of its investor marketing efforts. Based on his experience with other real estate sponsors, he considered this an unusual practice. He questioned how much the company was spending on these activities, whether those expenses were being paid by Broadstreet or indirectly by its investment funds, and what impact such expenditures might have on investor returns. Mr. Vardya does not have direct knowledge of

the amounts spent or how these expenses were allocated, but the practice raised questions for him about the company's financial management and use of investor capital.

<u>Ajay Ajmera, Aarthi Ajmera and Savithri Dudkikar</u>

855) Ajay B. Ajmera, age 54, and Aarthi K. Ajmera, age 56, invested in Broadstreet under the name “Ajay B and Aarthi K Ajmera Trust.” They were introduced to Broadstreet by a close friend who was also an investor in the company. They subsequently invested through Vikas Patel, a Broadstreet representative based in Michigan. In October 2023, Mr. Ajmera was invited to Greenville, South Carolina, to learn more about Broadstreet’s infrastructure and self-storage investment opportunities. Based on the representations made regarding the investments and the anticipated consistent cash flow, the Ajmeras ultimately invested in several of Broadstreet’s investment offerings. More than half of their total investment was allocated to cryptocurrency-related investments. They were not given the option to liquidate those cryptocurrency investments. When presented with the available redemption options, the Ajmeras elected to receive cash under Option A rather than accept SOUL stock.

856) At the end of 2024, both Mr. and Mrs. Ajmera lost their corporate jobs, leaving them without their regular employment income. They had relied on the monthly income generated by their Broadstreet investments to cover their everyday living expenses. As Broadstreet’s passive income payments were gradually withdrawn, their financial circumstances became increasingly difficult. At the beginning of 2025, they were forced to sell their home in Michigan to make ends meet. The loss of their employment income, combined with the reduction and eventual interruption of the expected investment income, placed significant financial pressure on the family.

857) Aarthi Ajmera’s mother, Savithri Dudkikar, invested with Broadstreet under the account designation “Savithri Dudkikar TOD Aarthi, Bhavana and Meena.” Ms. Dudkikar

invested after her daughter and son-in-law recommended the investment to her, emphasizing the consistent monthly cash flow it was expected to provide. The investment represented approximately one-quarter of Ms. Dudkikar's total assets, making it a substantial portion of her financial resources. She relied on the anticipated monthly income to help meet her everyday living expenses.

858) In February 2025, Ms. Dudkikar became a widow, making financial stability and access to her investment funds especially important during an already difficult period in her life. Like the Ajmeras, she elected to receive cash under Option A rather than accept SOUL stock.

859) The circumstances of the Ajmera family and Ms. Dudkikar demonstrate the significant financial consequences of Broadstreet's failure to provide the expected investment income and access to their funds. The Ajmeras invested in the BSG Fund in reliance on the anticipated passive income to support their household, while Ms. Dudkikar committed approximately one-quarter of her total assets, based on the expectation of consistent monthly payments. Both the Ajmeras and Ms. Dudkikar chose the cash redemption option rather than accept SOUL stock, reflecting their preference to recover their invested funds in cash rather than receive stock in place of the anticipated liquidity.

## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY JUDGMENT
### The Cash Redemption Plaintiffs v. BSG Management

860) The proponents of this cause of action repeat and reallege paragraphs 1-221 and 248-859.

861) In a May 22, 2026 letter to the BSG Fund investors, BSG Management informed all BSG Fund investors, including The Cash Redemption Plaintiffs, that it would not be honoring the cash redemption payments that it had agreed to pay in the November 2025 Redemption Notice and instead will be providing those investors with an "in-kind" stock redemption consistent with Redemption Choice – B.

862) BSG Management issued this letter approximately five (5) days before the cash redemption payment was due.

863) Thereafter, The Cash Redemption Plaintiffs sent BSG Management Demand Letters objecting to receiving an "in-kind" redemption and demanding that BSG Management honor its agreement to pay the cash redemption (Redemption Choice – A) that they selected in the November 2025 Redemption Notice.

864) There is an existing and actual legal controversy that can be effectively resolved by a declaratory judgment regarding whether BSG Management may choose to redeem BSG Fund investors "in-kind" or is obligated to pay cash to its investors who opted for a cash redemption.

865) The Cash Redemption Plaintiffs seek and are entitled to a declaration judgment regarding (i) whether BSG Management is required to honor the cash redemption that BSG Management agreed to provide to any of its investors who opted for a cash redemption in the November 14, 2025 Redemption Notice; (ii) whether BSG Management has the right to force an

"in-kind" redemption on BSG Fund investors who selected Redemption Choice – A to be redeemed in cash in the November 14, 2025 Redemption Notice; and (iii) whether the restricted SOUL shares qualify as an "in-kind" redemption.

**COUNT II**
**BREACH OF CONTRACT**
**(The Redemption Notice)**
**The Cash Redemption Plaintiffs v. Defendants**

866) The proponents of this cause of action repeat and reallege paragraphs 1-263 and 298-859.

867) On November 14, 2025, Defendants sent Plaintiffs the Broadstreet Global Fund Redemption Notice (the "Redemption Notice") attached hereto as **Exhibit A**. The Redemption Notice states in pertinent parts:

**PLEASE READ THIS NOTICE CAREFULLY**

**CONSULT YOUR ATTORNEY, INVESTMENT ADVISOR, OR OTHER PROFESSIONAL IF NECESSARY.**

**YOUR RIGHTS AS AN INVESTOR WILL BE SUBSTANTIALLY AFFECTED—WHETHER YOU MAKE AN ELECTION OR NOT.**

**AT THE CONCLUSION OF THE REDEMPTION DISCUSSED HEREIN, YOU WILL NO LONGER BE AN INVESTOR IN THE BROADSTREET GLOBAL FUND, LLC AND YOU WILL NO LONGER RECEIVE ANY RETURNS, DISTRIBUTIONS, OR OTHER FUNDS FROM THE BROADSTREET GLOBAL FUND, LLC.**

**As an Investor in the Broadstreet Global Fund, LLC ("BSG Fund"), you are hereby advised of our full redemption of the entirety of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), that each investor executed to become an investor with BSG Fund. This redemption is binding upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in or attached to this notice.**

**REDEMPTION OVERVIEW**

For your redemption, you will be given two choices, and you must make a selection. Under one option (Redemption Choice – A), the investor would receive, **in cash**, an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

**After this redemption, whether you choose choice A or B, you will no longer be an investor in BSG Fund, you will no longer receive preferred returns or other payments from BSG Fund, and there will be no additional amounts or returns paid to you by BSG Fund.**

**REDEMPTION PROCESS**

This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as Item 2 and also available in the BSG Fund data room under the tab Operating Agreement.

**REDEMPTION CHOICE – A**

For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSG Fund.

Kindly check the box below to reflect which choice you select.

( ) Redemption Choice – A – payment in cash in an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

(Emphasis added).

868) The majority of the Plaintiffs selected Redemption Choice – A and Docusigned the Redemption Notice (the "Cash Redemption Plaintiffs").

869) The Redemption Notice states that it is being made pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"). A copy of the Operating Agreement is attached to the Redemption Notice as Item 2. Section 11.04 of the Operating Agreement governs amendments, and provides:

Section 11.04 Amendments to Company Agreement. This Agreement (including any Series Schedule) may be amended in any manner the Manager deems desirable.

> The Manager shall promptly give **notice** to Members of any amendment made to this Agreement. **No such amendment shall, except as provided below, become effective as to any Member without the consent of such Member** or the consent of a Majority-in-Interest of the Members of the Company or the applicable Series, as applicable. Notwithstanding the foregoing, any amendment made by the Manager may be immediately effective if the amendment is made (i) to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein, to comply with any applicable requirements of law, or to make any other provision with respect to matters or questions arising under this Agreement that will not be materially inconsistent with the provisions of this Agreement; (ii) to delete or add any provision of this Agreement required to be so deleted or added by any Federal agency or by a state "Securities" or "Corporation" commission, department or administrator, or similar such body, agency or official, which addition or deletion is deemed by such body, agency or official to be for the benefit or protection of the Members; (iii) to admit additional Members; or (iv) to make any change that does not adversely affect the Members in any material respect.

(Emphasis added).

870) Pursuant to Section 11.04 the Redemption Notice is an amendment to and supersedes the Operating Agreement. As required by Section 11.04, the Redemption Notice provides members of the BSG Fund "**notice**" that their "**rights as an investor will be substantially affected**" by the election they make (or do not make), and it requires the members to **consent** to the change. The Redemption Notice goes on to say that "[t]his redemption is **binding** upon you whether you make an election or not." The Redemption Notice further advises members of the BSG Fund to "**consult your attorney**" before signing this document. The Redemption Notice also informs the members of the BSG Fund that "**at the conclusion of the redemption discussed herein, you will no longer be an investor in the Broadstreet Global Fund, LLC and you will no longer receive any returns, distributions, or other funds from the Broadstreet Global Fund, LLC**," thus materially altering terms of the Operating Agreement and Series Schedule. The Redemption Notice also changes the timing for the redemption/withdrawal payment as stated in Section 6.02 of the Operating Agreement from 60 days to 180 days. The

Redemption Notice is the manner in which the Manager of the BSG Fund chose to amend the Operating Agreement and Series Schedule.

871) Accordingly, the Redemption Notice is an amendment to the Operating Agreement and supersedes any contradictory provisions contained in the Operating Agreement, including provisions that would have permit the Manager of the BSG Fund to determine in its sole discretion how a member would be redeemed.

872) The moment the Cash Redemption Plaintiffs signed the Redemption Notice **consenting to the change** it became a binding contract. As consideration in exchange for all the rights previously owed to the Cash Redemption Plaintiffs under the Operating Agreement and Series Schedules, the Cash Redemption Plaintiffs agreed to receive a cash redemption of their capital accounts held at the BSG Fund when they selected Redemption Choice – A. Thus, pursuant to the Redemption Notice, the Defendants were contractually obligated to provide the Cash Redemption Plaintiffs with a cash redemption in accordance with the terms of Redemption Choice – A within 180 days of the Redemption Notice being executed.

873) In a letter to the BSG Fund investors dated May 22, 2026, approximately five (5) days before the cash redemption payment was due, Defendants informed the Cash Redemption Plaintiffs that they would not be honoring the cash redemption payments that they had agreed to in the Redemption Notice and instead will be providing the Cash Redemption Plaintiffs with an "in-kind" stock redemption consistent with Redemption Choice – B.

874) Defendants' refusal to honor the Cash Redemption Plaintiffs' selection to receive a cash redemption is a material breach of the Redemption Agreement.

875) The restricted shares that Defendants purport to provide the Cash Redemption Plaintiffs as an "in-kind" redemption have no known value, accordingly the Cash Redemption

Plaintiffs have sustained significant damages from not receiving the cash redemption owed to them under the Redemption Notice.

876) Accordingly, Defendants are liable to the Cash Redemption Plaintiffs for breach of contract and owe the Cash Redemption Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, the Cash Redemption Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest (including missed distribution payments), costs and such other relief as the Court deems appropriate and just.

**COUNT III**
**BREACH OF CONTRACT**
**(The Operating Agreement and "In-Kind" Redemptions)**
**Plaintiffs v. Defendants**

877) The proponents of this cause of action repeat and reallege paragraphs 1-859.

878) This Count is also pleaded in the alternative to Count I.

879) The highly speculative, illiquid and restrictive ZSQR and SOUL stocks that Defendants want to force on Plaintiffs is not an "in-kind" redemption under the Operating Agreement.

880) Plaintiffs are a party to the Operating Agreement for the BSG Fund with Defendants. Section 6.03 of the Operating Agreement governs situations such as this where the Manager decides on its own to redeem a member's capital account, and provides:

> Section 6.03 Required Withdrawals. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior **written notice of a termination of all or any portion of such Member's Capital Account**. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice shall receive the **fair value** of its Capital Account in connection with its withdrawal.

(Emphasis added).

881) Since Defendants claim they are exercising their right to force an "in-kind" redemption on Plaintiffs, said "in-kind" redemption would have to be made pursuant to the Required Withdrawals provisions of Section 6.03, which requires that Plaintiffs must receive the **fair value** of their capital accounts. Because the speculative, illiquid and restricted shares of ZSQR and SOUL that Defendants seek to force on Plaintiffs as an "in-kind" redemption have no readily ascertainable market value, their forced imposition on Plaintiffs does not reflects the fair value of Plaintiffs' capital accounts and thus cannot serve as consideration for a Required Withdrawal.

882) Moreover, an "in-kind" redemption represents an investors **pro rata share of the entire investment**. In particular, Section 80a-2(a)(32) of the U.S Code defines a "redeemable security" as:

> "Redeemable security" means any security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, ***is entitled*** (whether absolutely or only out of surplus) ***to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof.***

15 U.S.C. § 80a-2(a)(32) (emphasis added).

883) Here, Broadstreet only uses **30%** of its infrastructure assets to pay for the SOUL shares that it is distributing to **all** its investors. Thus, Broadstreet investors are only receiving their pro rata share of 30% of the BSG Fund's infrastructure projects – not their pro rata share of the entire BSG fund. Since the BSG Fund investors' capital account represented their pro rata share of the entire fund, the BSG Fund investors are receiving shares that are worth significantly less than their capital accounts in the BSG Fund.

884) Defendants have breached the Operating Agreement by forcing Plaintiffs to accept restricted shares of ZSQR and SOUL as an "in-kind" redemption that is not equal to the fair value of his capital accounts and does not satisfy the legal requirements of an in-kind redemption.

885) Plaintiffs have been damaged as a result.

886) Accordingly, Defendants are liable to Plaintiffs for breach of contract and owe Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT IV**
**CONVERSION**
**Plaintiffs v. Defendants**

887) The proponents of this cause of action repeat and reallege paragraphs 1-859.

888) The Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over millions of dollars belonging to the Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

889) The Plaintiffs have a superior right of possession of the monies and assets held in these investments.

890) Plaintiffs have invested over **$42 million** in the BSG Fund ("**Converted Monies**").

891) Plaintiffs' investment provided them with an ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Alt Solutions/BSG ALTS structure

b. BSG15

c. BSGF-2

d. BSG PTT

e. Broadstreet Tennessee

f. Crypto/Altcoin Mining - 28% Annual Return

g. Crystal Lagoons - 10% Annual Return/ Profit

h. DR Horton/Infrastructure #5

i. Data#2 - 19% Annual Return

j. Daytona Beach AC Retreats

k. Fixed Income Fund - 7% Annual Return

l. IF8 Infrastructure - 14.63% Annual Return

m. IF9 Infrastructure - 16% Annual Return

n. Infrastructure Reinvest - 14.63% Annual Return

o. Land Banking

p. North Charleston Element

q. Ripple

r. Self-Storage - 10% Annual Return/ Profit

s. Triller

t. Virgin Hyperloop

u. Weatherstone

(“**Converted Assets**”).

892) Nonetheless, the Defendants continue to exercise unauthorized dominion over Plaintiffs’ investments to the exclusion and in defiance of the lawful rights of the Plaintiffs to such investments.

893) Defendants have actively blocked Plaintiffs from receiving distributions owed to them from their investments in the BSG Fund.

894) Defendants have or are actively trying to transfer the Converted Assets and Converted Monies to themselves and/or third parties to permanently deprive Plaintiffs access to their investments.

895) The Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Defendants are forcing on Plaintiffs as an alleged "in-kind" redemption, to steal the assets acquired with Plaintiffs' monies.

896) Plaintiffs requested the return of the Converted Monies from Defendants in the civil theft demand letter attached as **Composite Exhibit C** and they have refused to return it.

897) As a result of these illegal distributions, millions of dollars have been stolen from the Plaintiffs.

898) The Defendants wrongfully assert dominion over the Converted Assets and Converted Monies in a manner that is inconsistent with the Plaintiffs' rights to own and possess the Converted Assets and Converted Monies.

899) Defendants' wrongful assertion of dominion over the Converted Assets and Converted Monies deprives the Plaintiffs of their right to own and possess the Converted Assets and Converted Monies.

900) The Plaintiffs have been damaged as a proximate and direct result of Defendants' conversion of Plaintiffs contributions to the BSG Fund. The Plaintiffs have been deprived of the reasonable rates of return that he otherwise would have earned.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the Defendants granting all damages and other available relief under applicable law.

**COUNT V**
**CIVIL THEFT**
**Plaintiffs v. Defendants**

901) The proponents of this cause of action repeat and reallege paragraphs 1-859.

902) The Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over millions of dollars belonging to the Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

903) The Plaintiffs have a superior right of possession of the monies and assets held in these investments.

904) Plaintiffs have invested over **$42 million** in the BSG Fund ("**Stolen Monies**").

905) Plaintiffs' investment provided it with an ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Alt Solutions/BSG ALTS structure

b. BSG15

c. BSGF-2

d. BSG PTT

e. Broadstreet Tennessee

f. Crypto/Altcoin Mining - 28% Annual Return

g. Crystal Lagoons - 10% Annual Return/ Profit

h. DR Horton/Infrastructure #5

i. Data#2 - 19% Annual Return

j. Daytona Beach AC Retreats

k. Fixed Income Fund - 7% Annual Return

l. IF8 Infrastructure - 14.63% Annual Return

m. IF9 Infrastructure - 16% Annual Return

n. Infrastructure Reinvest - 14.63% Annual Return

o. Land Banking

p. North Charleston Element

q. Ripple

r. Self-Storage - 10% Annual Return/ Profit

s. Triller

t. Virgin Hyperloop

u. Weatherstone

(“**Stolen Assets**”).

906) The Defendants knowingly obtained or used, or endeavored to obtain or use, the Stolen Monies and Stolen Assets.

907) The Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Defendants are forcing on Plaintiffs as an alleged “in-kind” redemption, to steal the assets acquired with Plaintiffs’ monies.

908) The Defendants’ actions were intended to permanently deprive the Plaintiffs of their rights to, and the benefits from, the Stolen Assets and Stolen Monies.

909) The Defendants’ actions were intended to appropriate the Stolen Assets and Stolen Monies for the Defendants’ own use.

910) Pursuant to Florida Statute § 772.11, the majority of the Plaintiffs sent Defendants a letter demanding the return of their portion of the Stolen Monies to no avail. See **Composite Exhibit C**.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against Defendants granting all damages including, but not limited to, compensatory damages, and where applicable treble damages, interest, attorneys' fees and court costs pursuant to Florida Statute § 772.11 and any other available relief under applicable law.

**COUNT VI**
**BREACH OF CONTRACT**
**(Altcoin Mining Participant Vote)**
**The Altcoin Plaintiffs v. Defendants**

911) The proponents of this cause of action repeat and reallege paragraphs 1-305 and 397-823.

912) This Count is pleaded in the alternative to Count VI.

913) Sometime around March 22, 2025, Broadstreet presented Plaintiffs who were invested in the Altcoin Mining /Crypto Series (the "Altcoin Plaintiffs") with a document entitled Altcoin Mining Participant Vote (**Exhibit F**). This document didn't give Altcoin Plaintiffs an option to vote yes or no. It only had a place for the Altcoin Plaintiffs to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

914) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and***

> ***investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

915) Pursuant to Section 11.04 of the Operating Agreement, the Altcoin Mining Participant Vote is an amendment to and supersedes the Operating Agreement. As required by Section 11.04, the Altcoin Mining Participant Vote provides members of the BSG Fund, including Plaintiffs, "**notice**" about a change to their rights under the Operating Agreement and Altcoin Series Schedule, and it requires the members to **consent** to the change. The Altcoin Mining Participant Vote is the manner in which the Manager of the BSG Fund chose to amend the Operating Agreement for the Altcoin Series. Accordingly, the Altcoin Mining Participant Vote is an amendment to the Operating Agreement and thus a binding contract between Plaintiffs and Defendants.

916) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment (depending on when the investor invested in the Altcoin Series).

917) Of the Broadstreet investors, Akhil Morada, a Partner at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

918) Also, upon information and belief, Broadstreet and its affiliates have paid themselves at least 30% of the money that was supposed to be allocated for the Altcoin Series.

919) Meanwhile, Plaintiffs who invested in the Altcoin Series, have not been repaid their full investment plus 50% or 100% of their investment (depending on when their investment was made).

920) The restricted Z Squared shares that Defendants purport to provide the Altcoin Plaintiffs as an “in-kind” redemption have no known value.

921) These payments to Akhil Morada, Broadstreet and its affiliates were made in breach of the Altcoin Mining Participation Vote that Broadstreet had the Altcoin Plaintiffs sign, and thus the Altcoin Plaintiffs have sustained significant damages from the dilution of any potential value of the Z Squared shares they received as an “in-kind” redemption.

922) Accordingly, Defendants are liable to the Altcoin Plaintiffs for breach of contract and owe the Altcoin Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, the Altcoin Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

## COUNT VII
## FRAUD IN THE INDUCEMENT
## (Altcoin Mining Participant Vote)
## The Altcoin Plaintiffs v. Defendants

923) The proponents of this cause of action repeat and reallege paragraphs 1-305 and 397-823.

924) The Defendants fraudulently induced the Altcoin Plaintiffs to convert their ownership interest in the Altcoin Series into shares of Z Squared, Inc.

925) Sometime around March 22, 2025, Broadstreet presented the Altcoin Plaintiffs with a document entitled Altcoin Mining Participant Vote (**Exhibit G**) for them to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

926) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.

> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

927) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

928) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including the Altcoin Plaintiffs, to agree to the sale to the public company.

929) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

930) Broadstreet was fully aware of what funds it had allocated to the Altcoin Series and how much the acquired assets were generating. Therefore, Broadstreet knew that they had no basis for representing to the Altcoin investors that they would receive their investment back plus an additional 100% or 50% of their investment in the March 22, 2025 Altcoin Mining Participant Vote. Broadstreet made these fraudulent statements to induce the Altcoin Plaintiffs and other investors in the Altcoin Series to agree to the Altcoin Mining Participant Vote.

931) In addition, the Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that the Altcoin Plaintiffs did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series.

932) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of the original investment decision and were not fully disclosed before the Altcoin Plaintiffs' consent was solicited in the Altcoin Mining Participant Vote.

933) Had this missing information been disclosed, the Altcoin Plaintiffs would not have signed the Altcoin Mining Participant Vote.

934) Broadstreet continued to make fraudulent statements to the Altcoin Plaintiffs and the other Altcoin Series investors even after the Altcoin Mining Participant Vote.

935) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including the Altcoin Plaintiffs, into Z Squared restricted stock. Indeed, as of June 1, 2026, the Altcoin Plaintiffs' monthly investor reports reflect that their Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

936) Of the Broadstreet investors, Akhil Morada, a senior managing director at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

937) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

938) However, this was a false statement because on July 27, 2026, Z Squared Inc. (stock ticker "ZSQR") closed at $4.81 per share, which means the 41,521,276 that Broadstreet and its investors received as part of the Altcoin Series conversion would only be worth around $200 million, if they could be trades.

939) But the Z Squared shares aren't even worth that much. Due to the restrictions on the Z Squared shares that the Altcoin investors are supposed to receive, the investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027. These restrictions materially impair liquidity and affect the value of the shares received.

940) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors (i) to get them to agree to receiving the stock, and (ii) to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions

paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

941) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

942) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. However, only 9,800 of the 16,000 altcoin machines were transferred from Broadstreet to Z Squared, Inc., and these machines are depreciating assets that become obsolete as new technology emerges.

943) SEC filings by Coeptis in June 2025 said that accounting firm CohnReznick's partners Anthony Doughty and Jake Wright appraised the mining systems in March 2025 at a value of $660 million, or $67,378 per unit. The filings said the valuation had assumed the machines were all Antminer L9 systems when, in fact, 84% of the fleet were L7s—an older, less-powerful system that isn't suited for AI modeling.

944) The $660 million CohnReznick valuation led to Broadstreet investors getting 85% of the merged company's shares when the deal went effective in April2026. A pro forma balance sheet in the merger proxy filing showed that the Broadstreet business had carried the mining systems at only $35.3 million.

945) Z Squared's June-quarter financial statements filed on August 13, 2026, recorded the mining fleet at a transferred historical carrying amount of approximately $12.4 million, or $1,296 per unit, and a June 30, 2026 net book value of approximately $11.3 million after depreciation.

946) This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation. Broadstreet materially overstated

the $600 million value of the Altcoin Series/Z Squared shares, including by relying on valuation assumptions inconsistent with the actual mining fleet.

947) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the investors receive their entire remuneration, and in that document and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce the Altcoin Plaintiffs and the other Altcoin investors to agree to accepting the Z Squared shares.

948) The Altcoin Plaintiffs relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

949) These misrepresentations warrant rescission of this transaction and the Altcoin Plaintiffs should be put back in the same position that they were in before these misrepresentations were made.

950) Accordingly, Defendants are liable to the Altcoin Plaintiffs for fraud, and Plaintiffs should have their Altcoin Series investment restored, or receive the monetary value thereof as damages including all distributions payments he was entitled to receive since March 2025.

**WHEREFORE**, the Altcoin Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest (including missed distribution payments), costs and such other relief as the Court deems appropriate and just.

**COUNT VIII**
**FRAUD**
**Plaintiffs v. Defendants**

951) The proponents of this cause of action repeat and reallege paragraphs 1-859.

952) Defendants have perpetrated numerous frauds on Plaintiffs that are continuous and ongoing.

953) Broadstreet provided Plaintiffs with monthly investor reports that made it appear that the distributions they received came from the investment that Plaintiffs selected when that was not the case.

954) These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money the Plaintiffs allocated to a particular investment Series made it to that investment, when in fact 30% of the funds Plaintiffs provided for their selected investment was immediately stripped out as fees.

955) While Broadstreet disclosed that it **could** pay itself as much as 30% of the money raised as fees, Broadstreet never disclosed to Plaintiffs that it **did** take 30% of the money received from Plaintiffs as fees. Instead, Broadstreet provided Plaintiffs with monthly investor reports that did not reflect any fees being paid.

956) Broadstreet also never provided Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

957) Through the monthly investor report Broadstreet falsely portrayed distributions to Plaintiffs as profits when in fact Broadstreet was actual funding these distributions through either a return of the Plaintiffs' own capital or using funds from new investors to pay later investors.

958) Broadstreet provided Plaintiffs with misleading monthly investor reports to fraudulently induce Plaintiffs to keep their funds invested in the BSG Fund. Had these investor reports not been misleading, Plaintiffs would have immediately requested to withdraw their funds.

959) Defendant David Feingold did not disclose to Plaintiffs that he was receiving additional compensation out of the money raised from investors for the BSG Fund, above and beyond the 30% Broadstreet was collecting as fees, from side deals he had with some of the companies the BSG Fund was investing in, including, but not limited to Samson Horus, Contender Development and Durham Homes.

960) Broadstreet represented in its Quarterly Reports that it owned assets that it did not actually own, including but not limited to, a Raleigh, NC-TownPlace Suites as one of its hotel projects.

961) In the July 15, 2023 email Broadstreet sent to the BSG Fund investors regarding the Compliance Acknowledgement Update, Broadstreet encouraged the Plaintiffs who received this email to sign it without reading it by claiming these Plaintiffs had already seen or certified the information that they would be acknowledging, which was not true.

962) In the November 2025 Redemption Notice in the answer to question 3, of Item 1, Broadstreet misrepresents that investors who select Option B to receive stock will not receive cash, since Broadstreet has entered into side letter agreements where it has agreed to return some of an investor's cash or transfer a portion of their investment to Innovative (a company in the Broadstreet family) where they can continue to receive cash distribution if they select Option B.

963) Broadstreet fraudulently represented to the BSG Fund investors, including Plaintiffs, in investor update letters that only 6% of the BSG Fund investors selected cash, when

in fact at least 18% elected a cash redemption and significantly more if you include the investors that Broadstreet entered into side deals for cash if they select Option B.

964) Broadstreet fraudulently represented to the BSG Fund investors, including Plaintiffs, that the "in-kind" stock redemption is worth three times each investor's capital account without any basis supporting that representation. Broadstreet made this misrepresentation numerous times to the BSG Fund investors, including in the November 2025 Redemption Notice and investor update letters.

965) Defendants are fraudulently misrepresenting the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors, including Plaintiffs, to accept as an "in-kind' redemption.

966) On July27, 2026, in an investor update letter, Broadstreet fraudulently represented to Plaintiffs that these two exit transactions: (a) the sale of the technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion with absolutely nothing that supports those valuation.

967) Defendants made these fraudulent misrepresentations regarding the value of these two transactions in order to (i) get the BSG Fund investors to agree to accepting theses shares as a "in-kind" stock redemption, (ii) hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the distributions paid to the BSG Fund investors was their own money being paid back to them in Ponzi-like fashion, and (iii) keep for themselves the BSG Fund's remaining assets (not involved in these two transactions) that were acquired with over $500 million of investor assets for themselves.

968) Defendants repeatedly told Plaintiffs that they could withdraw their investments anytime. However, Plaintiffs are learning those representations were a lie since Broadstreet is now attempting to force Plaintiffs into an investment that would have their funds locked up for the next 3 ½ years.

969) Plaintiffs relied on these misrepresentations when making their investment decisions to their detriment and have been damaged as a result.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT IX**
**BREACH OF FIDUCIARY DUTY**
**Plaintiffs v. Defendants**

970) The proponents of this cause of action repeat and reallege paragraphs 1-859.

971) As manager or as the de facto manager of the BSG Fund, Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra owe members of the BSG Fund, including Plaintiffs, the basic fiduciary duties of care and loyalty, which includes good faith, oversight and disclosure.

972) Moreover, Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra took discretion when making investment decisions for the BSG Fund and in determining how the funds raised for the BSG Fund would be deployed. Often disregarding the investment Series selected by the BSG Fund investor for their investment in the fund. Thus, they acted as investment advisors to the BSG Fund and its members with the highest fiduciary duty to

act in the BSG Fund and its members' best interest, which includes a duty to avoid conflicts of interest.

973) In the investment advisory and broker/customer relationship with Plaintiffs, Defendants were under a fiduciary duty to:

a. recommend investments only after studying them sufficiently to become informed as to their nature, price and financial prognosis;

b. refrain from self-dealing;

c. inform the customer of the risks involved in purchasing and selling a security;

d. perform orders promptly and in a manner to serve the customer's best interest;

e. transact business only after receiving approval from the customer; and

f. not to misrepresent any material fact to a transaction.

974) Defendants owed these fiduciary duties to Plaintiffs, and breached their fiduciary duties as set out above.

975) At all times herein, Defendants acted in the capacity of agent and fiduciary custodian for Plaintiffs. This fiduciary relationship arose out of Defendants holding themselves and their agents out as investment advisors and accepting compensation for their services, the Defendants' superior knowledge and experience regarding securities and investments, and the representations made by Defendants to Plaintiffs in regard to the investments.

976) Acting in these capacities, Defendants owed Plaintiffs the fiduciary duties of good faith, fair dealing, trust, and integrity in their dealings with Defendants and in their maintenance of the investments, supervision of the investments, and recommendations regarding the investments. Defendants also owed the Plaintiffs the duty not to self-deal and to supervise and prevent self-dealing by their agent. Said duties were breached by Defendants and their agent by their action and inaction set out herein.

977) For instance, Defendants recommended, and arguably forced, the ZSQR and the SOUL shares to Plaintiffs even though these investments were unsuitable for Plaintiffs' investment objectives and risk tolerance.

978) Defendants pushed these investments on the BSG Fund investors, including Plaintiffs, so that Defendants could keep for themselves assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

979) In doing so, Defendants breached the fiduciary duty to act in the BSG Fund and its members' best interest, to refrain from self-dealing, to avoid conflicts of interest and to be loyal.

980) Defendants also misrepresented the value of ZSQR and SOUL shares the BSG Fund investors would be receiving in violation of their duty to not to misrepresent any material fact to a transaction and to inform the customer of the risks involved in purchasing and selling a security.

981) As a direct and proximate result of Defendants' aforesaid conduct and breaches of fiduciary duties, Plaintiffs incurred damages of at least **$42 million**.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT X**
**DISGORGEMENT**
**Plaintiffs v. Defendants**

982) The proponents of this cause of action repeat and reallege paragraphs 1-859.

983) Every time Plaintiffs invested in a BSG Fund investment Series, Broadstreet immediately collected 30% of the funds as fees for services it promised to provide over the next five years.

984) Broadstreet did this pursuant to the Compliance Acknowledgement Updates that it had Plaintiffs sign which states:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to **fees of up to six percent per year for five years and all fees can be taken up front** or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

(Emphasis added).

985) Notably, Broadstreet did not simply say that it is entitled to a 30% upfront fee. Instead, Broadstreet said that it could pay itself "fees of up to six percent per year for five years and all fees can be taken up front." By phrasing it this way, if Broadstreet collects five years of fees up front, then Broadstreet is obligated to provide five years of services.

986) Despite collecting five years of fees upfront, Broadstreet is now forcing Plaintiffs out of the BSG Fund without providing them with five years of service.

987) Accordingly, to the extent that Broadstreet overpaid itself for services never rendered, Broadstreet must return any excess fees it collected back to Plaintiffs.

**WHEREFORE** Plaintiffs demand judgment in their favor and against the Defendants for disgorgement of any excess fees Defendants collected from Plaintiffs, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT XI**
**ACCOUNTING**
**Plaintiffs v. BSG Management and the Baldassarras Brothers**

988) The proponents of this cause of action repeat and reallege paragraphs 1-859.

989) Plaintiffs have entrusted millions of dollars to the BSG Fund, which has imposed upon BSG Management, Joseph Baldassarra and Steven Baldassarra the burden and duty of accounting for such funds.

990) As manager of the BSG Fund and fiduciary to the Plaintiffs, BSG Management and the Baldassarras must produce an accounting.

991) Article IX Section 9.06 of the Operating Agreement entitled "Books and Records" explicitly states that:

> (a) The Manager, together with the Administrator (if any), shall keep books and records pertaining to the Company's and each Series' affairs showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series. Such books and records of the Company and its Series shall be kept at the Company's office (or at an Administrator's office as directed by the Manager from time to time).
>
> (b) Except as otherwise expressly provided in this Agreement, **each Member shall have the right to obtain any information contained in the books and records of the Company or its Series upon reasonable advance notice, including any information relating to the Company's or its Series' investment activity**.

(Emphasis added.)

992) Plaintiffs have a contractual right to obtain an accounting of the finances relating to each Series they are or were invested in. Accordingly, the Court should order BSG Management and the Baldassarras to provide Plaintiffs with an accounting.

**WHEREFORE** Plaintiffs demand judgment in their favor and against Defendants BSG Management and the Baldassarras for an accounting providing the books and records pertaining to each Series that Plaintiffs were invested showing all of its assets and liabilities, receipts and

disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series, and such other relief as the Court deems appropriate and just.

**COUNT XII**
**<u>CONTROL PERSON LIABILITY</u>**
**Plaintiffs v. Feingold and the Baldassarras Brothers**

993) The proponents of this cause of action repeat and reallege paragraphs 1-859.

994) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra acted as a controlling person as alleged herein.

995) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra had the power to control and did control the BSG Fund. Through their control they made decisions to (i) force SOUL and ZSQR shares on Plaintiffs even though these investments were unsuitable for Plaintiffs' investment objectives and risk tolerance, and (ii) misrepresent the value of ZSQR and SOUL shares to Plaintiffs.

996) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra pushed these investments on the BSG Fund investors, including Plaintiffs, so that they could keep for themselves assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

997) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra knew, or were reckless in not knowing, the fraudulent communications Broadstreet agents were making to investors in the BSG Fund, including Plaintiffs, to solicit them to invest in the BSG Fund and remain invested in the BSG Fund.

998) As control persons of the BSG Fund, Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are responsible for the actions of Broadstreet's employees.

999) As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs have incurred damages in excess of **$42 million**.

**WHEREFORE**, Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are individually and personally liable to Plaintiffs as control persons of the BSG Fund for compensatory damages, plus punitive damages, prejudgment interest and costs.

**COUNT XIII**
**CONSTRUCTIVE TRUST, EQUTABLE LIEN,**
**AND/OR SEGREGATION OF SALE PROCEEDS**
**Plaintiffs v. Defendants**

1000) The proponents of this cause of action repeat and reallege paragraphs 1-859.

1001) Plaintiffs are the proper legal and equitable owner of specific, traceable property, namely their investments in the BSG Fund.

1002) Broadstreet intends to sell Plaintiffs' investments in the BSG Fund and make distributions to its partners who have certain levels of ownership in the business.

1003) Broadstreet has not provided Plaintiffs with adequate consideration for their ownership interest in their investments in the BSG Fund.

1004) This Court may impose an equitable or constructive trust over specific assets as a provisional or preliminary equitable measure to preserve identifiable property pending final determination of ownership.

1005) To whatever extent the Court permits the sale of assets held in Plaintiffs' investments in the BSG Fund, which it should not, Plaintiffs should be entitled to a constructive trust over all proceeds until entitlement to the same can be resolved.

**WHEREFORE**, the Plaintiffs demand that, if the Court permits the sale of assets pertaining to their investments in the BSG Fund to proceed, the Court exercise its authority to impose a preliminary constructive trust over any and all sale proceeds from these assets until such

time as proper ownership, control, and other rights to those proceeds can be adjudicated.

**COUNT XIV**
**SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78J AND**
**RULE 10B-5, 17 C.F.R. § 240.10B-5**
**Plaintiffs v. Defendants**

1006) The proponents of this cause of action repeat and reallege paragraphs 1-859.

1007) Feingold and the Baldassarras Brothers, by the use of means and instrumentalities of interstate commerce (i.e., mails and wire transfers), were primary participants in the following wrongful conduct and they each:

a. Employed devices, schemes, and artifices that were intended to and did defraud Plaintiffs;

b. Made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading;

c. Engaged in acts, practices and a course of business which operated as a fraud and deceit upon purchasers of membership interest in the BSG Fund, in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j and 78t) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

1008) On March 22, 2025, in the Altcoin Mining Participant Vote, Defendants misrepresented that Broadstreet would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

1009) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including Plaintiff, to agree to the sale to the public company.

1010) Also, Defendants misrepresented that all the Altcoin investors, including the Altcoin Plaintiffs, would receive their investment back plus an additional 100% or 50% of their investment back. Defendants were fully aware of what funds it had allocated to the Altcoin Series and how much the acquired assets were generating. Therefore, Broadstreet knew that they had no basis for representing to the Altcoin Plaintiffs that they would receive their investment back plus an additional 100% or 50% of their investment. Broadstreet made these fraudulent statements to induce the Altcoin Plaintiffs and other investors in the Altcoin Series to agree to the Altcoin Mining Participant Vote.

1011) In addition, the Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that the Alcoin Plaintiffs did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series.

1012) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of the original investment decision and were not fully disclosed before Altcoin Plaintiffs' consent was solicited in the Altcoin Mining Participant Vote.

1013) Had this missing information been disclosed, the Altcoin Plaintiff would not have signed the Altcoin Mining Participant Vote.

1014) Defendants used the Altcoin Mining Participant Vote to justify converting the Altcoin Plaintiffs ownership interest in the Altcoin Crypto Mining Series into shares of ZSQR.

1015) Feingold and the Baldassarras Brothers also fraudulently misrepresented the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors, including Plaintiffs, to accept as an "in-kind' redemption.

1016) On July27, 2026, in an investor update letter, Broadstreet fraudulently represented to Plaintiffs that these two exit transactions: (a) the sale of the technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion with absolutely nothing that supports those valuation.

1017) Defendants made these fraudulent misrepresentations regarding the value of these two transactions in order to (i) get the BSG Fund investors to agree to accepting theses shares as a "in-kind" stock redemption, (ii) hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the distributions paid to the BSG Fund investors was their own money being paid back to them in Ponzi-like fashion, and (iii) keep for themselves the BSG Fund's remaining assets (not involved in these two transactions) that were acquired with over $500 million of investor assets for themselves.

1018) Feingold and the Baldassarras Brothers **disseminated or approved** the materially false and misleading representations in the Altcoin Mining Participant Vote, the Redemption Notices, and in Investor Updates regarding, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the representations made, in light of the circumstances under which they were made, not misleading.

1019) Through their verbal and written representations to BSG Fund investors regarding the value of these two transactions directly or indirectly, by the use of a means or instrumentality of interstate commerce, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

1020) By the use of a means or instrumentality of interstate commerce, Defendants engaged in acts, practices, and a course of business that operated as fraud or deceit upon the BSG Fund investors.

1021) Plaintiffs have suffered injury in that, in reliance on the misrepresentations and/or omission of Defendants and their employees Plaintiffs acquired shares of ZSQR and SOUL.

1022) None of these material facts were apparent to Plaintiffs through common observations or ordinary diligence.

1023) Plaintiffs did not know that Defendants' statements regarding the valuation of the shares of stock they would receive were untrue and that the Defendants omitted material facts.

1024) Also, in the May 22, 2026 Investor Update, Defendants misrepresented to Plaintiffs that they could force Plaintiffs to accept shares of SOUL and an "in-kind" redemption.

1025) Plaintiffs would not have invested in ZSQR or SOUL had they been aware that Defendants had made such misrepresentations and/or omissions.

1026) Unaware of the falsity of Defendants' statements and representations concerning the true nature of and their plans for the investments, Plaintiffs, to their detriment, reasonably relied on those statements and communications described above in acquiring shares of ZSQR and SOUL.

1027) Feingold and the Baldassarras Brothers concealment of this material information served only to harm the Plaintiffs in ignorance of the financial risk to them as a result of such nondisclosures.

1028) As a proximate result of Defendants' wrongful conduct alleged herein, Plaintiffs suffered millions of dollars in damages in connection with their investments in ZSQR and SOUL.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory damages, interest, costs, attorneys' fees, and such other relief as the Court deems appropriate and just.

**COUNT XV**
**BREACH OF CONTRACT**
**(Zimiles Side Letter Agreements)**
**Plaintiffs Andrei Zimiles and Edlene Zimiles v. Defendants Broad Street Global Management, LLC, Steven Baldassarra and Joseph Baldassarra**

1029) The proponents of this cause of action repeat and reallege paragraphs 1-404 and 540-561.

1030) Plaintiffs Andrei Zimiles and Edlene Zimiles are husband and wife (collectively the "Zimiles").

1031) The Zimiles' April 13, 2024 Side Letter Agreements constitutes a legally binding and enforceable contract between the Zimiles and the BSG Fund. See **Exhibit L**.

1032) Defendant Steven Baldassarra signed the April 13, 2024 Side Letter Agreement on behalf of the BSG Fund as a managing member of Broad Street Global Management, LLC. The other managing member of Broad Street Global Management, LLC is Joseph Baldassarra.

1033) The BSG Fund breached its material obligations under the April 13, 2024 Side Letter Agreements as a result of, among other things, (i) failing to continue paying the Zimiles an annual return of 28% in equal quarterly payments to be made as a preferred return to be paid before

any management, performance, or expenses are paid for the quarter, (ii) failing to pay the Zimiles the amount owed pursuant to the April 13, 2024 Side Letter Agreements in the event that the business is sold, and (iii) failing to make distribution payments to the Zimiles from the returns achieved from the altcoin mining subseries.

1034) All of the Zimiles' material obligations under the April 13, 2024 Side Letter Agreements have been performed or waived.

1035) As a direct and proximate result of the BSG Fund's material breach of the April 13, 2024 Side Letter Agreements, the Zimiles have suffered damages in an amount to be determined at trial.

1036) Accordingly, Defendants Broad Street Global Management, LLC, Steven Baldassarra and Joseph Baldassarra are liable to the Zimiles for breach of contract and owe the Zimiles any and all damages stemming from said breach.

**WHEREFORE**, the Zimiles demand judgment in their favor and against Defendants Broad Street Global Management, LLC, Steven Baldassarra and Joseph Baldassarra for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs seek the following relief:

a. That the Court enters an order declaring that BSG Management is required to honor the cash redemption that it agreed to provide BSG Fund investors who opted for a cash redemption in the November 14, 2025 Redemption Notice;

b. That the Court enters an order declaring that BSG Management does not have the right to force an "in-kind" redemption on BSG Fund investors who selected

Redemption Choice – A to be redeemed in cash in the November 14, 2025 Redemption Notice;

c. That the Court enters an order declaring that the restricted SOUL shares do not qualify as an "in-kind" redemption;

d. That the Court enters an order finding in Plaintiffs' favor on Counts I through XV;

e. That the Court award Plaintiffs compensatory damages in an amount to be determined at trial but believed to be at least **$42 million**;

f. That the Court awards Plaintiffs punitive damages;

g. That the Court awards Plaintiffs treble damages pursuant to Florida Statute § 772.11;

h. That the Court awards Plaintiffs rescission and rescissionary damages;

i. That the Court enters an order against Defendants for disgorgement of fees paid by Plaintiffs;

j. That the Court enters an order for injunctive relief preventing Defendants from selling or transferring away assets of any investment Series that Plaintiffs have an ownership interest;

k. That the Court enters an order for Defendants to place any proceeds from the sale of any assets from a BSG Fund investment that Plaintiffs have an ownership interest into a constructive trust;

l. That the Court enters an order placing an equitable lien on behalf of Plaintiffs on any asset from a BSG Fund investment that Plaintiffs have an ownership interest in;

m. That the Court enters and order for Defendants to provide Plaintiffs with an

accounting;

n. That the Court enters an order dissolving the BSG Funds, removing the manager from the BSG Funds, and appointing a Receiver to oversee the liquidation of the BSG Funds;

o. That the Court awards Plaintiffs reasonable attorney's fees, costs and expenses pursuant to Florida Statute § 772.11;

p. That the Court awards Plaintiffs the costs, including experts' fees, and other expenses incurred in the pursuit of this action;

q. That the Court awards Plaintiffs pre- and post-judgment interest where appliable, including missing distribution payments owed to Plaintiffs pursuant to their selected investment Series in the BSG Fund;

r. For interest to run until the date that the award is fully paid and satisfied by Defendants;

s. That all costs of this action be taxed against Defendants; and

t. That the Court awards such other and further relief as this Court may deem just and proper.

Plaintiffs reserve the right to amend the Complaint.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Date: October 20, 2026

Respectfully Submitted,

**EPPERSON & GREENIDGE, P.A.**
20 South Olive Street, Suite 304
Media, Pennsylvania 19063
T. 877.445.9261
*/s/ Andrew M. Greenidge*
**ANDREW M. GREENIDGE, ESQ.**
Fla. Bar No. 0016581
andrew@eppersongreenidge.com
greenidgelaw@gmail.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I CERTIFY that on this 20th day of October 2026, the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Andrew M. Greenidge*
Andrew M. Greenidge, Esq.